# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re** <br><br> DAVID K. DRUMM, <br><br> **Debtor** | **Chapter 7** <br> **Case No. 10-21198-FJB** |
| **IRISH BANK RESOLUTION CORPORATION LIMITED (IN SPECIAL LIQUIDATION),** <br><br> **Plaintiff** <br> **v.** <br><br> DAVID K. DRUMM, <br><br> **Defendant** | **Adversary Proceeding** <br> **No. 11-1267** <br> **(Consolidated)** |
| **KATHLEEN P. DWYER, CHAPTER 7 TRUSTEE,** <br><br> **Plaintiff** <br> **v.** <br><br> DAVID K. DRUMM, <br><br> **Defendant** | **Adversary Proceeding** <br> **No. 11-1268** <br> **(Consolidated)** |

## MEMORANDUM OF DECISION

By their complaints in the above-captioned adversary proceedings, creditor Irish Bank

Resolution Corporation Limited (in Special Liquidation) ("IBRC") and chapter 7 trustee Kathleen P. Dwyer

(the "Trustee") (collectively "the Plaintiffs") object to the discharge of debtor David K. Drumm

("Drumm" or "the Debtor") on numerous bases.  For the most part, the Plaintiffs allege that Drumm,

under oath, knowingly and fraudulently failed to disclose and otherwise concealed prepetition transfers

to his wife of cash and real estate that would be subject to avoidance and recovery in bankruptcy.

Drumm admits many of the misrepresentations but denies that they were knowing or fraudulent.  After

a six-day consolidated trial of the two adversary proceedings, I now enter the following findings of fact

and conclusions of law.  Finding Drumm not remotely credible and his conduct both knowing and

fraudulent, I conclude that the Plaintiffs have established cause to deny him a discharge many times

over.  Drumm's statements to this Court were replete with knowingly false statements, failures to

disclose, efforts to misdirect, and outright lies.  Such conduct disqualifies a debtor from the privilege of a

discharge in our system of bankruptcy.

## PARTIES AND PROCEDURAL HISTORY

### a.       Complaints and Trial

Drumm filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on October

14, 2010 (the "Petition Date"), thereby commencing the present bankruptcy case.  Kathleen Dwyer was

appointed trustee in the case on October 15, 2010 and since then has served continuously in that

capacity.

IBRC was formerly known as Anglo Irish Bank and, under that name, was a commercial bank in

Ireland.  From 2005 through most of 2008, Drumm was its chief executive officer.  After a catastrophic

few months for the bank, Drumm resigned this position on December 19, 2008.  The bank was

nationalized in January 2009, renamed more than once, and entered into "special liquidation" under

Irish law.  It is now referred to as "Irish Bank Resolution Corporation Limited (in Special Liquidation)."

On the Petition Date, Drumm was indebted to IBRC in an amount exceeding $11 million on account of

loans made to him by the bank. [1]  IBRC is by far Drumm's largest creditor.  Drumm does not dispute

IBRC's standing to object to his discharge.

On August 31, 2011, the Trustee and IBRC filed the complaints commencing the present

adversary proceedings.  Each asserts various objections under 11 U.S.C. § 727(a)(4)(A) (false oaths),

---

[1] In the schedule of creditors holding secured claims that he filed in his bankruptcy case on October 29, 2010, Drumm scheduled this indebtedness—five separate debts to Anglo Irish Bank—and characterized it all as undisputed.

(a)(2)(A) (prepetition fraudulent transfers and concealment), and (a)(2)(B) (postpetition concealment of property of the estate) to granting Drumm a discharge.  IBRC's complaint also asserts an objection under § 727(a)(4)(B) (presentation or use of a false claim).  Drumm moved to dismiss the Trustee's complaint as untimely, and the court denied that motion.  The Court then consolidated the two adversary proceedings for discovery, pretrial proceedings, and trial.  IBRC has also filed a separate complaint to determine the dischargeability of its claim against Drumm; the adversary proceeding thereby commenced is being held in abeyance by agreement until resolution of the present matters.

The Plaintiffs' complaints in the present adversary proceedings are arranged into counts corresponding to the subsections of 11 U.S.C. § 727(a) under which their various objections to discharge are asserted, but under subsection (a)(4)(A), the complaints assert numerous false oaths, each of which, if proven, would constitute a basis for denial of discharge.  Though the complaints did not fail to plead each with sufficient particularity, the sheer number of discrete bases for denial of discharge that they collectively asserted cried out for organization.  Accordingly, at the final pretrial conference, the Court ordered the Plaintiffs to jointly file an itemized list of the acts of fraud, misrepresentations, concealments, transfers, and other predicate acts that provide their bases for relief under 11 U.S.C. § 727(a).  They filed this itemized list on May 19, 2014 (the "Itemized List").

The adversary proceedings were tried over six days.  Six witnesses testified: (1) Drumm; (2) Stewart Grossman ("Grossman"), an attorney and partner at the firm of Looney & Grossman, LLP ("L&G"), who represented and counseled Drumm in the bankruptcy case; (3) Heather Zelevinsky ("Zelevinsky"), an attorney and a former associate at L&G, who also worked with Drumm on his case; (4) Lorraine Drumm ("Mrs. Drumm"), Drumm's spouse; (5) Peter-Paul Covo ("Covo"), an attorney who represented the Drumms in connection with their purchase of a home in Wellesley, Massachusetts; and (6) the Trustee. The parties submitted stipulated facts, and numerous exhibits were admitted into

evidence.  The Plaintiffs further introduced into evidence designations of Drumm's prior deposition

testimony and Drumm's responses to Plaintiffs' Requests for Admission.

At the close of the trial, the Plaintiffs jointly moved to amend their complaints to incorporate

the evidence presented at trial and to incorporate each of the allegations set forth in Plaintiffs' Itemized

List.  The motion, being unopposed, was granted on June 3, 2014.

**b.**      **The Counts**

As articulated in their Itemized List, the Plaintiffs have proceeded on and now seek adjudication

of fifty-two discrete objections to discharge.  There are few disputes of law; most counts turn on

findings of fact.  The counts, and the factual issues each presents, are as follows:[2]

**i.**      **False Oaths Under § 727(a)(4)(A)**

**Counts 1-9:**  The Plaintiffs allege that Drumm knowingly and fraudulently omitted from his

original Statement of Financial Affairs ("Original SOFA"), item 10a ("item 10a" or "SOFA-10"[3]), nine

discrete transfers of cash from himself to his wife.  Drumm admits the false representations under oath

but denies that they were knowing or fraudulent and blames his attorneys for these errors.

| Count | Date of Transfer | Originating Account | Receiving Account | Amount |
|-------|------------------|---------------------|-------------------|--------|
| 1 | November 3, 2008 | Joint account at Allied Irish Bank ("Allied"), account ending in 010 | Mrs. Drumm's Allied Fixed Term account ending in 080 | €80,000 |
| 2 | November 3, 2008 | Debtor's Anglo account ending in 668 | Mrs. Drumm's Anglo account ending in 39/01 | €50,000 |
| 3 | December 12, 2008 | Joint Allied account, ending in 010 | Mrs. Drumm's Allied Fixed Term account ending in 247 | €180,000 |
| 4 | December 15, 2008 | Joint Allied account, ending in 010 | Mrs. Drumm's Allied Fixed Term account ending in 247 | €372,561 |
| 5 | June 15, 2009 | Joint Cape Cod Five Cents Savings Bank ("Cape Cod") account, ending in 8424 | Mrs. Drumm's Allied US Dollar hold account, ending in 500 | $99,991.05 |

[2] The Plaintiffs itemized their diverse counts but did not number them; the numeration is my own.
[3] Item 10 of the SOFA includes a subparagraph b, but it plays no role in this proceeding.  All references to SOFA-10 are to subparagraph a.

| 6 | September 12, 2009 | Debtor's Cape Cod account, ending in 9109 | Joint Cape Cod account, ending in 7073 | $1,500.00 |
| 7 | September 18, 2009 | Cape Cod account of Harborlight (Debtor's business), ending in 9737 | Joint Cape Cod account, ending in 7073 | $1,000.00 |
| 8 | September 19, 2009 | Debtor's Cape Cod account, ending in 9019 | Joint Cape Cod account, ending in 7073 | $1,000.00 |
| 9 | September 28, 2009 | Debtor's Cape Cod account, ending in 9109 | Joint Cape Cod account, ending in 7073 | $3,000.00 |

**Counts 10-14:**   The Plaintiffs allege that Drumm also knowingly and fraudulently omitted from his Original SOFA, item 10, the following non-ordinary course of business real estate-related transfers from himself to Mrs. Drumm or to third parties.  As to Count 10, Drumm denies falsity, saying there was no transfer.  As to Counts 11-13, Drumm admits the false representations under oath.  As to all five counts, Drumm denies knowledge of falsity and fraudulent intent.

| Count | Omission |
| --- | --- |
| 10 | The transfer of Drumm's 50% equity interest in the Epiphany Nominee Trust to Mrs. Drumm on January 6, 2010. |
| 11 | The grant of the mortgage to KBC Homeloans on Skerries Rock (the "Skerries Rock Mortgage") in December 2008 to secure a loan in the amount of €250,000. |
| 12 | The transfer of 100% of the proceeds of the Skerries Rock Mortgage to Mrs. Drumm in December 2008 in the amount of €250,000. |
| 13 | The transfer of Drumm's 100% interest in 173 Cross Street to himself and Mrs. Drumm jointly for nominal consideration on October 20, 2008. |
| 14 | The sale of 173 Cross Street to the Porch Light Trust on September 17, 2009 for the sum of $2,365,000, generating net proceeds of $412,000, of which 50% was transferred to Mrs. Drumm's sole bank account at Cape Cod (account ending in 869). |

**Counts 15-18:**   The Plaintiffs allege that Drumm also knowingly and fraudulently omitted from his Original SOFA, item 10, the following non-ordinary course of business automobile transfers from himself to Mrs. Drumm or to third parties.  Drumm acknowledges the omissions but denies that they

were knowing or fraudulent.  He also argues that the sales "arguably" were ordinary course transactions

that therefore did not need to be disclosed in SOFA 10.

| Count | Omission |
|-------|----------|
| 15 | The sale of a Range Rover owned and titled in Drumm's sole name to a third party for €36,000 on or about May 5, 2009. |
| 16 | The transfer of the sale proceeds of the Range Rover to Mrs. Drumm's sole bank account at Allied (ending in 247). |
| 17 | The sale of a BMW owned and titled in Drumm's sole name to his sister for €20,000 on or about September 7, 2009. |
| 18 | The transfer of the sale proceeds of the BMW to a bank account held jointly by Drumm and Mrs. Drumm at Allied (ending in 054). |

**Counts 19-20:**  The Plaintiffs allege that Drumm also knowingly and fraudulently made related

false oaths in his Original SOFA, item 3a, and in his original schedules, filed on October 29, 2010 (the

"Original Schedules"), at Schedule F, the schedule of unsecured creditors, concerning the existence of a

loan from Mrs. Drumm.  Drumm denies that the statements in question were false, that he knew them

to be false, and that he made them with fraudulent intent.

| Count | Gravamen |
|-------|----------|
| 19 | In question 3c of his Original SOFA, Drumm made a material false oath or account when he indicated that payments totaling $50,093.00 within one year of the Petition Date to Mrs. Drumm were repayments for a loan; in fact there was no loan, and the transfers were just additional cash transfers to Mrs. Drumm. |
| 20 | In Schedule F of his Original Schedules, Drumm made a false oath by indicating that, as of the Petition Date, he owed Mrs. Drumm $210,347.00 on a loan; in fact there was no loan. |

**Counts 21-23:**  The Plaintiffs allege that Drumm also knowingly and fraudulently made three

additional false oaths in his Original Schedules:

| Count | Gravamen |
|-------|----------|
| 21 | In Schedule B, Item 19, Drumm misrepresented the current value of his 50% interest in the Epiphany Nominee Trust as $0.00 and thereby concealed value of approximately $415,000.  Drumm defends his valuation and denies knowledge of falsity and fraudulent intent. |
| 22 | In Schedule B, Item 4, Drumm materially understated the value of his household goods and furnishings when he listed his "Furniture and fittings at Chatham and Wellesley" as having a current value of $10,000.  Drumm defends his valuation, denies knowledge of falsity and fraudulent intent, and pleads reliance on the advice of counsel. |

| 23 | In Schedule B, Item 4, Drumm failed to disclose furniture held in storage.  Drumm concedes the omission but denies knowledge of falsity and fraudulent intent. |

**Counts 24-25:**  The Plaintiffs allege that Drumm also knowingly and fraudulently made two

further false oaths regarding the Original SOFA and Original Schedules at two sessions of the Section 341

meeting of creditors.  Drumm invokes his defenses to Counts 1-23 and, where falsity is admitted, denies

knowledge of falsity and fraudulent intent.

| Count | Gravamen |
|---|---|
| 24 | Drumm falsely testified under oath at the November 16, 2010 Section 341 meeting that the Original Schedules/SOFAs were "true and correct." |
| 25 | He again falsely testified under oath at the April 1, 2011 Section 341 meeting that, except for a few amendments disclosed at the start of that meeting, his Original Schedules/SOFAs were "complete and accurate." |

**Counts 26-28:**  On May 17, 2011, Drumm filed amended schedules ("Amended Schedules") and

an amended statement of financial affairs ("Amended SOFA").  The Plaintiffs contend that Drumm made

three false oaths in the Amended SOFA at item 10a concerning real estate transfers.  Drumm defends as

he does to the corresponding counts regarding the same representations in the Original SOFA, Counts

10, 11, and 14.

| Count | Gravamen |
|---|---|
| 26 | Drumm again omitted the transfer of his 50% equity interest in the Epiphany Nominee Trust to Mrs. Drumm on January 6, 2010. |
| 27 | Drumm again omitted his grant of a mortgage to KBC Homeloans on Skerries Rock in December 2008 to secure a loan in the amount of €250,000. |
| 28 | Drumm failed to disclose that he transferred 50% of the $412,000 in net proceeds (from the sale of 173 Cross Street to the Porch Light Trust on September 17, 2009)  to Mrs. Drumm's sole bank account at Cape Cod (account ending in 869).[4] |

**Counts 29-30:**  The Plaintiffs contend that Drumm made two false oaths in the Amended SOFA

at item 10a by failing to disclose sales of automobiles.  Drumm answers that he did not fail to disclose

the sales.

---

[4] Count 28 differs slightly from Count 14.  In Count 14, the focus is on the omission of the sale of 173 Cross Street; in Count 28, the focus is on the omission of the transfer of a portion of the sale proceeds.

| Count | Gravamen |
|---|---|
| 29 | Drumm omitted the sale of a Range Rover owned and titled in Drumm's sole name for €36,000 on or about May 5, 2009. |
| 30 | Drumm omitted the sale of a BMW owned and titled in Drumm's sole name for €20,000 on or about September 7, 2009. |

**Counts 31-33:**  The Plaintiffs contend that Drumm also made three false oaths in the Amended

Schedules.

| Count | Gravamen |
|---|---|
| 31 | In Schedule B, item 19, Drumm misrepresented the current value of his 50% interest in the Epiphany Nominee Trust as $0.00 and thereby concealed value of approximately $415,000.  Drumm defends as he does to Count 21. |
| 32 | In Schedule B, item 4, Drumm misrepresented the value of his household goods and furnishings when he listed his "Furniture and fittings at Chatham and Wellesley" as having a current value of "unknown."  Drumm defends as he does to Count 22. |
| 33 | In Schedule F of his Amended Schedules, Drumm made a false oath by indicating that, as of the Petition Date, he owed Mrs. Drumm $216,840.69 on a loan; in fact there was no loan.  Drumm defends as he does to Count 20. |

**Counts 34-35:**  The Plaintiffs allege that Drumm also knowingly and fraudulently made two

further false oaths regarding the Amended SOFA and Amended Schedules at sessions of the meeting of

creditors.  Drumm invokes his defenses to Counts 26-33 and, where falsity is admitted, denies

knowledge of falsity and fraudulent intent.

| Count | Gravamen |
|---|---|
| 34 | Drumm falsely testified under oath at the August 9, 2011 Section 341 meeting that the Amended Schedules/SOFAs were intended to be accurate; in fact, they were not accurate (in the manners alleged in Counts 26-33). |
| 35 | Drumm falsely testified under oath at the April 1, 2011 Section 341 meeting that he would amend the Mrs. Drumm loan claim in Schedule F to $200,215.69; in fact, on May 17, 2011, he amended the loan amount to $216,840.69. |

### ii.    False Claim under § 727(a)(4)(B)

**Counts 36-40:**  The Plaintiffs allege that, in five instances concerning the same alleged debt,

Drumm knowingly and fraudulently presented or used a false claim within the meaning of 11 U.S.C. §

727(a)(4)(B) in his Original and Amended Schedules and SOFAs and in certain testimony at a session of

the 341 Meeting as follows:

| Count | Gravamen |
|-------|----------|
| 36 | In Schedule F of his Original Schedules, Drumm presented or used a false claim when he indicated that, as of the Petition Date, he owed Mrs. Drumm $210,347.00 on a loan; in fact there was no loan.  Drumm defends as he does to Count 20. |
| 37 | In his Original SOFA at Item 3c, Drumm presented or used a false claim when he swore that he had repaid Mrs. Drumm $50,093.00 within one year of the Petition Date; in fact there was no loan.  Drumm defends as he does to Count 19. |
| 38 | In Schedule F of his Amended Schedules, Drumm presented or used a false claim when he indicated that, as of the Petition Date, he owed Mrs. Drumm $216,840.69 on a loan; in fact there was no loan.  Drumm defends as he does to Count 20. |
| 39 | In his Amended SOFA at Item 3c, Drumm presented or used a false claim when he swore that he had repaid Mrs. Drumm $73,250.00 within one year of the Petition Date; in fact there was no loan.  Drumm defends as he does to Count 19. |
| 40 | Drumm falsely testified under oath at the April 1, 2011 Section 341 meeting that the Mrs. Drumm Loan claim in Schedule F, previously stated to be in the amount of $210,347, was amended to $200,215.69. |

### iii.    Transfer, Removal, or Concealment of Property Within One Year Before the Petition Date under § 727(a)(2)(A)

**Counts 41-45:**  The Plaintiffs assert five counts under 11 U.S.C. § 727(a)(2)(A).  In each  they

allege that Drumm, with intent to hinder, delay, or defraud a creditor, transferred, removed, or

concealed property he owned within one year before the Petition Date.

| Count | Gravamen |
|-------|----------|
| 41 | Drumm transferred, removed, or concealed property within one year of the Petition Date when, on January 6, 2010, he executed and permitted the Wellesley purchase through the Epiphany Nominee Trust. |
| 42 | Drumm transferred, removed, or concealed property within one year of the Petition Date when, on January 6, 2010, he executed the Separate Property Agreement with Mrs. Drumm in order to transfer his 50% equity interest in the Epiphany Nominee Trust to her. |
| 43 | Drumm transferred his 50% equity interest in the Epiphany Nominee Trust on January 6, 2010, within one year of the Petition Date, through execution of the Separate Property Agreement, which disclaimed his past or present interest in the funds used to make the down payment to buy the Wellesley Property. |
| 44 | Through the purchase of the Wellesley Property using the Epiphany Nominee Trust and the Separate Property Agreement within one year of the Petition Date, Drumm intended to and did continuously conceal significant transfers of cash, property, and property-related proceeds to Mrs. Drumm. |

| 45 | Within one year of the Petition Date, Drumm concealed his interest in non-ordinary course of business cash transfers from himself to Mrs. Drumm by characterizing the transfers as loan repayments on account of the fictitious Mrs. Drumm Loan claim. |

### iv.  Transfer, Removal, or Concealment of Estate Property After the Petition Date under § 727(a)(2)(B)

**Counts 46-52:**  The Plaintiffs assert seven counts under 11 U.S.C. § 727(a)(2)(B).  In each except

Count 51 and 52, they allege that Drumm, with intent to hinder, delay, or defraud a creditor or the

chapter 7 trustee, concealed property of the estate after the Petition Date.[5]

| Count | Gravamen |
|---|---|
| 46 | Drumm concealed property of the estate after the Petition Date when he listed the current value of his 50% equity interest in the Epiphany Nominee Trust as $0.00 in Schedule B, item 19, and testified during the case that he held no property interest in the Epiphany Nominee Trust as a result of the Separate Property Agreement. |
| 47 | Drumm did not list non-ordinary course of business bank account cash transfers to Lorraine Drumm in his Original Schedules/SOFA.  This count is based on the omissions that are the basis of Counts 1-9. |
| 48 | Drumm did not list non-ordinary course of business real estate-related transfers in his Original and Amended Schedules/SOFA.  This count is based on the omissions that are the basis of Counts 10-14 and 28. |
| 49 | Drumm did not list non-ordinary course of business automobile transfers in his Original and Amended Schedules/SOFA.  This count is based on the omissions that are the basis of Counts 15-18 and 29-30. |
| 50 | Drumm misrepresented the value of his household goods and furnishings by swearing to a total value of $10,000 in his Original Schedule B, Item 4 and by later revising that valuation to "unknown" in his Amended Schedule B, Item 4. |
| 51 | Drumm presented and used the fictitious Mrs. Drumm Loan claim and loan repayments in his Original and Amended Schedule F and SOFA question 3c. |
| 52 | Drumm intentionally carved out of the Estate the Mrs. Drumm Loan monies and his Harborlight/Delta bank accounts and related transactions by insisting on the validity of the Mrs. Drumm Loan claim and the legitimacy of the alleged loan repayments within one year of the Petition Date. |

---

[5] It is not evident how counts 51 and 52 state claims under § 727(a)(2)(B), but the Plaintiffs have listed them as claims under this subsection.

**c.      After Trial**

After the close of the evidence, the Court heard closing arguments.  Later each party submitted

proposed findings of fact and conclusions of law, whereupon the Court took the matter under

advisement.

**FINDINGS OF FACT**

**A.      The Drumms and Anglo Irish Bank**

1.      Drumm is an experienced businessman who has held senior executive positions in a

global financial institution.  As of December 2008, he had been employed as an executive in the banking

industry for approximately sixteen years.  Through this and other experience he gained an

understanding of real estate finance and purchase and sale transactions.  He has knowledge of loans,

lending practices, and loan documentation as well as collateral, security interests, liens, and guaranties

relating to indebtedness.

2.      Drumm also has been trained as an accountant and is or was a Chartered Accountant in

Ireland.  He knows how to read and interpret balance sheets, income statements, cash flow statements,

and financial reports.

3.      Drumm has been married to Lorraine Drumm ("Mrs. Drumm") since 1991.  They have

two children.

4.      At all times—including from September 2008 through the Drumm's bankruptcy filing in

2010—Drumm has been the family bookkeeper and manager of the family's finances, even of those

assets held ostensibly in the name of Mrs. Drumm alone.  In these capacities he made all the decisions

with respect to which bank accounts to open and where to move money between accounts, and he

made all the Drumms' investment decisions.  On occasion, but by no means always, he consulted Mrs.

Drumm about particular financial matters, but the initiative and control were always his.

5.      In 1998, Drumm, who was then a resident of Ireland and an executive in the employ of

Anglo Irish Bank ("AIB"), moved with Mrs. Drumm to the United States.  He was tasked by AIB with

building its lending operation in this country and opening a representative office.  He helped AIB build a

multi-billion dollar business here from scratch.  Drumm's business experience in the United States

includes consulting on real estate finance transactions, mergers and acquisitions, and other commercial

transactions.  During this time in the United States, he established many contacts and relationships in

the Boston area.

6.      After six years in the United States, the Drumms returned to Ireland.  There Drumm was

appointed Group CEO of AIB and joined its board of directors as an executive director.  He served in

these capacities from 2005 until December 19, 2008.  During his tenure in these capacities he received

compensation totaling $18 million.

7.      Going into the fall of 2008, the Drumms owned at least the following assets:

a.      €354,000 in deposit accounts in Ireland--€296,000 in Drumm's sole name, the

balance in joint accounts;

b.      $135,000 in deposit accounts in the United States;

c.      stock in AIB valued at €6,153,000;

d.      their principal residence at 20 Abington, Malahide, County Dublin in Ireland

("Malahide"), which they owned jointly and which Drumm valued at €2,800,000 and

indicated was unencumbered;

e.      investment real estate at 11 The Way, Skerries Rock, Co. Dublin, Ireland ("Skerries

Rock"), which they owned jointly and which Drumm valued at €350,000 and

indicated was unencumbered;

    f.   an interest in a joint venture to develop the real property at 173 Cross Street,

        Chatham, Massachusetts, in the United States ("173 Cross Street"), which interest

        Drumm owned solely, valued at $895,780, and indicated was unencumbered;

    g.  the real property located at 262 Stage Neck Rd., Chatham, Massachusetts (the

        "Chatham Property"), which they acquired in March 2008 and owned jointly;

    h.  a BMW vehicle titled in Drumm's sole name; and

    i.   a Range Rover SUV titled in Drumm's sole name.

8.     The fall of 2008 was a very difficult time in AIB's history and led in just months to the

bank's demise. During September 2008, in Drumm's own words, the world was "falling apart," and the

second half of September was "Armageddon." Lehman Brothers had recently gone bankrupt.  AIB, under

Drumm's stewardship, faced enormous pressures, a plummeting share price, the prospect of

government intervention, and potential loss of its independence.  As Mrs. Drumm testified, it was an

"economically bad time" in Ireland; "the markets were in turmoil"; "the share price of Anglo Irish Bank

had collapsed."  On December 19, 2008, Drumm resigned his positions at AIB.  On January 21, 2009, AIB

was nationalized under the Anglo Irish Bank Corporation Act 2009; the Act vested all shares of AIB's

stock—which had in any event become all but worthless—in Ireland's Minister for Finance and re-

registered AIB as a private limited company.  AIB was defunct.

9.     AIB's collapse dramatically affected the Drumms in several ways.  Until his resignation,

Drumm was under great stress at work.  Mrs. Drumm said "he was working all the hours God sent him"

and was never at home.  She feared he might drop dead of a heart attack "because that's what it looked

like most days."  The stress and long hours of this period put a strain on their marriage; she conceded

however that his long hours, and the strain they placed on the marriage, were not new but had been

constant over the two preceding years.  For his role at AIB, Drumm became the focus of considerable

and inescapable media attention in Ireland, not favorable.  AIB's collapse also affected the family

financially.  Drumm's resignation terminated his substantial salary.  His prospects for future employment

in Ireland had considerably dimmed.  The Drumms had real estate holdings, but the recession had

undermined real estate values.  Much of the Drumms' net worth had been in AIB stock, which had

secured Drumm's debts to AIB and now was worthless and, in any event, had been nationalized.  He

owed a ruinous sum—in excess of $11 million—to AIB, which surely would demand payment and likely

would commence legal proceedings against him.

10.     To these turns of events, the Drumms responded with essentially five measures.  First,

commencing in September 2008 and continuing through most of the next year, Drumm transferred

most of the assets that Drumm owned either solely or jointly with Mrs. Drumm to Mrs. Drumm's sole

ownership.  Second, in June 2009, they left Ireland and moved permanently to the United States, with

intent on Drumm's part to earn a living by establishing a business here.  Third, in January 2010, and with

a substantial portion of their now-liquidated holdings, they purchased a home in suburban Boston.

Fourth, in the fall of 2010, Drumm attempted without success to negotiate with IBRC, to avert a trial in

litigation between them in Ireland.  Fifth and finally, on October 14, 2010, Drumm filed for bankruptcy

relief in the United States, under chapter 7 of the Bankruptcy Code.

**B.      The 2008 Transfers to Mrs. Drumm**

11.      In late 2008, Drumm made the following transfers to Mrs. Drumm:

a.   On September 24, 2008, Drumm transferred €150,000 from his sole account at

Anglo Irish Bank (ending in 668) to an account in Mrs. Drumm's sole name at AIB

(ending in 39/01).

b.   On October 20, 2008, Drumm transferred a 50 percent interest in the real property

located at 173 Cross Street to Mrs. Drumm.  On September 30, 2008, Drumm had

acquired from a business partner, Michael Barnett, a 100% interest in 173 Cross

Street, subject to an existing mortgage securing an obligation in the approximate amount of $1,600,000.

c. On or about November 3, 2008, Drumm transferred €50,000 from his sole account at AIB (ending in 668) to Mrs. Drumm's sole account at AIB (ending in 39/01).

d. Also on or about November 3, 2008, Drumm transferred €80,000 from a joint account held in Drumm's and Mrs. Drumm's names at Allied Irish Bank ("Allied") (ending in 010) to an Allied account in Mrs. Drumm's sole name (ending in 080).

e. On or about December 12, 2008, Drumm transferred €180,000 from the same Allied joint account (ending in 010) to a new Allied account opened that day by Mrs. Drumm (ending in 247) in her sole name.

f. On or about December 15, 2008, Drumm transferred €372,561 from the same Allied joint account (ending in 010) to the new Allied account (ending in 247) held in Mrs. Drumm's sole name.

g. Also in December 2008, the Drumms obtained a loan that they secured with a mortgage on Skerries Rock, an investment property they had jointly owned since 1999 and which had been unencumbered since 2006; the loan was in the amount of €250,000, roughly the full amount of the equity in that property.  Drumm transferred the entire amount of the mortgage loan proceeds to Mrs. Drumm by depositing the monies into Mrs. Drumm's newly opened Allied account (ending in 247) held in her sole name.

12. When Mrs. Drumm opened a bank account at AIB (account ending 39/01) on September 19, 2008, to receive the first cash transfer from Drumm, it was the first time in the Drumms' then-seventeen-plus-year marriage that Mrs. Drumm had a bank account in her sole name.  Prior to September 2008, all of the Drumms' bank accounts, and indeed all of their assets, were owned either by

15

Drumm solely or by the couple jointly.  During the time period before these transfers were being made,

and at all relevant times, Mrs. Drumm had full access to substantial cash assets that the couple held

jointly, and she could have withdrawn cash and written checks from those joint accounts.

13.      The initial cash transfer—€150,000 on September 24, 2008—occurred just days after

the Lehman collapse and bankruptcy and at a time when Drumm faced enormous challenges as AIB's

CEO.   As Drumm acknowledged, these transfers were not in the ordinary course of business.  As is

shown by Drumm's own financial statements for August 2008 and the following months, Drumm's net

worth dropped in September 2008 by some $3.5 million, with a barely positive net worth at month's

end, and then by another $2.2 million in the next month.  That is, he became balance-sheet insolvent in

October 2008, and matters only got worse from there.  In September, he was sliding quickly into

insolvency, and he well knew it.

14.      Drumm maintains that he made these transfers, and others in 2009 (listed below),

because Mrs. Drumm implored him to do so.  And she insists that she did so not out of concern about

his creditors but because she could envision a future without him—their marriage was severely strained,

and the stress on him made her fear for his health—in which *she* would need to provide for herself and

her children.  She therefore asked him to transfer some money—"like a million euro," she told him—

into her name, so that she could control it herself.  I do not doubt that Mrs. Drumm asked her husband

to transfer money to her sole name, or that she was motivated by the concerns she mentioned.

However, it was Drumm himself who transferred most of the funds and other assets, and he was

complicit in her transfer of the balance, all of which she made with his knowledge, consent, and indeed

facilitation.  He not only assented to her request but was at least as much the impetus behind the

transfers as she.  As for Mrs. Drumm, I do not believe that she was motivated by a need for protection

from possible alienation from Drumm any more than she was motivated by a fear of Drumm's creditors.

Indeed, I do believe that each of them was motivated first and foremost by desire to shelter their assets

from seizure by Drumm's creditors, especially AIB.  Their salutary concern to protect Mrs. Drumm and

their children gave rise to action because creditors would soon be seizing family assets; concerns about

creditors and solvency certainly account for the timing of these transfers.  Concern for family does not

negate concern about creditors and desire to thwart them.  Among the insolvent, these often go hand in

hand.

C.      **Early 2009:  Relocation to the United States, Establishment of Harborlight**

15.      In the weeks after Drumm's resignation, he and Mrs. Drumm resolved to leave Ireland

and move permanently to the United States, where Drumm believed his employment and economic

prospects were more favorable.  On the advice of immigration attorneys in the United States, he

planned to immigrate under an "E-2 Treaty Investor Visa," which would require that he place $250,000

at risk in a business in this country.  Drumm began to make plans for the move; he made numerous trips

over six months to the United States.  In support of his immigration plans, he wrote a business plan for a

U.S. business in January 2009 that described an objective to form a limited liability company, known as

Harborlight, [6] to purchase distressed real estate assets and provide related consulting and financial

services.  To satisfy the visa's investment requirement, in February 2009, Drumm formed Harborlight

and invested $250,000 in it.

16.      Drumm maintains and testified that, at the time, he had insufficient funds remaining in

his own name to fund this investment, and therefore that, by express but not written agreement with

Mrs. Drumm, he borrowed the full $250,000 from her.  It is undisputed that the funds Drumm invested

in Harborlight came from an account in Mrs. Drumm's sole name, but also that this account had itself

been wholly funded with monies Drumm had transferred to her in the preceding five months, from

---

[6] Although the business plan was for an entity named "Stage Harbor Capital Partners LLC," Drumm established his
business in the United States under the name "Harborlight Capital Partners LLC," which name was later changed to
"Delta Corporate Finance LLC."  Consistent with the Plaintiffs' usage, "Harborlight" shall mean Drumm's U.S.
business under any of these names.

accounts that he owned solely and others that he owned jointly with her. The Plaintiffs seek a finding

that there was no loan, just a transfer of funds from Mrs. Drumm to Drumm.

17.     The only evidence to support the existence of a loan—as opposed to a simple transfer—

is the testimony of the Drumms.  Mrs. Drumm testified consistently with her husband that he had asked

her for a loan of $250,000 and that she had agreed to it.  She wanted it to be a loan, not a gift, she

testified.  Both acknowledged that the loan was wholly undocumented.  The first mention of there being

any loan from Mrs. Drumm to Drumm occurred in mid-September 2010—fully eighteen months after

the funds were transferred—when Drumm prepared summaries of his financial affairs and the first draft

of his SOFA for his advisers.  Both Drumms testified that they negotiated no terms whatsoever, including

no interest rate and no duration.  Drumm testified that he believed he would need three years to repay

the loan—for Harborlight to generate a profit that would enable him to repay it—but he did not discuss

this expectation with Mrs. Drumm, much less make it a term of the loan.

18.     Mrs. Drumm's testimony was not wholly consistent with her husband's about this and

other alleged loans from her to him.  He testified—and had represented to the Trustee, in a "loan

reconciliation" he supplied to the Trustee in August 2011—that she later supplemented this loan with an

additional advance of $155,654.00, and he told his advisers that she had made loans to him—including

this one and others—totaling in excess of $900,000.  She testified that she had never supplemented this

loan or made another to him.  He testified—and in the same loan reconciliation represented to the

Trustee—that he had repaid some $188,814 of this loan (as allegedly supplemented), but she testified

that he had never repaid any significant portion of it:  "Q.  So the entirety is still owing?  A.  Pretty

much."

19.     There are other reasons to doubt the existence of this alleged loan.

a.    First, both Drumms represented to Boston Private Bank ("Boston Private") that

there was no loan.  In a mortgage loan application that the Drumms jointly

submitted to Boston Private in November 2009, and signed and thereby verified at

the loan closing in January 2010, neither spouse mentioned this alleged loan; had

there been an outstanding loan debt, they would have been obligated to include it.

Of course, the omission from the loan application may itself have been the false

statement; the contradictory representations place in doubt the credibility of both

Drumm and Mrs. Drumm, but they do not necessarily disprove one or the other of

the representations. We know only that one is false.

b.  Second, both Drumms indicated that they did not memorialize the alleged loan

because they felt no need to, but I find this testimony not credible.  Later, when

they purchased their current home, both insisted on memorializing Mrs. Drumm's

contribution of the down payment with a written agreement, the "Separate

Property Agreement."[7]  Also, Mrs. Drumm's serious concerns around this time

about the future of her marriage were further cause to document any loan.  And, in

view of his insolvency at the time, Drumm himself had reason—as against his

creditors and possibly a trustee in bankruptcy—to document any loan and keep

records of his payments on it.  Had there truly been a loan, they would surely have

memorialized it.

c.  Third, at different times, Drumm himself made wildly different statements as to

how much he owed Mrs. Drumm for this loan.  For example, in a verified personal

financial statement that Drumm supplied to AIB in October 2010, reflecting his

financial condition as of August 31, 2010, he averred that he was indebted to Mrs.

Drumm in the amount of $471,441.  He described this sum as "net balance Mr.

Drumm owes Lorraine Drumm per analysis of Separate Property Agreement dated

---

[7] Their efforts in that regard are discussed below.

1/6/2010 pertaining to the Wellesley residential property and the cumulative total

of transfer to and from Mrs. Drumm." Though the Separate Property Agreement is

anything but clear, it is at least clear that Drumm understands it to obligate him to

pay to Mrs. Drumm, when the Wellesley property is ever sold, the first $415,553 in

equity that inures to him as 50% beneficiary of the trust that owns the Wellesley

property. Backing out this $415,553 "debt,"[8] Drumm is here averring that his

remaining debt to Mrs. Drumm is approximately $56,000. But in the Original

Schedules he filed in his bankruptcy case, he quantified his loan debt to Mrs.

Drumm, as of October 14, 2010, at $210,347; and in his Amended Schedules, he

quantified the same debt at $216,840.69.

d.   Fourth, Drumm kept no records whatsoever of payments on the loan. For him,

payments on the loan consisted of those transfers to or for Mrs. Drumm's benefit

that he later deemed expedient to characterize as loan payments. It became

expedient to do so in the fall of 2010, when a bankruptcy filing became likely and

imminent, so that (i)  at least some of the transfers from Drumm to Mrs. Drumm

could be portrayed as repayments of debt, and not outright transfers for no

consideration, which might be cause for denial of discharge under 11 U.S.C. §

727(a)(2)(A), and  so that (ii)  he could create the impression that, after his transfers

of cash to her, he did not have just as much control over the cash as he had enjoyed

before the transfers. Had there been a loan, Drumm, an accountant and banker,

would have kept contemporaneous records of his payments on it; indeed, *Mrs.*

*Drumm* would have kept records of his payments and certainly would have known

---

[8] Drumm here characterizes his obligation regarding this $415,553 as a debt, but he is not consistent in doing so
and more often characterizes it as a property right that is already vested in Mrs. Drumm. To be clear, in my view,
the latter characterization is more accurate.

of them.  The fact that Mrs. Drumm was unaware of any such payments is indication

that there was no loan and that, after Drumm transferred most of his cash and

other interests in property to Mrs. Drumm's sole name, he continued to manage it

all without her knowledge, as if it remained his.

e.  Fifth, the evidence for this loan consists entirely of testimony of Drumm and Mrs.

Drumm.  On this issue and many, many others, Drumm has shown himself not to be

credible at all.  The Plaintiffs have shown him to have virtually no regard for the

truth, and I would not credit his testimony on any point in controversy—save

perhaps where it is corroborated (and then only on the strength of the

corroboration) or when contrary to his interest.  Mrs. Drumm, though more credible

on the whole than Drumm, made an inconsistent representation to Boston Private

on this subject, made a significant misrepresentation in the Separate Property

Agreement, and is highly motivated to protect him and their combined assets.  She

admits to facilitating and indeed requesting and insisting on numerous transfers

that, I find, were intended to place Drumm's assets beyond the reach of his

creditors.

f.  Sixth, what the Drumms refer to here as a loan neither looks nor smells much like a

loan.  The lack of repayment date makes this just a transfer of indefinite duration.

And the Drumms are not even clear with each other as to when a particular transfer

from her to him is a loan advance and when a particular transfer from him to her is

a loan repayment.  In one astonishing colloquy near the end of his redirect

examination, Drumm (i) testified that Mrs. Drumm didn't know when she was

making an additional loan to him, and that they had no agreement in that regard,

oral, undocumented, or otherwise, (ii) then, when asked "she doesn't know she was

lending you more money?" answered that he would always get her permission before taking money from her, thereby implying that she did know, but then (iii) when asked, "But you just swore under oath not ten seconds ago she had no understanding it was an additional loan, right?", he answered, "We didn't—we didn't make—we didn't make a big deal out of it," and finally (iv) when asked, "but you didn't discuss it as a loan, correct?" he answered, "That's fair enough, yeah."

20.     For all these reasons, I find that the Plaintiffs have carried their burden of proving that the "loan" of $250,000 is a fiction, an accounting treatment invented after the fact. There was never an intra-spousal loan or payment on any such loan, just outright transfers between the spouses. And even if the Drumms did in fact agree to a $250,000 loan before these funds were transferred to Drumm, the nature of their arrangement—with no obligation to repay by any time and no accounting for advances and  payments—shows it not to have been a true loan at all, just a transfer with a false label.

21.     On June 23, 2009, Drumm and his family arrived in the United States. They resided initially in their vacation home, the Chatham Property, and in July 2009 filed a Massachusetts homestead declaration as to that home. In August 2009, they moved to a rental property in Wellesley, Massachusetts, occupying it under a six-month lease at a cost of $6,500 per month, to be near the private school in which they had enrolled their children.

**D.     Transfers in 2009**

22.     In 2009, Drumm continued to transfer assets to Mrs. Drumm.

a.     On or about May 5, 2009, in Ireland, Drumm sold a Range Rover SUV titled in his sole name to a garage for €36,000 and deposited all of those proceeds into an account in Mrs. Drumm's sole name.

b.     In May 2009, Drumm transferred his one-half interest in their residence, Malahide, to Mrs. Drumm for no consideration.

i.  In order to make this transfer, Drumm was required to and did certify that he was solvent at the time of the transfer.  His certification to this effect was false and made with knowledge of its falsity.  He was insolvent at the time under either of the commonly used meanings of that term:  his liabilities exceeded his assets, and he was unable to pay his debts as they came due.  In fact, the same month that he signed the solvency certificate for the Malahide transfer, Drumm wrote IBRC that he did not have the resources to service an interest payment on a €400,000 loan.  His attempts at trial to deny that, when he made this certification, he believed himself to be insolvent, only further eroded his credibility.

c.   On or about June 15, 2009, Drumm transferred $99,991.05 from a joint account in Drumm's and Mrs. Drumm's names at Cape Cod 5 (ending in 8424) to Mrs. Drumm's Allied U.S. Dollar hold account (ending in 500).

d.  On or about September 7, 2009, in Ireland, Drumm sold a BMW vehicle titled in his sole name to his sister for €20,000 and deposited those proceeds into a joint account.

e.  On or about September 17, 2009, the Drumms sold 173 Cross Street and deposited half of the $412,000 in net sale proceeds into Mrs. Drumm's Cape Cod 5 account (ending in 869).  This was consistent with Drumm's earlier transfer—on October 20, 2008—of a half interest in 173 Cross Street to Mrs. Drumm.

f.  Also in September 2009, Drumm made a series of cash transfers from his Cape Cod 5 account held in his sole name (ending in 9109) to a joint account in Drumm's and Mrs. Drumm's names at Cape Cod 5 (ending in 7073):

i.  on September 12, 2009 in the amount of $1,500.00,

ii.   on September 19, 2009 in the amount of $1,000.00, and

iii.   on September 28, 2009 in the amount of $3,000.00.

g.   Also in September 2009, Drumm transferred $1,000.00 from the Harborlight Cape

Cod 5 account (ending in 9737) to the same joint account at Cape Cod 5 (ending in

7073).  Though the transfer was effected by a check directly from Harborlight to the

joint account, it was in effect a two-step transaction:  first a distribution from

Harborlight to Drumm and then a transfer from Drumm alone to the joint account.

h.   On November 6, 2009, Drumm transferred another $50,000 from his sole Cape Cod

5 account (ending in 9109) to an account in Mrs. Drumm's sole name at Allied in

Ireland.

**E.     Purchase of Wellesley**

23.       In late September or early October of 2009, the Drumms' landlord sold their rental

home and required that they move out of it no later than February 2010.  Wanting a more permanent

home, they immediately began looking for a home in the area to purchase as their principal residence.

In November, they found a suitable home in Wellesley (the "Wellesley Property") and set out to

purchase it.

24.       On September 28, 2009, however, IBRC had made demand on Drumm to pay his

obligations to AIB.  On November 25, 2009, IBRC sued Drumm in Ireland on his loans, to recover $11

million.  And on December 2, 2009, the Bank commenced a second lawsuit, against Drumm and Mrs.

Drumm, to avoid the alleged fraudulent transfer of Drumm's 50 percent interest in Malahide to Mrs.

Drumm for no consideration.  Drumm admitted that these two lawsuits were the biggest litigation that

had ever been filed against him in his life.  It was this litigation in Ireland that ultimately caused Drumm

to file for bankruptcy relief under chapter 7.

25.     In view of IBRC's demand and legal actions, the Drumms were especially keen to acquire the Wellesley Property in Mrs. Drumm's name alone.  They planned to do so with funds that, at the time of the purchase, were hers alone but which had been transferred to her by Drumm since September 2008.  They wanted to place this property out of the reach of Drumm's creditors.  For privacy from the press and further protection from creditors, they also wanted to keep the Drumm name off of the property and related transaction records, and they therefore planned on Mrs. Drumm's purchasing the property in her maiden name, the first time they would do so in their marriage.  However, they also planned on financing the purchase in part with a mortgage loan, which loan would be paid from Drumm's own earnings.  Mrs. Drumm had no employment income.

26.     On or about November 12, 2009, the Drumms applied to Boston Private for the mortgage loan.  Because Drumm would be making the payments on the loan, Boston Private insisted on their owning the property jointly.  Once the Drumms learned that they would have to own the Wellesley Property jointly, and that Mrs. Drumm could not buy the property alone, they consulted an attorney about how best to achieve their goals.  The attorney, Peter-Paul Covo ("Covo"), was representing Boston Private in conjunction with the closing of this loan.  He agreed to represent the Drumms on limited aspects of the real estate and loan transactions, where their interests were not at odds with those of Boston Private.

27.     With regard to the manner in which they would acquire the property, the Drumms, after consulting with Covo, decided to acquire the property through the legal device of a nominee trust, of which Drumm and Mrs. Drumm would each be a 50 percent beneficiary.  The trust would be known as the Epiphany Nominee Trust, and its trustee was an unrelated individual.  This device was used here precisely to keep the identities of the owners/beneficiaries private and out of the public record; the beneficial owners of a nominee trust need not be disclosed in any document publicly recorded at the registry of deeds.  Because Drumm would be a 50 percent beneficiary of the trust, and in effect a 50

percent owner of the property, this device was consistent with Boston Private's condition that Drumm

be a joint owner.

28.    In conjunction with their mortgage loan application, the Drumms made representations

to Boston Private about their assets and liabilities.  In response to the question, "[a]re you a party to a

lawsuit?" each answered no.  Both knew at the time that this was untrue as to each of them.  They also

did not disclose an interspousal loan, either as an asset (hers) or liability (his).

29.    The purchase and sale agreement for the Wellesley Property was executed on

November 24, 2009.  It identified Mrs. Drumm alone as the buyer, and she signed it using her maiden

name, Lorraine M. Farrell.

30.    The sale closing occurred on January 6, 2010.  It was held at the law office of attorney

Covo, who presided over the closing.  Drumm and Mrs. Drumm, through the Epiphany Nominee Trust,

purchased the Wellesley Property for $2,042,891.  The purchase price was financed to the extent of

$1,230,000 by a mortgage loan from Boston Private, on which both Drumm and Mrs. Drumm were

borrowers; and the balance of $831,106.01 was paid by Mrs. Drumm from funds then held in her sole

name.  However, all the funds she used for the purchase had earlier been transferred to her from

accounts that Drumm held solely and others he held jointly with Mrs. Drumm.  The Epiphany Nominee

Trust became the owner of the Wellesley Property.

31.    At the moment of closing on the Wellesley Property, the Drumms each owned a 50

percent interest in the trust that owned the property.  Drumm therefore held a 50 percent interest in

the $831,106.01 equity in the Wellesley Property.  Had the Wellesley Property been sold immediately

following the closing, the Drumms would each have been entitled to 50 percent of the sale proceeds

after payment of the Boston Private loan.   By virtue of the purchase through the nominee trust, Mrs.

Drumm had essentially purchased and given to Drumm a new asset, his beneficial interest in the trust,

with a value of $415,553.

32.     The Epiphany Nominee Trust states:

The term "Beneficiaries" wherever used herein shall mean the person or
persons identified as such in a certain Schedule of Beneficial Interests
this day executed and filed with the Trustee or Trustees, or in any
revised Schedule of Beneficial Interests so executed and filed from time
to time.  The Trustee or Trustees shall not be affected by any
assignment or transfer of any beneficial interest until receipt by the
Trustee or Trustees of notice that such assignment or transfer has in
fact been made and a revised Schedule of Beneficial Interests shall have
been duly executed and filed with the Trustee or Trustees.

**F.     The Separate Property Agreement**

33.     Later on January 6, 2010, after the closing had been completed, Drumm entered into an

agreement, known as the Separate Property Agreement (or "SPA"), with Mrs. Drumm.  This agreement

was prepared by Attorney Covo, who confirmed that Drumm had called him after the closing to discuss

drafting an agreement and that, in fact, the Separate Property Agreement had been drafted and signed

after the closing.  Drumm had testified at his deposition that they had signed the SPA at the closing;

when Attorney Covo later testified that this signing occurred later in the day, after the closing had been

completed, Drumm changed his testimony to agree with that of Attorney Covo.

34.     In the SPA, Drumm and Mrs. Drumm first recited that they desired to conclusively

establish, by a comprehensive agreement, the status of their respective property interests in the

Wellesley Property and its purchaser, the Epiphany Nominee Trust (the "Trust"), of which each owned a

separate 50 percent beneficial interest.  They then agreed as follows:

a)  Identification of Separate Property:

Husband and Wife mutually agree that the money used for the
purchase of the Property on January 6, 2010 totaling
[$831,106.01] belonged to and was owned exclusively by the
Wife and that Husband had no past, present or future right or
interest in said money (the "Purchase Money").

Husband and Wife mutually agree that Husband's beneficial
interest in the Trust and participation in the lending process was
to assist and facilitate the Parties (sic) ability to borrow money

and mortgage the Property on favorable lending terms and conditions.

This Agreement is specifically intended to be an "express declaration" by the Parties that any present and future equity ownership in the Property derived from the Purchase Money is forever intended to remain the independent and exclusive separate sole property of Wife.

In the event of a sale of the Property, Wife's contribution shall be considered a primary obligation secured against the Property and be paid first from any net proceeds of any such sale of (sic) transfer for consideration, as if the same were a recorded mortgage.

b) Retain Separate Property Character:  Husband and Wife affirmatively and expressly intend to retain the character of the Property with the benefits attendant to the character available under applicable State law as it exists at the time of execution of this Agreement. . . .

c) Binding Agreement:  This agreement shall be binding on the administrators, personal representatives, successors, and assigns of the Parties hereto."

35.     Drumm conceded at trial that the statement in the SPA (at the first sentence of paragraph (a)) to the effect that he had "no past . . . right or interest" in the purchase money was false and that in fact he had had an interest in every dollar or euro of the purchase money, either solely or jointly with Mrs. Drumm, before transferring it to Mrs. Drumm's sole name.

36.     Drumm testified at trial that he did not read the SPA before signing it.  This testimony is not credible.  The SPA was not a routine closing document; Covo drafted it specifically for the Drumms to meet their unusual needs in this particular transaction, and, by the testimony of both Drumm and Mrs. Drumm, it was important to both of them.  They went back to Covo's office to get it drafted and to sign it; both would certainly have read it to assure themselves that it did what they intended for it to do. I find that both read it before they signed it and that each signed it knowing that its recitation that Drumm had "no past . . . right or interest" in the purchase money was false.  I further find that both also

intended that the SPA would undo the transfer of equity to Drumm that had been effected by the purchase through a nominee trust of which Drumm was a 50 percent beneficiary.

37.     The Drumms testified that this was simply an agreement between the two of them that was not intended to affect the rights of Mr. Drumm's creditors.  This testimony, too, is not credible.  The SPA expressly makes itself binding on the parties' successors and assigns.  (Whether it can be effective in that regard is another question.)  More to the point, the SPA is a clear attempt at an end-run around Boston Private's insistence that Drumm be a joint owner of the property;[9] but for this agreement, Mrs. Drumm could lay no claim to the equity that belonged to Drumm as a 50 percent beneficiary of the trust.  Though the Agreement contains no language of transfer, its purpose and effect were to transfer back to Mrs. Drumm that which, in the closing, she had effectively given to him.  To be sure, it served to protect her against any claim he may later assert to the equity; but also, and more urgently in both their minds, it served and was intended to protect both of them against any claim his creditors may assert to his interest in the Wellesley Property and in the trust that owned it.[10]  Drumm made this transfer with intent to place his interest in the Epiphany Nominee Trust beyond the reach of IBRC.

38.     Notwithstanding their use of the SPA to effect a transfer of a portion of Drumm's beneficial interest in the Epiphany Nominee Trust, no evidence has been adduced that Drumm and Mrs. Drumm have executed or filed with the trustee of the trust a revised Schedule of Beneficial Interests or otherwise notified the trustee of the transfer effected by the SPA.

39.     The Drumms argue that the SPA merely memorialized an agreement between them that existed before and during the closing, and therefore that it did not effect a transfer back.  In this view,

---

[9] Although I fail to see how Covo was free to facilitate this for them, I need make no finding as to how and whether he squared this service to the Drumms with his obligations to Boston Private.

[10] It is unclear how large an interest the SPA conveyed back to Mrs. Drumm.  At the very least, it transferred back any right Drumm would otherwise have enjoyed to the first $415,553 that would otherwise have inured to his benefit.  Arguably, by the third sentence of paragraph (a), it transferred back all Drumm's beneficial interest in the trust.  While that is surely what the Drumms intended, I need not decide the issue.  It is enough to note that it transferred back nothing less than the first $415,553 that he might otherwise realize.

the closing never truly transferred anything to Drumm, and therefore there was no need for him to

transfer anything back.  This cannot be true.  Even if they went into the closing with this preexisting

agreement between themselves—I do not doubt that they did—and even if, at the closing, Mrs. Drumm

secretly had her fingers crossed behind her back, she undeniably did purchase for the trust a res with a

value some $830,000 in excess of the mortgage encumbering it and thereby gave Drumm, as a 50

percent beneficiary of the trust, a one-half interest in that equity.  She needed to do this to satisfy

Boston Private's condition of making the loan:  the condition that he be a 50 percent joint owner of the

Wellesley Property.  This was no fiction; the closing really had given Drumm a valuable asset.  It is

precisely because the closing had this effect that the Drumms deemed the SPA so necessary.  Both

understood the SPA to restore to Mrs. Drumm what she had given Drumm at the closing.  Despite much

equivocating, Drumm conceded that this is precisely what he understood the SPA to have accomplished:

"Q.  And through the Separate Property Agreement you relinquished some portion of that 50 percent

[his 50 percent interest in the nominee trust], had you not?  A.  I suppose so, yes."  (Tr. Day 1 a.m.

session, p. 119.)

**G.      Retention of Professionals; Efforts to Settle Irish Litigation**

40.      In the summer of 2010, IBRC's suit in Ireland against him remained pending, and

Drumm, with the assistance of counsel he had retained there, was trying to reach a settlement of IBRC's

claims.  In conjunction with these settlement efforts, he needed to submit a personal financial

statement to IBRC, which statement would have to be certified by a suitable accounting professional.

Also around this time, Drumm's attorney in Ireland had suggested that he consider filing for bankruptcy

relief in the United States if he could not settle the IBRC litigation in Ireland.  Drumm believed and

testified that there was a real possibility the Irish litigation would settle, but also that, due to "the

political nature of it," "there was also a potential they would never settle."

41.     During this same period, and in the course of work each was doing for a mutual client, Drumm became acquainted with Stewart Grossman ("Grossman"), a partner at the law firm of Looney & Grossman, LLP ("L&G").  Grossman, an experienced bankruptcy attorney, has been involved in thousands of bankruptcy cases during his 41-year legal career.  After they discussed Drumm's financial situation, Drumm, on or around August 6, 2010, retained L&G to assist him with both (i) the preparation of a personal financial statement to send to IBRC in connection with the Bank's lawsuit against him in Ireland and (ii) a possible bankruptcy filing in the United States, including the preparation of the schedules and SOFA he would have to file in his bankruptcy case.  On Grossman's advice, Drumm, through L&G, also retained the accounting firm of Verdolino & Lowey, P.C. ("V&L") to assist in both tasks.

42.     Drumm planned to file for bankruptcy in the United States before the case against him in Ireland went to trial, if he could not reach a settlement with the Bank before that time.  The trial was set to begin on October 26, 2010.

43.     On October 1, 2010, Drumm finalized and submitted to the Irish court and to IBRC, through his Irish counsel, a personal financial statement reflecting his affairs as of August 31, 2010 (the "2010 PFS").  The 2010 PFS was submitted with a declaration in which he swore to the accuracy of his statement and a cover letter signed by accountant Craig Jalbert of V&L.

44.     The 2010 PFS was not the first personal financial statement that Drumm transmitted to his counsel for submission that day.  Earlier on October 1, 2010, Drumm had emailed his counsel, for submission, a version that he had verified and that showed his net worth to be negative: ($3,213,986).  Upon receipt of this version, his Irish counsel promptly informed him that a negative net worth would expose him to a possibility of being involuntarily placed into bankruptcy proceedings in Ireland, which Drumm stated "would be a total disaster."  To avert this outcome, Drumm promptly changed the statement.  Most notably, in his original version, he had valued a $3,322,914 counterclaim he held

against AIB for unpaid salary and benefits at $0, stating in a note that the realizable value of the claim was "unknown and subject to significant litigation and numerous issues, including assessment per terms of the Anglo Irish Bank Act of 2009.  Accordingly, this resource is fully reserved."  In the submitted version, Drumm valued the claim at its full face value, with no reserve, and without mention of the earlier-stated grounds for reservation.  With this change, the 2010 PFS now showed a positive net worth of $340,203.  "Problem solved," Drumm declared.  He then transmitted the revised statement for submission—with the same declaration and cover letter as had accompanied the earlier version.  With respect to the valuation of the counterclaim, I do not find that the change of assumption as to its collectability was indefensible as an accounting treatment, but I do find that he had previously determined and believed that the earlier treatment more accurately represented his affairs, *that he continued to so believe*, and that he nonetheless changed the accounting treatment because, and solely because, he needed to reach a result other than that which he deemed most truthful and accurate.

**H.      Bankruptcy Filing**

45.      Having been unsuccessful in settling the Irish litigation, and with the trial nearing, Drumm filed his petition for relief under Chapter 7 of the Bankruptcy Code on October 14, 2010.  Kathleen Dwyer was appointed interim trustee on October 15, 2010 and continues to serve as trustee.

46.      Drumm was required to file schedules and a statement of financial affairs on or before October 29, 2010, and he did file his Original Schedules and Original SOFA on that date.  With the Original Schedules and Original SOFA, Drumm filed declarations under penalty of perjury that he had read them and that they were true and correct.  On May 17, 2011, he filed amendments to his schedules ("Amended Schedules") and statement of financial affairs ("Amended SOFA").  The Amended SOFA included a declaration by Drumm under penalty of perjury that he had read the Amended SOFA and that it was true and correct.  He filed no such declaration, and I have no evidence that he made any comparable oath, as to the Amended Schedules.

47.     At 11 U.S.C. § 341, the Bankruptcy Code requires that the United States trustee convene a meeting of creditors; at this meeting, the chapter 7 trustee and creditors may examine the debtor under oath.   Such a meeting was convened and held in Drumm's case in six separate sessions (collectively, the "Meeting of Creditors"), adjourned from time to time:  first on November 16, 2010, then on December 7, 2010, and January 5, February 14, April 1, and August 9, 2011.  The Trustee examined Drumm under oath at all six sessions.

**I.      The Original SOFA**

48.     Drumm's Original SOFA was completed using Official Bankruptcy Form 7 ("Form B7"). At item 10a, Form B7 instructs the debtor: "List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case."  As to each such transfer, the debtor must then indicate the name and address of the transferee, the transferee's relationship to the debtor, the date of the transfer, the property transferred, and the value received for it.  In the instruction to "list all *other* property," the word "other" means other than transfers already listed in response to previous items in the SOFA.  Several of the earlier items require disclosures of transfers.  The only one of relevance here is item 3c.  Item 3c instructs the debtor: "List all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders," and, as to each such transfer, to identify the transferee, the date of payment, the amount paid, and the amount still owing to the transferee.

49.     In the Original SOFA at item 3c, Drumm disclosed (in relevant part) transfers to Mrs. Drumm totaling $50,093, which he stated left an amount owing of $210,347.  He did not specify the dates of the payments except by the single word "various."  This response, the subject of Count 19, was false because Drumm owed no debt to Mrs. Drumm at any time in the year before the bankruptcy filing, including the date of the filing.  It was also incomplete because it did not specify the date and amount of

each transfer.  In characterizing these payments as payments "to or for the benefit of creditors who are or were insiders," Drumm was falsely representing that Mrs. Drumm was a creditor.  On the basis of findings made above (in ¶¶ 16-20), I find that Drumm made this misrepresentation with knowledge if its falsity and intent to mislead.

50.     In item 10a, Drumm listed only two transfers.  First he listed his transfer in April 2009 of the Malahide property to Mrs. Drumm; he appended a note, "Transfer will be unwound pursuant to litigation in Ireland."  And second, he listed the involuntary transfer in January 2009 to the Minister of Finance of Ireland of his approximately 1,050,000 shares in AIB.

51.     Drumm's response to item 10a should have included, but in fact did not include, the following transfers:

 a. The nine transfers of cash to Mrs. Drumm that are the subject of Counts 1 through 9 (as these counts are detailed above).  These transfers occurred more than one year before the bankruptcy filing and therefore cannot have been part of the unitemized transfers disclosed in response to item 3c.  If Drumm's interests in jointly held accounts are valued at 50 percent—he does not argue for anything less—the transfers in these nine counts effected an aggregate transfer of value from Drumm to Mrs. Drumm of €366,280.50 and $56,495.52.

 b. The transfer of Drumm's 50 percent equity interest in the Epiphany Nominee Trust to Mrs. Drumm through the Separate Property Agreement on January 6, 2010, the subject of Count 10.  The Separate Property Agreement effected a transfer back to Mrs. Drumm of at least the equity that Drumm had in the Trust when that agreement was executed, $415,553.

 c. The grant of the Skerries Rock Mortgage to KBC Homeloans in December 2008 to secure a loan in the amount of €250,000, the subject of Count 11.

d.  The transfer of 100% of the $250,000 proceeds of the Skerries Rock Mortgage,
which proceeds belonged to the Drumms jointly, to Mrs. Drumm solely in December
2008, the subject of Count 12.  This cash transfer, too, occurred more than one year
before the bankruptcy filing and therefore cannot have been part of the transfers
disclosed in response to item 3c.

e.  The transfer of Drumm's 100 percent interest in 173 Cross Street to a joint interest
of himself and Mrs. Drumm for nominal consideration on October 20, 2008, the
subject of Count 13.

f.  The sale of 173 Cross Street, which Drumm and Mrs. Drumm owned jointly at the
time, to the Porch Light Trust on September 17, 2009 for $2,365,000, generating net
proceeds of $412,000, of which 50 percent belonged to Drumm, the subject of
Count 14.[11]

g.  The transfers that are the subject of Counts 15 and 17:  the sale of a Range Rover
owned and titled in Drumm's sole name to a third party for €36,000 on or about
May 5, 2009; and the sale of a BMW owned and titled in Drumm's sole name to his
sister for €20,000 on or about September 7, 2009.  Drumm states that these
transfers were "arguably" not outside of the ordinary course of business; I reject
this suggestion.  Drumm was not in the business of selling automobiles, the vehicles
had significant value, and one of the transfers was to an insider.  The fact that the
sales were necessary because the Drumms were moving across the ocean, and to a
country for which the vehicles were not suited, the steering wheel being on the

---

[11] I do not understand the Plaintiffs to be alleging in Count 14 that it was a further false oath for Drumm to have omitted from item 10a the transfer of Mrs. Drumm's 50 percent share of the sale proceeds to an account in her sole name.

right side, hardly makes them ordinary, even if the Drumms themselves have had to sell for these reasons more than once in their lives.

h. The transfers that are the subjects of Counts 16 and 18: the transfer of the €36,000 sale proceeds of the Range Rover, which belonged to Drumm alone, to Mrs. Drumm's sole bank account at Allied (ending in 247); and the transfer of the €20,000 sale proceeds of the BMW, which belonged to Drumm alone, to a bank account held jointly by Drumm and Mrs. Drumm at Allied (ending in 054). These cash transfers, too, occurred more than one year before the bankruptcy filing and therefore cannot have been part of the transfers disclosed in response to item 3c.

52.     The foregoing eighteen omissions from item 10a were false statements.

**J.     The Original Schedules**

53.     In Schedule F of his Original Schedules, the schedule of creditors holding unsecured nonpriority claims, Drumm was obligated to list "all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition." As to each, he was further required to indicate the amount of the claim, the date it was incurred, and the consideration for the claim. In Schedule F of his Original Schedules, Drumm listed Mrs. Drumm as a creditor having a claim in the amount of $210,347. With respect to the date this obligation was incurred and the consideration for the claim, he stated simply, "various loans." This entry, the basis of Count 20, was false. Drumm owed no debt to Mrs. Drumm, and she had made no loan to him.[12] On the basis of findings made above (in ¶¶ 16-20, 49), I further find that Drumm knew his answer to be false and that he made it with fraudulent intent.

54.     In Schedule B of his Original Schedules, the schedule of personal property, Drumm was obligated to "list all personal property of the debtor." At item 19, the schedule clearly directed that he

---

[12] Even if there were a debt, I would find, consistent with Mrs. Drumm's testimony, that she had made only one loan, the $250,000 loan to capitalize Harborlight, and that Drumm had made no payments on it.

list "rights or powers exercisable for the benefit of the debtor other that those listed in Schedule A—

Real Property," describe the assets, and state their current values without deducting any secured claim

or exemption.  Under item 19 of Schedule B of his Original Schedules, he listed: "50% beneficial interest

in Epiphany Nominee Trust holding 73 Colony Rd., Wellesley MA 02481."  As further description, he

added, "Trust assets are worth approximately $1,850,000 and are subject to $1,230,000.00 mortgage

and $831,106.01 separate property agreement."  He listed the value of the asset as $0.00.  This

valuation, the basis of Count 21, was not false because, by the Separate Property Agreement, Drumm

had transferred to Mrs. Drumm no less than the first $415,553 that he would otherwise have been

entitled to receive on account of his 50 percent interest in the trust.  In view of the value of the

Wellesley Property at the time, and the extent of the mortgage against it, his interest was therefore

worth $0.

     55.    Item 4 of Schedule B of Drumm's original schedules required that he disclose

"household goods and furnishing."  He listed "furniture and fittings at Chatham and Wellesley" and

valued the same at $10,000.  The Drumm's had spent over $300,000 on the furniture, window

treatments, and carpets at the Chatham Property, a large house, in 2008.  They were insuring the

personal property in that house for $300,000.  The Trustee sold the Chatham personal property later in

the bankruptcy, along with the real estate, in an arms-length transaction in which the buyer, the

Trustee, and Mrs. Drumm agreed to a value of $150,000 for the Chatham furniture and furnishings.  Also

in 2010, the Drumms were insuring the contents of the Wellesley Property for $200,000.  In a draft of

Schedule B, Drumm himself had initially valued the furnishings and household goods collectively at

$100,000 before reducing that number to $10,000.  For these reasons, I find that Drumm's valuation,

the basis of Count 22, was false, a substantial understatement by any measure not only of the value of

the household goods and furnishings, objectively considered, but—more to the point—also of what

Drumm believed the value of the furnishings and household goods to be.

56.     Drumm's response to item 4 of Schedule B was also false in a second respect: it omitted approximately six items of furniture that were being held in storage, at a location other than Wellesley or Chatham.  This omission is the basis of Count 23.  The Plaintiffs contend that Drumm made this omission both knowingly and fraudulently.  In view of the much greater volume and value of the furniture at Drumm's homes in Chatham and Wellesley, Drumm can have had no reason to deliberately omit these few items.  The evidence preponderates in favor of a determination that this omission was an oversight, neither knowing nor fraudulent.

K.     **The Meeting of Creditors**

57.     At the first session of the Meeting of Creditors, held on November 16, 2010, Drumm testified under oath that the Original Schedules and Original SOFA were true and correct.  The Original Schedules and Original SOFA were false in the 23 ways found and detailed in the foregoing paragraphs.  Therefore, this testimony, the basis of Count 24, was also false.

58.     At the fifth session of the Meeting of Creditors, held on April 1, 2011, Drumm testified under oath that, except for a few amendments disclosed at the start of that meeting, his Original Schedules and Original SOFA were "complete and accurate."  Of the amendments he disclosed, only two related to the subject matter of Counts 1 through 22.  First, Mr. Drumm testified that on Schedule F, the amount owed to Mrs. Drumm was being amended from $210,347 to $200,215.69.  Second, through attorney Zelevinsky, he disclosed that item 10a of the SOFA should include the sale of 173 Cross Street; Drumm himself added that this was a sale in September 2009 by himself and Mrs. Drumm to a third party for $2.365 million, which yielded net proceeds of $412,000, half of which went into Drumm's bank account and half into Mrs. Drumm's.  The amendment concerning the amount of the alleged loan from Mrs. Drumm did not correct the falsehoods in Schedule B as to that entry.  The amendment concerning 173 Cross Street did fully correct the omission that constitutes the basis of Count 14.  The Original

Schedules and Original SOFA therefore remained false in 22 ways; therefore, this testimony, the basis of Count 25, was also false.

59.      In Count 35, the Plaintiffs seek a finding that, at the April 1, 2011 session of the Meeting of Creditors, Drumm testified under oath that he would amend his Schedule B by reducing the debt to Mrs. Drumm to $200,215.69, but that this was false in that, in his Amended Schedule B, Drumm increased the debt to Mrs. Drumm to $216,840.69.  I find that, at the April 1 session, Drumm did testify under oath that he would amend his Schedule B by reducing the debt to Mrs. Drumm to $200,215.69. This was a representation as to his then present intent.  I do not find that this was a false statement. Drumm did at the time have the intention to which he testified.  He later determined to amend Schedule B differently, but I have no evidence that his intent on April 1 was anything but consistent with his testimony.

**L.      The Amended SOFA**

60.      On May 17, 2011, Drumm filed under penalty of perjury an amended statement of financial affairs ("Amended SOFA").  In the Amended SOFA, Drumm supplied much of what had been omitted from the Original SOFA.  He added responses previously omitted, changed some earlier responses, and, where an earlier response was unchanged, expressly carried it forward in the Amended SOFA.  However, in the Amended SOFA, he reiterated five omissions in response to item 10a:

a.   Drumm again omitted the transfer of his 50 percent equity interest in the Epiphany Nominee Trust to Mrs. Drumm through the Separate Property Agreement on January 6, 2010.  This omission is the basis of Count 26.

b.   Drumm again omitted the grant of the Skerries Rock Mortgage to KBC Homeloans in December 2008 to secure a loan in the amount of €250,000.  This omission is the basis of Count 27.

  c. Drumm again omitted the transfer of 50% of the $412,000 in net proceeds from the

sale of 173 Cross Street to the Porch Light Trust on September 17, 2009, which

proceeds the Drumms owned jointly, to Mrs. Drumm's sole bank account at Cape

Cod (account ending in 869).  Drumm contends that this was not a transfer,

because, as I have found, Mrs. Drumm had already been given a half interest in the

173 Cross Street.  I disagree.  The transfer in question was from joint ownership to

sole ownership.  Even if the transaction amounted to distributing to each party

separately the fraction that he or she had until then owned jointly with the other, it

accomplished this by two transfers (half to Drumm, half to Mrs. Drumm) from joint

ownership to sole ownership.  These were transfers of property in which Drumm

held an interest.  The transfer to Mrs. Drumm needed to be listed.  This omission is

the basis of Count 28.

  d. Drumm again omitted the sale of a Range Rover owned and titled in Drumm's sole

name to a third party for €36,000 on or about May 5, 2009.   This omission is the

basis of Count 29.

  e. Drumm again omitted the sale of a BMW owned and titled in Drumm's sole name to

his sister for €20,000 on or about September 7, 2009.  This omission is the basis of

Count 30.

  61. Drumm protests that language he used as to the Range Rover and the BMW in the

Amended SOFA did disclose these transfers.  His entry as to the Range Rover stated only:  "Range Rover

Proceeds to Lorraine's account at AIB 119247."  His two identical entries as to the BMW[13] stated only:

"Half of proceeds of BMW sale to Joint AIB account -054."  Drumm contends that his use of the word

"proceeds" in each amounted to a disclosure of the respective sales.  I disagree.  To be sure, one might

---

[13] The proceeds of the BMW were transferred in two installments.

infer from the word "proceeds" that there had been a sale, but more than the bare inference of a sale is

required.  Neither entry discloses the date of the transfer; one might surmise from the lack of required

information that the sale date preceded the two-year look-back period of item 10a.  Neither entry

discloses the transferee, one of whom was his sister, an insider.  And the first entry does not disclose the

amount of the sale proceeds (only the amount transferred to Mrs. Drumm's account).  This was all

required information.  This language in question did not disclose the sales, only the transfer of proceeds.

**M.     The Amended Schedules**

62.     On May 17, 2011, Drumm filed amendments to his Schedules B, E, F, H and I ("Amended

Schedules").  Though Drumm testified that he signed them under penalty of perjury and understood

that he was signing them under penalty of perjury, I have no direct evidence that he signed or filed

these under oath or penalty of perjury.  In these Amended Schedules, he listed only additions and

changes to the Original Schedules and did not otherwise reiterate what he had stated in the Original

Schedules.

63.     In Count 31, the Plaintiffs contend that at item 19 of Schedule B of his Amended

Schedules, Drumm misrepresented the current value of his 50 percent interest in the Epiphany Nominee

Trust as $0.00 and thereby concealed value of approximately $415,000.  It is true that, at item 19 in

Amended Schedule B, Drumm did not indicate that his interest in the trust was worth $415,000, but it is

also true that at item 19 of Amended Schedule B, Drumm simply said nothing at all.  He made no

addition or change to his earlier disclosure—in which he valued his interest in the trust at $0.00—and

reiterated nothing.  In any event, I have found that the original disclosure was not false.

64.     In item 4 of Schedule B of his Amended Schedules, Drumm amended the entry for his

household goods and furnishings.  He mentioned that certain furniture and fittings were "in storage,"

and he changed the valuation of his household goods and furnishings from $10,000 to "unknown."  This

is the basis of Count 32.  The Plaintiffs contend that the valuation of "unknown" was false.  While I have

found that his initial statement of $10,000 was misleading and a significant understatement, I also now

find that, within a very large range of possibility, all much richer than $10,000, Drumm truly did not

know the total value of his household goods and furnishings.  Moreover, by the time he made this

statement, the Trustee and IBRC knew that the issue required investigation, such that there was little

point in his hazarding a further guess.  In the context, "unknown" was not false or misleading and indeed

was far more honest than his original answer.

65.     In Schedule F of his Amended Schedules, Drumm amended the entry for his alleged debt

to Mrs. Drumm by (i) changing the description of the debt from "various loans" to "working capital loan

and Irish legal bills" and (ii) increasing the amount of the debt from $210,347.00 to $216,840.69.   This

entry, the basis of Count 33, was false.  Drumm owed no debt to Mrs. Drumm; and even if there were a

debt, I would find, consistent with Mrs. Drumm's testimony, that she had made only one loan, the

working capital loan of $250,000, that he owed her no separate debt in conjunction with the payment of

his Irish legal bills, and that Drumm had made no payment on any loan from her.

**N.      Later Session of the Meeting of Creditors**

66.     At the session of the Meeting of Creditors that was held on August 9, 2014, the only

session held after Drumm amended his Original Schedules and SOFA, Drumm testified under oath that

when he filed the Amended SOFA, he intended it to be accurate.

67.     Later in the August session of the Meeting of Creditors, Drumm also testified under oath

that to the best of his knowledge the Amended Schedules were complete and accurate when he filed

them.

**O.      Knowledge and Specific Intent regarding Omissions from Original SOFA Item 10a**

68.     With respect to the transfers at issue in Counts 1 through 18 from item 10a of the

Original SOFA, the Plaintiffs maintain that Drumm omitted each both knowingly and fraudulently.  The

omissions were made knowingly, the Plaintiffs maintain, because, when Drumm completed and filed the

Original SOFA, he was aware of each omitted transfer, knew that each was a transfer of property outside of the ordinary course of business within two years before his bankruptcy filing, and knew and understood that it was responsive to and required by item 10a.   The omissions were made fraudulently, the Plaintiffs maintain, because Drumm omitted these transfers deliberately, with intent to hide them from IBRC, the public, and the Trustee, at least for a time, for strategic advantage in negotiations with the Trustee over Mrs. Drumm's retention of assets, especially the Wellesley Property, which Drumm feared the Trustee would recover for the estate in fraudulent transfer litigation.   The Plaintiffs rely on a plethora of evidence for this position:  the number of omissions; their aggregate value; the fact that all involved or were related to transfers to Mrs. Drumm for no consideration while Drumm was insolvent; Drumm's lack of credibility; inconsistencies in his testimony and excuses; his transparent motivation at every step to place and keep his assets beyond the reach of creditors; and his clear interest in controlling the release of information and in limiting those people who would see it and the terms and conditions on which the Trustee, and only the Trustee, would get it.

69.      As to each omitted transfer, Drumm denies both knowledge of falsity and fraudulent intent.  As to each omission of a cash transfer--Counts 1 through  9 (cash in bank accounts), 12 (proceeds of Skerries Rock Mortgage), 16 (proceeds of Range Rover), and 18 (proceeds of BMW)— Drumm maintains that he was mistakenly under the impression that item 10a applied only to transfers of real property and that he relied on his advisers—attorney Heather Zelevinsky and accountant Donald Swanson, both of whom knew of all the transfers except of the vehicles and their proceeds—to catch his mistakes, but that neither saw any error or told him he should revise his answer to item 10a.  In that way, Drumm contends, they tacitly confirmed him in his innocent error.  Zelevinsky was herself under the mistaken impression that item 10a did not apply to cash transfers.  Drumm's current attorney says it was all "a perfect storm."  As for the noncash transfers, he honestly did not regard the Separate Property Agreement as a transfer of any kind, the transfers of 173 Cross Street simply slipped his mind,

and so did the sales of the vehicles.  Drumm offers no explanation in his proposed findings and

conclusions regarding the omission of the Skerries Rock Mortgage.  He emphasizes the following:  (i)

that throughout the case, he responded to the Trustee's requests for information, gave her all his and

Mrs. Drumm's banking and other records, provided summaries and other materials, and generally

cooperated with her; (ii) that he was surprised and extremely upset when he later learned that his

response to item 10a was deficient; (iii) that his professionals, all of excellent reputation, would not

have been party to fraud of the kind that he is alleged to have committed; and (iv) that he could not

have expected to hide the omitted transfers from the Trustee and IBRC for long, in view of which it

would have been incredibly stupid for him to try such a stunt and thereby to jeopardize the discharge of

some $11,000,000 of debt.   For these reasons, Drumm would have the Court conclude that his diverse

misrepresentations were in sum a huge coincidence of innocent mistakes.

70.     The evaluation of these competing claims requires a careful review of the evidence as to

Drumm's interaction with his advisers, production of the schedules and SOFA, later production of

records and other disclosures to the Trustee, testimony at the six sessions of the Meeting of Creditors,

and efforts to settle with the Trustee.

### i.     Establishment of Relationship with Professionals

71.     Drumm formally retained L&G on or around August 6, 2010.  By this time, Drumm had

already discussed his situation and legal needs with Grossman.  Grossman immediately asked

Zelevinsky, an associate at L&G, to work on Drumm's case, and she began communicating with Drumm

no later than August 6.  Within L&G, the evidence shows that attorney Pamela Harbeson also worked to

a significant extent on Drumm's matters.  On or around August 6, and on Grossman's recommendation,

Drumm also hired the accounting firm of V&L, for its expertise in bankruptcy-related accounting, to

assist in their efforts.  At V&L, Drumm's matters were staffed primarily by Craig Jalbert, a senior

accountant, and by Don Swanson.  Grossman and Zelevinsky testified at the trial in this matter.[14]

Notwithstanding his advice of counsel defense, Drumm did not call Harbison, Jalbert, or Swanson to

testify.

72.       Drumm and his advisers determined early that they would work simultaneously on two

fronts:  (i) prepare the personal financial statement to send to IBRC in connection with an attempt to

settle the Bank's lawsuit in Ireland, which was due on October 1, 2010, and (ii) prepare the schedules

and SOFA he would have to file if a bankruptcy filing became necessary.  On August 6, 2010, Zelevinsky

sent Drumm an email that included a blank copy of the forms for the schedules and SOFA he would have

to complete.  She did not in that email ask him to complete these forms, but the evidence establishes

that L&G asked Drumm to complete these in the first instance.  Drumm so testified, and his later

retraction of that testimony is not credible.  Grossman testified that his firm's usual practice with debtor

clients was to ask the client to complete the forms first, and then for lawyers at the firm to work with

the client, line by line, on refining, editing, correcting, completing the answers and explaining what was

required by each individual item.  Grossman said clients usually returned their first drafts with

incomplete information "because some of the questions are difficult for a non-lawyer to understand."

However, Drumm did not testify that any of the relevant parts of the schedules and SOFA were difficult

for him to understand; nor did his advisers testify that Drumm, whom they conceded was highly

sophisticated, would have difficulty understanding the items in question.  L&G followed its usual

practice here, and Drumm concedes that he in fact completed the first drafts of the schedules and SOFA.

73.       Before he did so, he received advice from Grossman and Zelevinsky, who, between the

two of them, told him the following:

---

[14] Drumm waived the attorney-client privilege in producing evidence at the trial.  Insofar as Drumm had the benefit
of highly capable counsel both before and at the trial in this matter, I find that this waiver was knowing and
intentional.

- that he needed to be as accurate as possible in completing the schedules and SOFA, would have to swear to their accuracy, and would have to sign them under pains and penalty of perjury;

- that the bankruptcy process was about "getting naked in public";

- that he was responsible for the accuracy and completeness of the schedules and SOFA, and that they were *his* schedules and SOFA, not counsel's;

- that leaving out assets on the schedules and SOFA is where people get into trouble— Grossman sent an early email to Drumm to this effect;

- that for every schedule and for every question on the SOFA, the trustee will have questions, and he would need to supply backup documentation, whatever the trustee wanted;

- that he would have to disclose all his transfers within a certain period of time, that the trustee could look back at these transfers, and that the schedules and SOFA would be used by the trustee to determine whether he or she thought a fraudulent transfer had occurred and could be recovered for the bankruptcy estate; and

- that for the trustee to make this assessment, he (Drumm) would have to disclose, *in his schedules and SOFA*, all transfers of property he had made in the prior two years in his schedules and SOFA.  Grossman did not himself work with Drumm on completion of the SOFA or tell him precisely where in these forms the disclosure of transfers within the two-year look-back period would have to be made, but he did tell Drumm that they would have to be disclosed *in these forms*.

74.     The ability of the trustee in bankruptcy to avoid transfers that occurred before the bankruptcy filing was of particular concern to Drumm because, in the two years before he expected to file his bankruptcy petition, he had transferred considerable cash and real estate to Mrs. Drumm that he had held in his own name or jointly with her, and most of this value had since been invested by her into the purchase, improvement, and furnishing of the Wellesley Property.  Drumm knew this, and it was a major concern of his in deciding whether to seek bankruptcy relief and in his approach to the case once he decided to file.  Being a chartered accountant and senior banking executive, and having twice been the defendant in fraudulent transfer suits in the preceding two years, he knew what a fraudulent transfer was.  With good reason he knew and feared that a chapter 7 trustee could reach or liquidate Mrs. Drumm's equity in the Wellesley Property to recover the transferred value.  Therefore, when

Grossman advised him that the transfers would have to be disclosed in his schedules and SOFA, it is

unlikely that Drumm failed to take note.  Drumm testified that, when he completed his first draft of the

schedules and SOFA, he understood only that he would have to disclose his prepetition transfers to Mrs.

Drumm *at some point* in the bankruptcy case, but that he did not know when or how; he at least implied

that he did not know these disclosures would need to be in the schedules or SOFA.  This testimony is not

credible.  Drumm understood from Grossman that disclosure of transfers within two years of the

bankruptcy filing would need to be made in the schedules and SOFA.

75.      There is considerable evidence in the record that, well before Drumm filed his Original

Schedules and SOFA, Drumm made his advisers aware of these transfers, and that the transfers and

their potential consequences for Mrs. Drumm and the Wellesley Property and became the subject of

discussions and strategizing among Drumm and his advisers.  Drumm offered very little evidence of the

substance of these discussions, most of which, it is clear, occurred in conversations, either in person or

by telephone, and not in emails or other documented form.  The absence of this evidence undermines

the credibility of his "reliance on his advisers" defense.

76.      Drumm's advisers did not tell him that he could discuss with the trustee his transfers of

property at some later time but omit them from his schedules and statements. Nor did either Grossman,

Zelevinsky, or any of Drumm's lawyers or accountants advise him that he should not list in SOFA 10 the

transfers of cash to Mrs. Drumm.  Nor did Drumm ever tell any of them that he had formed a conclusion

that SOFA 10 concerned only real property.  There is no evidence or suggestion that he ever asked any

one of his advisers about the meaning and scope of SOFA 10.

77.      On September 7, 2010, Drumm met at length with Grossman and Jalbert.  They

discussed the personal financial statement, its production, the prospect of a bankruptcy filing, his assets

and liabilities, his wife's assets and how she had gotten them, the bankruptcy process, and the ability of

a trustee to recover certain prepetition transfers within at least two years of the bankruptcy filing and

possibly three or four years.  Drumm testified:  "they gave me the basics of what I needed to put

together to come back to them for a real substantive meeting, which I did . . . about a week later."

78.      On September 14, 2010, Drumm again met with Grossman and Jalbert and, at this

meeting, delivered to them the first draft of his schedules and SOFA (the "First Draft"), a draft of his

2010 PFS, and two binders of materials to support these. The First Draft was handwritten and would

remain the only draft of the schedules until October 25 and of the SOFA until the morning of October

28.  The binders contained some 571 pages of financial records and related documents, the majority

being bank statements.  The 571 pages were arranged into tabbed sections corresponding to line items

in the draft 2010 PFS.

**ii.      Omission of Cash Transfers from First Draft**

79.      The First Draft is notable in the following respects:

- In the SOFA at item 3c, which instructs "List all payments made within one year immediately

    preceding the commencement of this case to or for the benefit of creditors who are or were

    insiders," Drumm listed Lorraine Drumm as a creditor who received transfers aggregating

    $31,000 and was owed a balance of $928,000.  A notation stated:  "see schedule of transfers

    attached."  The "attached" is a reference to the following two pages, which include three

    schedules of transfers that Drumm himself prepared and inserted into the SOFA.

    - o    The first is entitled "Transfers from David to Lorraine (AIB Bank Dublin)."  It discloses

        the four sizable transfers that are the subjects of Counts 1, 3, 4, and 12, all in

        November and December 2008:  transfers of €80,000, €180,000, and €372,561 from

        a joint account to Mrs. Drumm's sole account, and a €250,000 "drawdown of

        mortgage on Skerries Rock property deposited to Lorraine's sole account."  Drumm

        added a handwritten note as to these four items indicating: "None within last 12

months." This was an indication that these transfers were not responsive to item

3a.

- o  The second is entitled "Loans from Lorraine to David." It lists seven discrete loans

totaling $928,000. These include: a $250,000 loan on 2/2/2009 to capitalize

Harborlight; two transfers of $50,000 into accounts in Mrs. Drumm's sole name;

$415,000 described as "$831,000 equity on purchase of Wellesley House from

Lorraine account"; and $107,500 described as "Lorraine contract for renovations of

Wellesley House for $215,000."

- o  The third is entitled "Last 12 Months Routine Account Transfers to Lorraine or Joint

Account." It lists 12 transfers totaling $31,000, all made on or after September 12,

2009. All but one of the transfers, for $10,000, was to a joint account.

- •  In item 10a of the SOFA, Drumm listed only a single transfer: the transfer of Malahide in

April 2009. Where the transferee should have been identified, Drumm identified the

property transferred. The transferee, Mrs. Drumm, is nowhere mentioned in this entry. A

note adds, "Transfer reversed __/__/2010." He listed no transfer of cash, of other real

estate, of a motor vehicle, of an interest in the Epiphany Nominee Trust, or of his stock in

AIB.

80.     Drumm contends that his wholesale omission of cash transfers from the filed version of

SOFA 10 was the result of an error that his advisers should have but failed to catch and that, by their

silence, they unwittingly but effectively led him to believe was no error at all. The question arises: why

was his answer to SOFA 10 wrong in the first instance, when he completed the First Draft, before he

allegedly received erroneous advice? Drumm concedes that he had read and understood SOFA 10. This

is not an admission that he understood it correctly. Nonetheless, he admits that he read it and formed

an understanding of it.  So what went wrong?  At and before the trial, he answered this question five

times with a total of four different answers:

a.      In an answer to an interrogatory, given under penalty of perjury in this adversary

proceeding on February 6, 2014, Drumm stated (referring to himself in the third person):  "Mr.

Drumm . . . reviewed the SOFA prior to its filing but has no recollection of having thought about

the omission of the transfers beyond the one year period.  He does not know why the transfers

to Mrs. Drumm were omitted from SOFA 10, as he has no present memory of his thought

process on that particular day."[15]  The gist of this answer is that he didn't remember or know

what went wrong.

b.      At his deposition in this adversary proceeding just five days later, on February 11, 2014,

he testified that when he read SOFA 10, he understood it to be asking exclusively for transfers of

real estate.  He offered no explanation for the change from the answer he had offered five days

earlier.

c.      In examination by IBRC's counsel at trial, Drumm was asked: "When you signed the

schedules, you were not under the impression that these transfers [of cash and real estate to

Mrs. Drumm] had been disclosed in the schedules, were you?"  Drumm answered:  "I was not

under any impression about them.  We completely forgot about them, obviously."  In this

testimony Drumm essentially contended that he had simply forgotten about the cash and real

estate transfers and, in reviewing his draft, so had his advisers.

d.      In further examination at trial by IBRC's counsel, Drumm said: "The way it started out

for me was I looked it up and I thought it was real estate."  This is a reiteration of the answer he

gave at his deposition.  He did not explain how he had "looked it up."

---

[15] Later in the same answer, he added:  "The first time Mr. Drumm was led to believe that SOFA 10 required the disclosure of these transfers was at the 341 meeting in April 2011.  He was shocked and extremely anxious. Immediately following the meeting, he contacted Mr. Grossman and asked if it was a problem."

e.       In later examination at trial by his own counsel, Drumm was asked why he hadn't

included cash payments in SOFA 10 of his hand-written draft.  He answered:  "I must've read it

as being property like whatever real estate."  This time Drumm is back-tracking:  not that he *did*

understand it in a particular way, but that he "must have" understood it in a particular way.

What way? "Like whatever real estate."  And why must he have understood it in that way?  He

didn't say.   In any event, Drumm now seeks a finding that he did not list cash transfers because

"he did not believe SOFA 10 called for cash transfers," and it is this rather remarkable answer

that he cites as the basis for this proposed finding.

81.       The overall sense is of a man casting about for any plausible answer but the truth.  The

variety and inconsistency of his diverse answers, and the lack of conviction with which he delivered

each, undercut whatever credibility any one of them might have enjoyed had it stood alone.

82.       There are other reasons to doubt the veracity of Drumm's contention that he

understood, or must have understood, SOFA 10 to be limited to transfers of real estate.   First, he failed

to include in SOFA 10 three transfers of real estate:  the grant of the Skerries Rock Mortgage, the

conveyance of 173 Cross Street from himself to himself and Mrs. Drumm jointly, and their later sale of

that same property to a third party.  He offers excuses for these omissions, too, but (for reasons I

explain below) I find them neither credible nor plausible. And the only real estate transfer he did include

was one of which AIB was already aware.  Second, when his advisers later suggested adding to SOFA 10

the involuntary transfer of his stock in AIB to the Irish Government, Drumm did not protest that the

stock was not real estate and therefore didn't belong there; nor did he reconsider his omission of all

non-real estate transfers from SOFA 10.  Third, Drumm at no time attempted to justify or explain how he

came to understand SOFA 10—or why he "must have" understood it—to be limited to real estate; and I

fail to see how anyone, much less he, a well-educated accountant, could so read it.  It instructs to list "all

other *property*," not all other real estate.

### iii.    From Initial Draft to Filed Schedules and SOFA

83.    After Drumm gave the First Draft to his advisers on September 14, 2010, thirty days

passed before Drumm filed his bankruptcy petition and forty-five before he filed his Original Schedules

and SOFA.  Activity in the first sixteen days focused primarily, but not exclusively, on preparation of the

2010 PFS.  Thereafter, the focus turned to a possible bankruptcy filing.  Actual drafting and revision of

the schedules and SOFA did not resume until October 25 for the schedules and October 28 for the SOFA,

the day before their October 29 due date.  In the meantime, Don Swanson and others at V&L had been

working on information gathering and fact checking.

84.    On September 21, 2010, a Matthew Whitehouse of V&L, having just created an

inventory of the bank statements Drumm had given Jalbert in binders on September 14, sent an email to

Jalbert and Swanson saying, "Craig, the binder that we received does not contain all bank statements for

the 2-year period of interest (08/08-Present)."  Jalbert responded:  "I think the SOFA only asks for one

year."  Minutes later, Swanson replied to Jalbert, saying "Question 10 Other Transfers says:  'a. List all

other property, other than property transferred in the ordinary course of the business or financial affairs

of the debtor, transferred either absolutely or as security within 2 years immediately preceding the

commencement of this case.'"  Jalbert then promptly forwarded this string of emails to Grossman and

Harbeson at L&G, saying:  "Stewart/Pam - see below.  David only gave us one year.  With the house trust

issue and the question below. Please have David send another year and we should be sure that the

'constructive trust' thing is set."  The "constructive trust thing" is a reference to one theory that L&G

was developing to keep the trustee from recovering the Wellesley Property for Drumm's bankruptcy

estate.  Harbeson then forwarded this larger string of emails to Jalbert, Grossman, Zelevinsky, and

Swanson with this message:  "Given that we need to do a fraudulent transfer analysis as well, does it

make sense to look at statements for the past 4 years?  We know about the Ireland house, but there

might be others as well. Stewart?"  Grossman replied to all:  "He was solvent until 2008 so we don't

have to go back 4 years." They settled on asking for bank statements going back only two years and promptly asked Drumm to supply those of his statements within the two years that he hadn't already supplied.

85.     This email chain is significant in several respects. First, because bank statements track the movement of cash and not real estate or other assets, it gives reason to believe that Swanson did not believe that SOFA 10 was limited to real estate or noncash property. Second, the string is circulated to Zelevinsky but elicits no protest from her that SOFA 10 is limited to noncash property. Third, it gives reason to believe that at this juncture Harbeson was unaware of virtually all of the transfers at issue here. Fourth, by virtue of this exchange, Drumm—who by now has read and understood SOFA 10 and knows it to be the only SOFA item that looks back *two* years—is asked by his advisers to produce bank statements, which track only cash, for the second year. He's fully capable of putting two and two together and therefore now has reason to believe his advisers understand SOFA 10 to include transfers of cash.

86.     At this juncture, Drumm's advisers are asking only for Drumm's own bank accounts, not accounts in Mrs. Drumm's sole name. The latter are produced only after the schedules and SOFA are filed, at the Trustee's request. Consequently, Drumm's advisers worked on the Original Schedules and SOFA without benefit of the statements for Mrs. Drumm's sole accounts and had no bank record of those transfers of cash to her that did not originate from Drumm's sole or joint accounts. These include the proceeds from sales of the two vehicles.

87.     On September 29, 2010, a Thomas Bailey of V&L emailed Zelevinsky saying he needed certain documents of Drumm's real estate transactions, including three regarding 173 Cross Street: the 9/30/08 deed from Michael Barnett to Drumm; another deed (no date specified) from Drumm to himself and Mrs. Drumm as tenants by the entirety; and the deed selling of 9/17/09. Zelevinsky promptly obtained the three deeds and forwarded them to Bailey.

88.     On September 30 and October 1, Drumm and his professionals worked to meet the

October 1 deadline for the 2010 PFS.  Almost immediately after its submission, apparently, they knew

that no settlement of the Irish litigation was in the offing.  They turned to preparing for a possible

bankruptcy filing in time to avert the start of trial in Ireland in late October.

89.     Also on October 1, Swanson sent an email to Zelevinsky, with copies to Drumm and

Jalbert, saying:  "Here is the list of transfers with revisions we just discussed."  It lists four large transfers

from Drumm to Mrs. Drumm in November and December 2008, the same four that appear on the

schedule attached to item 3c in Drumm's original draft of the SOFA, and many smaller ones in 2009 and

2010.  It also lists seven transfers that Drumm had described as "loans" from Mrs. Drumm to himself and

states that two are "confirmed" and the other five are "invalid."  Zelevinsky testified that she believed

she had received this email but also that she didn't recall the discussions to which it refers, saying

"[t]here were quite a few phone calls."  She concedes that by virtue of this document at least, she was

familiar with the fact that Drumm had made transfers to his wife within two years of the filing.  It is also

clear from Zelevinsky's testimony that there were a great many communications between Drumm and

his advisers that Drumm has not introduced into evidence.

90.     On or around October 5, Zelevinsky received from Michael Siedband, who was then at

L&G as either an associate or a law clerk, a nine-page memorandum that someone at L&G had asked

him to prepare in conjunction with Drumm's anticipated bankruptcy filing. Its conclusion was that

Drumm's 50 percent interest in the nominee trust that owned the Wellesley Property was more likely

than not to be included in the bankruptcy estate.  Among other things, the memorandum stated:  "We

have yet to receive documents showing that the purchase money was truly Lorraine's sole property

(e.g., came from her account, cannot be traced to jointly owned marital assets, etc.).  If documents show

that the house was purchased with Lorraine's money, there should not be any fraudulent conveyance

issues."

91.      On October 5, Zelevinsky asked Grossman by email whether they should send

Siedband's memo to Drumm and his Irish counsel so that they could better understand the risk to the

Wellesley Property if Drumm were to file a petition under chapter 7.  Grossman forwarded it to Adam

Ruttenberg, another attorney at L&G, asking whether he agreed with Siedband's conclusion that the

trustee could sell the Wellesley Property under 11 U.S.C. § 363(h).  Ruttenberg wrote back that he did

agree: he thought the trustee in bankruptcy of one beneficiary of a multi-beneficiary nominee trust

could probably sell the trust res under § 363(h).

92.      By email of October 6, Grossman then forwarded the memorandum to Drumm and his

Irish counsel because, as Grossman testified, Drumm wanted to know everything they were thinking.

The email said:  "Don't freak out when you read this.  Our plan to deal with this has not changed.  The

proceeds of sale of the Chatham property [262 Stage Neck Road] that will be payable to Lorraine will be

used to purchase your interest in Wellesley.  We have a resulting trust theory but it is an argument

rather than a clear winner.  The litigation will hold up any attempted sale of the Wellesley house until

Chatham is sold."  Drumm received the memo and read it.  He testified that he didn't really understand

it and that it had not been important to him, but I find this not credible.  He knew going into the case

that none of the money invested in the Wellesley Property had originally been Mrs. Drumm's alone, that

the Wellesley house was therefore at risk, and that tracing of the purchase money would be done

through the transactions required to be disclosed in SOFA 10.

93.      On October 14, 2010, Drumm filed his petition for relief under chapter 7 of the

Bankruptcy Code without his schedules and SOFA.  The Court ordered that these be filed by October 29.

The meeting of creditors was scheduled to commence on November 16, 2010.

94.      It is not clear when the work of actually refining Drumm's First Draft began.  Grossman

testified that it was Zelevinsky, Harbeson, Jalbert, and Swanson who sat down with Drumm and went

over the schedules and SOFA with him line by line; Grossman testified that he had almost no role in that process.  Drumm presented no testimony from Harbeson, Jalbert, or Swanson.

95.      From Drumm's hand-written First Draft of the schedules, Zelevinsky used software to create a computer-printed draft of the schedules.  It closely followed Drumm's original, but not without some changes:  most notably, the loan debt to Mrs. Drumm on schedule B is reduced from $928,000 to $214,000.  Schedule B, item 4 continues to value "Furniture and Artwork at Chatham and Wellesley" at $100,000.  There is little evidence of the extent to which Zelevinsky's generation of this draft involved consultation with Drumm or others. This is the first draft after Drumm's original.  On October 25 at 2:59 p.m., Zelevinsky sent it by email to Drumm, with copies to Grossman and Harbeson, saying "Please see the attached draft schedules and let me know when you're available to discuss."

96.      October 26 was spent refining the schedules.  At 11:28 a.m., Drumm emailed Zelevinsky: "see my marked up copies of the schedules attached for our call at Noon."  Among his markings, he modified the entry of schedule B for automobiles a little:  from "2010 Land Rover, 2010 Mercedes Benz E350W4, 2011 Mercedes Benz G1450" to "2010 MB sedan E350W4, 2011 MB SUV."

97.      At 6:14 p.m., Zelevinsky emailed draft schedules to Jalbert and Swanson, saying "Attached are draft schedules for David Drumm.  David and Stewart already reviewed the prior draft, so hopefully there aren't too many changes needed.  SoFA tomorrow.  Apologies for not getting you this last week.  I was out with a pinched nerve in my upper spine."

98.      At 6:29 p.m., Zelevinsky emailed a draft to Drumm:  "This should incorporate the changes we discussed."  At 7:58 p.m., Drumm responds to Zelevinsky, saying "I think this looks good with the following observations," after which he lists four.  In one he is concerned to mask the make of his automobiles:  "Automobiles – I'm still not happy!  - can you remove the 'MB' reference as they have been surrendered and just leave it as 'Sedan' and 'SUV' – if the Trustee doesn't care she won't ask and the media can go fish."  The last concerns timing:  "I think it would be good to file early if possible - let

the media get it out of their system this week while things are relatively calm and the fizz has gone out

of the bankruptcy a bit – also might look better not to wait until the last day if we don't have to – what

do you think?"  At 8:09 p.m., Zelevinsky responded to Drumm.  As to the automobiles, she said simply

"Done"; and consequently the Original Schedule B at the item for automobiles said just "sedan and

SUV."  With respect to timing, Zelevinsky answered:  "First and foremost I would like to make sure the

Schedule and SoFA are correct and do not have to be amended later.  It is very common to file on the

deadline, but if this is a problem please let me know."

      99.    The next day, October 27, at 1:46 p.m., Swanson responded to Zelevinsky and Jalbert

with extensive comments and questions about the draft that Zelevinsky had sent them the day before.

Regarding valuation of furniture and other personalty he wrote:  "Furniture, Books, Clothing, Jewelry, &

Sports Equipment—don't we need to add a caveat explaining how each of these values was derived?"

Zelevinsky testified that she couldn't recall any ensuing discussion about this particular question.

Swanson also had extensive comments about the calculation of the $214,000 amount due on the loan

debt to Mrs. Drumm.

      100.    At 7:51 that evening, Zelevinsky emailed further drafts of schedules A through J to

Drumm, with copies to Harbeson and Grossman, saying "Here are the revised schedules. Per our

conversation, I also attached a declaration for you to sign and return."  In this draft at schedule B, the

value of the furniture is reduced to $10,000.  By this time, Grossman had seen the earlier valuation and

talked with Drumm about it.  I have no evidence as to precisely who instigated this conversation.  There

is no evidence of further work on the schedules after this email.

      101.    From Drumm's hand-written First Draft of the SOFA, Zelevinsky used software to create

a computer-printed draft of the SOFA.  It closely followed Drumm's original.  This is the first draft of the

SOFA after Drumm's original.  As in Drumm's preliminary draft, it lists only the transfer of Malahide in

SOFA 10; Zelevinsky edited the entry only by adding the annotation, "Transfer is expected to be

unwound pursuant to pending litigation in Ireland."

102.     Zelevinsky testified that prior to completing this draft, she did not consult with anyone

about the meaning of any SOFA item and had no conversations with Drumm or Swanson about whether

SOFA 10 required cash transfers.  She was aware of and had not forgotten about the cash transfers.

103.     Asked why she did not include the cash transfers in SOFA 10, she answered:  "SOFA 10

didn't list any cash transfers because SOFA 10 is asking about other property and I had put the cash

transfers in question 3."  "I interpreted the requirements of SOFA 10 to require the debtor to disclose

other property that hadn't already been described elsewhere in the SOFA as having been transferred."

"The SOFA requires disclosure of cash transfers in number 3, number 7, possibly number 6, number 8,

number 9, maybe 13."

104.     Drumm urges the Court to find, on the basis of this testimony, that it was Zelevinsky's

belief when she reviewed Drumm's First Draft and completed this draft that cash transfers did not have

to be disclosed in SOFA 10 because a cash transfer had already been disclosed in response to item 3c.  It

was Zelevinsky's position, says Drumm, that if a particular kind of transfer had been disclosed earlier,

that kind of transfer did not need to be listed in SOFA 10, even if the particular transfer in question had

not itself already been disclosed.  The evidence does not support the proposition that this was

Zelevinsky's understanding of SOFA 10.

a.     First, the interpretation itself is not remotely plausible.  SOFA 10 requires the

listing of "all other property . . . transferred," with no exception for property not previously

disclosed but of the same kind as a transfer already disclosed; it's obvious purpose is to

ensure that each transfer within two years that should be reviewed is brought to the

attention of the trustee, creditors, and the court.  No other SOFA item has a two-year look-

back.  By Drumm's proposed interpretation, a debtor could make a small cash gift, disclose it

in SOFA 7 (requiring disclosure of certain gifts and donations), and in that way purchase

exemption from disclosure of much larger fraudulent transfers of cash that would otherwise

be responsive to SOFA 10.  Zelevinsky would not have indulged so silly a position.  And where

so many transfers for so much aggregate value were at issue, she surely would not have

indulged this peculiar understanding without at least vetting it with a more senior attorney,

which she did not do.

b.      Second, Zelevinsky conceded on cross-examination that, in fact, this was not her

understanding of SOFA 10:  "Q.  And if the debtor transfers cash to someone within two

years of the petition date, but doesn't list that transfer in any of the other SOFA questions

then that cash transfer goes on SOFA-10, correct?  A.  If someone transfers cash in the two

years preceding the petition date and that transfer isn't listed elsewhere, then perhaps it

should be listed on 10."

c.      Third, Zelevinsky conceded that in the email chain of September 21-22 above, to

which she was privy, Swanson had essentially indicated that SOFA 10 requests information

on cash transfers within two years of the petition date, and that this was why they needed

the bank statements going back two years.

d.      Fourth, this alleged misunderstanding, if true, would not explain Zelevinsky's

failure to address Drumm's omissions from SOFA 10 of real estate transfers; it explains too

little, only the cash omissions.  It is unlikely that the omissions of cash and of the various real

estate transfers are attributable to different causes.  Drumm's narrative of a coincidence of

highly consequential innocent mistakes, all involving transfers to Mrs. Drumm, is highly

improbable.  I find that Zelevinsky was operating under no misunderstanding of the

requirements of SOFA 10.

105.     At 9:44 a.m. on October 28, the day before the schedules and SOFA were due,

Zelevinsky circulated this draft for the first time, sending it by email to Drumm with copies to Jalbert,

Swanson, Grossman, and Harbeson.

106.     At 3:07 p.m., Swanson responded first by emailing to Zelevinsky an extensive list of

comments and questions.  As to SOFA 10, he wrote:  "Do we need to list a. The transfer of debtor's

property to Epiphany Nominee Trust (self-settled)?  b. The transfer of debtor's Wellesley equity rights to

Lorraine per the Property Agreement?  c. The transfer of debtor's Anglo Irish Bank stock to the Irish

state per the nationalization that occurred?"  Drumm responded to these comments by email at 7:55

p.m.  In it he said:  "10 a and b the Wellesley home was purchased by Epiphany - there were no

transfers" and "10c - the stock was taken by the Government there was no transfer by me."

107.     At 4:48 p.m., Zelevinsky emailed a revised draft of the SOFA to Drumm and Swanson.  It

is clear from the emails that Drumm and Zelevinsky are communicating not only by email but also by

phone.  The substance of their telephonic communications is not in evidence.

108.     In the meantime, at 5:18 p.m., Drumm had sent Zelevinsky an email, saying "I've spent

quite a bit of time reviewing the transfers to and from Lorraine  -  building on Don's work and updating

and the new numbers are as follows:  Lorraine as a creditor = $209,097.  Transfers to Lorraine in last 12

months = $50,843."  This information was for insertion in item 3c.

109.     Twenty minutes later, at 5:38 p.m., Drumm emailed to Swanson and Zelevinsky a list of

transfers to and from Mrs. Drumm entitled "Lorraine transfers," but the list omits the transfers in 2008

(including the four large ones that appeared in the schedule he attached to item 3c in his draft SOFA)

and all transfers from himself to Mrs. Drumm prior to June 12, 2009.  Zelevinsky admitted at deposition

that she undertook no independent investigation at that time to determine whether this was a complete

list of the transfers from Drumm to his wife.

110.    At 6:15 p.m., Drumm by email sent comments to Zelevinsky on the latest draft of the

SOFA.  Regarding payments to creditors in item 3c, Drumm states:  "Lorraine Drumm $32,750 (1 Year)."

111.    At 10:34 p.m., Zelevinsky emailed to Drumm a further revised draft SOFA that added to

item 10a the transfer of his AIB stock to the Minister of Finance of Ireland.

112.    At 10:42 p.m., Drumm emailed to Zelevinsky four pages of the SOFA with "the changes

we discussed."  Drumm sent these just to Zelevinsky, with no copy to Swanson.  The changes include a

small change on the entry for Malahide in SOFA 10.  Drumm also stated in this email:  "The LLC did make

the second payment [to] the school as well as the charitable donations so I've removed both."  This

refers to (i) removal from item 7 (for gifts) of a gift of $2,500 to his children's school's annual fund and

(ii) removal from item 3b of a $31,000 payment for his children's school tuition, saying these were made

by the LLC, Harborlight.  Zelevinsky modified the draft SOFA accordingly.  At trial, Drumm insisted that

the payments by Harborlight for these and other personal purposes were in effect capital distributions

to himself that he in turn paid over to third parties; the appropriate way to account for these, therefore,

was (in part) as a transfer from himself, and Drumm testified that he always accounted for them in this

way.  By this instruction to Zelevinsky, Drumm was removing disclosures that he knew should have

remained where they were.  Zelevinsky effected the changes as instructed without question.

113.    On October 29, after reviewing the final, ready-to-file draft of the schedules and SOFA,

Drumm, through Grossman, filed the Original Schedules and Original SOFA, the relevant features of

which I have set forth above.  L&G's policy, consistent with Zelevinsky's usual practice, was to have the

client approve the schedules and SOFA before filing.  Drumm did approve the schedules and SOFA and

authorized their filing.   They were filed electronically, using Grossman's E-filing signature, so he, too,

would have had to, and did, authorize the schedules and SOFA before they were filed.   Grossman

testified that he did not read the SOFA before he did this and that he was unaware at that time of the

wholesale omissions from SOFA 10.

114.   Drumm would have the Court find that at no time before the filing of the Original

Schedules and SOFA did he and any of his advisers discuss whether cash transfers should be listed in

SOFA 10.  For the following reasons, I cannot so find by a preponderance of the evidence.

a.   Based on his lack of credibility at the trial and the totality of his testimony, I do

not take Drumm's word for it.

b.   At the very least, Grossman advised him early in the process that he needed to

disclose the cash transfers to Mrs. Drumm *somewhere* in his schedules and SOFA, and,

upon reading the SOFA, Drumm understood they belonged in SOFA 10.

c.   Zelevinsky remembered no communications on the subject but later qualified

her answer, cryptically, to say that she wasn't sure it had ever come up.

d.   Inexplicably, Drumm did not call Swanson, Jalbert, and Harbeson to testify.  The

evidence establishes that Swanson was especially active and involved in the drafting of

the SOFA.  Jalbert and Harbeson were involved too, but, given that many

communications were oral and not recorded, the extent of each's involvement is

unclear.

e.   Swanson had alerted the rest of Drumm's team of advisers to the need for *two*

years of bank statements for purposes of completing SOFA 10.  It is fair to surmise that

he, at least, thought cash transfers were responsive to SOFA 10.  And later, when Jalbert

asked him why cash transfers hadn't been disclosed in SOFA 10, Swanson answered by

email, "I recall at the time we went back and forth on this."  Who went back and forth,

and about what precisely?  I can draw only a negative inference from Drumm's failure to

call Swanson for his testimony.

f.   In view of (i) the sheer number and aggregate value of omitted cash transfers,

(ii) the fact that they were a major concern of both Drumm and all his legal team, and

(iii) the fact that neither Zelevinsky nor Drumm contends that they simply forgot or

neglected to include the cash transfers, it strains credulity to suggest that, when Drumm

submitted his First Draft, not one of his advisers noticed the huge hole in SOFA 10 and

inquired.

    **iv.**    **From October 30 to April 1**

115.    On November 16, the first session of the Meeting of Creditors was held.  This brief

session is notable because, at it, IBRC attempted to elect a trustee of its own choosing, a Michael

Epstein of CRG Partners, to replace Ms. Dwyer, but because Ms. Dwyer, as interim trustee, had that

morning filed a complaint objecting in part to the claim of IBRC, the United States trustee, presiding over

the meeting, determined to certify the election of Mr. Epstein as disputed.  As a consequence, and by

operation of Fed. R. Bankr. P. 2003(d), Ms. Dwyer, as interim trustee, continued as trustee pending

resolution of the dispute by the Court.[16]  Mrs. Drumm was represented at this session by Attorney

Christopher Panos and through him objected to the election and supported Ms. Dwyer's position.  The

meeting was adjourned to December 7.  Drumm was examined very little at the November 16 session.

116.    On November 29 and 30, and in response to a request by the Trustee for documents,

Drumm, through Zelevinsky, transmitted to the Trustee and her counsel, Andrew Lizotte, a stack of

documents relating to Drumm's assets.   These included the deed of September 16, 2008, by which

Michael Barnett transferred 173 Cross Street to Drumm alone.  The assembled documents included no

bank statements, but Zelevinsky indicated to the Trustee and Lizotte that she was working on getting

them and other requested documents.

117.    On December 2, the Court entered a Stipulated Order (the "Stipulated Order") on a

motion that IBRC had filed for an order pursuant to Fed. R. Bankr. P. 2004 directing Drumm to produce

documents and appear for examination.  In part, the Stipulated Order required Drumm to produce

---

[16] As it happens, the dispute was never presented to the Court.  Ms. Dwyer has continued to serve without
interruption as trustee in the case.

certain documents to both IBRC and the Trustee no later than December 21, 2010.  The Order was

agreed to by Drumm, the Trustee, and IBRC.  The documents Drumm was so obligated to produce

included "all bank statements from January 2008 to date" and "all documents referring to, relating to,

evidencing loans by Debtor's spouse to the Debtor and assets transferred by the Debtor to the Debtor's

spouse from January 2008 to date."

118.    On December 3, after receiving notice that the Trustee had just filed an application to

employ CRG Partners as her financial adviser in the bankruptcy case, Grossman sent an email to Drumm,

Zelevinsky, and Harbeson, saying:  "I spoke to Chris Panos . . . told him we have to get him up to speed

because Lorraine will probably be their target."  Grossman was concerned here about the transfers to

Mrs. Drumm and possible avoidance actions.  He continued:  "I really expected that we would have a

few months of being in bed with the trustee before she got into bed with Anglo."  It thus appears that

Drumm's team had hoped for a period, before the Trustee made common cause with IBRC, in which a

settlement might be reached with the Trustee regarding the transfers to Mrs. Drumm and the

consequences thereof.  Grossman thought that the Trustee's hiring of the firm that employed the

individual that IBRC had tried to elect as trustee in this case signaled that IBRC might already be too

closely aligned with the Trustee to make this possible.

119.    On December 7, the Trustee conducted the second session of the Meeting of Creditors.

This time Drumm was examined by the Trustee at length.  Notably:

a.    Asked when the Skerries Rock Mortgage had been taken out, Drumm said:

"sometime in 2008," obfuscating that the date was in the latter part of the year and

within the two-year look-back period.

b.    Drumm obfuscated about where the Skerries Rock Mortgage proceeds had been

channeled: " Q. What were the mortgage proceeds used for?  A. It just went into the

household, into our bank accounts.  Q. What bank account?  A. I think they went into a

personal account in either our joint names or Lorraine's name. I'll have to check. It just went into the household accounts. I can't remember.  Q. What bank account?  A. Our main bank accounts in Ireland were with AIB Bank, not to be confused with Anglo. It's a retail bank in Ireland.  Q. Is it your testimony the proceeds went into an account at AIB Bank that was either in your name or a joint name? A. Yeah.  Mr. Grossman:  Probably. He'll have to find out.  A.  I'll have to find out."  The proceeds had in fact gone into an account in Mrs. Drumm's sole name.

    c.   Drumm testified falsely that he had transferred his interest in Malahide to Mrs. Drumm for tax planning purposes in conjunction with the then-anticipated move to the United States; in fact the transfer had been motivated by desire to hinder, delay, and defraud IBRC.

    d.   Asked how he had arrived at the $10,000 value for the furnishings, Drumm said, "It was a best guess on, you know, sale value of the furniture."  This response was incomplete and misleadling.  He did not mention advice from Grossman, his own original valuation of $100,000, the cost of the furnishings, or the amount for which they were insured.

    e.   Drumm denied that he had made loans to family members when in fact he had just made a loan to his brother from assets of Harborlight.

    f.   The Trustee told Drumm that he would have to document the disposition of the income that had passed through his hands, going back two years, "sources and uses documentation."  At this session the Trustee also requested Mrs. Drumm's bank records.

120.    On December 14, with the Stipulated Order's December 21 production deadline nearing, Drumm emailed Grossman:  "Stewart I want to arrange a meeting on Monday next with Craig

before I hand over the documents requested.  I need to clearly understand our strategy as regards each

of the assets and to examine my stance in relation to transfers to Lorraine, Wellesley etc."  He specified

the participants and attached an agenda.  The agenda included "review, approve, and turnover to L&G

for transmission to Trustee of documents required by Agreed Order on 2004 motion."  Also, "Discuss

treatment of transfers with between (sic) David & Lorraine and approach to Trustee/strategy toward

Wellesley.  Review–Reconstructed Statement of Net Worth December 16th 2008 (date of last transfer to

Lorraine in 2008)."  It similarly included discussion of strategy toward Malahide, Chatham, and

exemptions.

121.    The meeting was held on December 20; in attendance were Drumm, Grossman,

Zelevinsky, Jalbert, Panos, and Mrs. Drumm.  No evidence was adduced as to what was said at this

meeting about the status of Drumm's disclosures to date.

122.    Around this time, Grossman advised Drumm that Mrs. Drumm should retain separate

counsel of her own, because she would be the target of efforts by the Trustee to recover transferred

property for the estate.  It is not clear precisely when Mrs. Drumm retained Panos.

123.    Later on December 20, Drumm emailed to the attendees at that day's meeting (except

Mrs. Drumm) what he called a re-draft of a document he had prepared at the request of L&G (the "Big

Picture Document").  "When finalized [Grossman] can pass on to the Trustee in order for her to get the

big picture."  The document is comprised of two pages.  One shows his total income, taxes paid, and

income after taxes for each year 2004 through 2009, totaling €7,619,000.  The other purports to show

the uses of the funds, but with no dates and no specific transactions.  Grossman testified that the "big

picture" refers to charts and spreadsheets that he urged Drumm to prepare for the Trustee and her

professionals, to help them easily see what would otherwise have to be pieced together from

voluminous bank and transaction records.  Whatever the merits of this document, it contained no dates,

listed no individual transactions, and did not supply the information called for by SOFA 10.  In any event, it was not transmitted to the Trustee at this time.

124.     December 21 was the due date for documents to be produced under Agreed Order. Nothing was produced by this date.

125.     On December 22, Drumm, through Zelevinsky, supplied to the Trustee, but not to IBRC, hard-copies of numerous documents requested by the Trustee at the Meeting of Creditors or responsive to the Stipulated Order.  This 396-page production consisted of numerous bank statements of Drumm's sole and joint accounts.  These statements included those showing the cash transfers that are the subjects of Counts 1-6, 8, and 9.  Nothing in these statements or in this production as a whole indicates the purpose, transferee, or destination of the transfers in question.  This production contains no information about the transfer that is the subject of count 7, from the Harborlight account, the bank records of which were not in this production, notwithstanding that Drumm made personal transfers from it.  Nor did it disclose anything about the transfers in counts 12 (the proceeds of the Skerries Rock Mortgage) and 16 and 18 (the proceeds of the vehicle sales) because these did not originate in one of Drumm's own accounts.

126.     That same day, Zelevinsky sent an email to Drumm and Grossman, saying "I sent Andy [Lizotte, Trustee's counsel] a hard-copy of everything David provided *(minus the summary of transfers between David and Lorraine)*.  All documents sent to Andy were stamped 'confidential.'"  (Emphasis added.)  The removed "summary" was actually two summaries.  The first is a list entitled "Cash Transfers to Lorraine Drumm in 2008, Prepared at the Request of Counsel," showing some six transfers to Mrs. Drumm totaling €1,082,561:  one transfer that occurred prior to commencement of the two-year look-back period and the five transfers that are the subjects of Counts 1, 2, 3, 4, and 12.  The second summary is a list entitled "Cash Transfers Between David & Lorraine Drumm 2009 and 2010."  It lists some 29 cash transfers between the spouses in 2009 and 2010, including those that are the subjects of

Counts 5, 6, 8, and 9.  Between them, these two documents contain the information required by SOFA

10 as to nine cash transfers.  Alas, though these documents were ready no later than December 22, they

were not provided to the Trustee on December 22 or at any time thereafter until this litigation.

127.    Why did Zelevinsky withhold them?  Drumm testified that he had wanted Zelevinsky to

transmit the summaries to the Trustee, but he concedes that he knew she had not and that he did

nothing about it, which I find to contradict his contention that Zelevinsky was acting contrary to his

instructions or inconsistently with his intentions.  Grossman testified that the removed summaries were

"something that we did to help the Trustee and counsel see the big picture and the details," but he did

not know or remember why they had been removed or on whose authority.  Neither did Zelevinsky

remember.  She nonetheless speculated that she might have withheld them on her own initiative

because they were privileged or work product, but this would make no sense.  Whether they were

privileged and work product or not, these documents were created precisely to make disclosures.  I

conclude that the summaries were withheld because Drumm did not want to make the disclosures they

would have effected, at least not yet.

128.    On December 23, Drumm sent an email to Jalbert with copies to Grossman, Zelevinsky,

and Panos.  He attached a revision of the Big Picture Document first generated on December 20 and

said:  "The main changes to the draft you saw at the meeting are: breaking out the Lorraine transfers to

what she did with the money as suggested by [Jalbert].  I took out the proceeds of the Mortgage from

the Lorraine transfers total as the question is about what happened to the money I earned from Anglo.  I

took out 2010 income for the same reason."  Grossman testified that he had not told Drumm to remove

the proceeds of the mortgage or the 2010 income.  Though this document was prepared precisely to

send to the Trustee and was ready to be delivered on December 23, it was not actually delivered to the

Trustee until January 24.

129.     On January 3, 2011 in anticipation of the next session of the Meeting of Creditors,

scheduled for January 5, Drumm emailed Grossman:  "Stewart, what time tomorrow works for a call?

Have you put any thought into where the landmines are buried at Wednesday's 341 [i.e. the Meeting of

Creditors]?  I need help prepping for it."  Grossman responded:  "Lorraine transfers are the only major

concerns of mine."

130.     On January 4, Drumm delivered more bank statements to the Trustee.  The Trustee

testified that these were probably the most helpful to her in getting her arms around the transfers.

131.     On January 5, the third session of the Meeting of Creditors was held.  At this session

Drumm testified that the proceeds of the Skerries Rock Mortgage had been deposited into an account

held solely by Mrs. Drumm.  "Q. And the money in Lorraine's account did it come from anywhere other

than your earnings?  A. The money that Lorraine had in her own sole accounts came from deposit

accounts which were funded obviously from earnings, joint deposit accounts.  She also received

proceeds of the mortgage of Skerries Rock which was €250,000, so between those two sources that's

what funded her accounts."  The same answer obscured the fact that Mrs. Drumm's sole accounts were

funded also by transfers from accounts held solely by Drumm, proceeds of the sale of 173 Cross Street,

and proceeds of the sales of two automobiles.  At the conclusion of this third session, the Trustee

adjourned the meeting to February 14.

132.     On January 16, Drumm sent an email directly to Panos, with a copy only to Mrs.

Drumm.  Attached to it were two documents that Drumm himself had prepared—a personal financial

statement for Lorraine, and an Estimate of Realizations for the bankruptcy estate if the Trustee were

successful in liquidating all properties and obtaining 50 percent of the proceeds in each instance.  These

were for use by Panos in meeting with the Trustee's counsel about settlement of possible avoidance

actions and related attempts to liquidate property in which Mrs. Drumm had an interest.  "Both Lorraine

and I would like you to have a conversation with Harry [Murphy, one of the Trustee's attorneys] about this right away and we are both prepared to come in and meet him as soon as possible."

133.     On January 18, Grossman asked Drumm to send him "the summary statement I am going to send to [the Trustee]." On January 18, Drumm responded by email: "see attached. Can we set up a meeting with her to discuss the whole process?" The "attached" is the two-page Big Picture Document that Drumm had prepared. Drumm testified that he asked Grossman to set up a meeting with the Trustee "to discuss the whole process" because he was concerned about "whatever arrangements the bank would have with the trustee." "I wanted to get front and center with the Trustee and explain everything to her, give her the bank statements, give her the transfers. That's why I went to the trouble of typing them all up and that's why I was calling for this meeting. Q.  What do you mean when you say 'to discuss the whole process'?  A. Dealing with the transfers, dealing with the fraudulent conveyance, dealing with Lorraine and getting that to some conclusion."

134.     Grossman arranged this meeting.  Held on January 24, it was attended only by Drumm, Grossman, the Trustee, and Lizotte.  Unlike the Meeting of Creditors, it was not recorded but entirely off-the-record and, in essence, a settlement conference.  Drumm did most of the talking and gave the Trustee the Big Picture Document.  He communicated that there had been transfers but gave no dates. The Trustee testified that the meeting was frustrating and not productive. She added:  "I didn't see that Mr. Drumm was getting the understanding—the importance of his presenting information under oath on schedules as opposed to this oral presentation he preferred, this kind of off-the-record presentation." By this point she suspected Drumm of being up to something and did not think the omissions from SOFA 10 were simple mistakes:  there were so many of them, for so much total value; he was highly sophisticated, not the sort to make this kind of mistake; he did not promptly correct any of his mistakes; and he had this strange desire to make his most important disclosures off-the-record. She told him at the end of the meeting, as she did whenever new information came out, that he had to

amend the disclosures in his schedules—perhaps she added "and SOFA," she wasn't sure.  Precisely how

she told him is unclear, and what Grossman understood of this is even less clear.  He apparently left the

meeting still unaware that much of what Drumm had just discussed had been omitted from the Original

Schedules and SOFA.

135.      Later that same day, and as a result of the meeting, Lizotte sent an email to Grossman,

with copies to Zelevinsky, Panos, and the Trustee, confirming that Drumm "will provide us with all of

Lorraine's bank records, along with a summary of interspousal transfers" before the end of that week.

"We would ask that responsive documents other than the bank records be provided as well."

136.      On January 31, Drumm emailed to Panos a draft of a document the parties call "the

Road Map."  Created by Drumm, it consisted of 22 pages of summaries of inflows to and outflows from

Lorraine Drumm's bank accounts along with supporting schedules.  He sent it to Panos so that he could

use it to support his settlement efforts with the Trustee on behalf of Mrs. Drumm.  Drumm told Panos:

"I am happy to get on a call to walk through it with you if it is still hard to follow."   They did in fact have

a call, but no testimony was adduced as to its contents.

137.      On February 1, Panos, for Mrs. Drumm, sent to Lizotte by hand copies of bank

statements for 15 enumerated bank accounts and summary sheets that Drumm had prepared as to 11

of these.

138.      On February 3, Panos sent the Road Map to Lizotte by hand delivery.  Panos's cover

letter stated:  "Enclosed are summaries of inflows to and out flows from Lorraine Drumm's bank

accounts along with supporting schedules.  I am providing this to follow up Harry's invitation to discuss

possible claims that would be asserted by the Trustee to give you 'road map' type information.  As

discussed, this summary is provided as a settlement communication subject to Fed. R. Evid. 408."  The

whole of the transmittal was marked confidential and was part of an attempt to settle any fraudulent

transfer claims the Trustee might assert against Mrs. Drumm.  The Road Map was not signed under oath

by Drumm or even by Mrs. Drumm and was not provided to IBRC, much less filed on the record in the

bankruptcy case.  The Trustee testified that with this transfer, she finally had all the information that she

would ultimately get with the amendment of the SOFA in May.

139.    On February 14, a fourth session of the Meeting of Creditors was held and, at its

conclusion, adjourned to April 1.  At this meeting, the Trustee further interrogated Drumm for

approximately an hour.  The Trustee asked whether Drumm planned to make any amendments to the

schedules or SOFA.  Grossman answered for him:  "We'll be doing that this week. . . .  I don't think

there'll be any surprises."  But Drumm did not amend his schedules before the next session or until May

17.

140.    On March 2, Panos sent an email to Jalbert, saying "I have officially retained you to

assist us in representing Lorraine and possibly as a testifying witness – so attached is a DRAFT solvency

analysis.  Look particularly at March 14 and then at the last point of solvency."  Attached were 11

balance sheets prepared by Drumm in early 2011 as to himself, indicating his financial condition as of

the end of March 2008 and the end of each succeeding month through January 2009.  They show him

becoming insolvent in October 2008 and remaining so thereafter.  The principal variable is the value of

AIB stock, which dropped from a high of €8.95/share in April, when Drumm's net worth was $9,366,359,

to a low of €0.21 in December, when his net worth bottomed out at ($5,580,576).  Drumm prepared

these at the request of Panos, to help in determining how to respond to a fraudulent transfer action.

**v.      The April 1 Session of the Meeting of Creditors and its Aftermath**

141.    On April 1, a fifth session of the Meeting of Creditors was held.  Zelevinsky attended the

meeting with Drumm; Grossman did not.  Early in the session, Drumm averred that his Original

Schedules and SOFA were correct—knowing full well that in SOFA 10 and elsewhere, they were far from

correct.  Then Drumm was interrogated at quite some length by counsel for IBRC; this was IBRC's first

opportunity to examine Drumm in the Meeting of Creditors.  Much of the questioning concerned

transfers to Mrs. Drumm and other transfers and sales.  At the end of this line of questioning, Drumm

was asked whether some of these transfers had occurred after October 14, 2008, and whether they had

been listed in his answer to SOFA 10.  He acknowledged that the transfers had occurred after October

14, 2008 but not been disclosed.  By virtue of this line of questioning, it had become clear to Drumm

that IBRC had a good handle on his transfers.  Though no one had said so at the Meeting of Creditors,

Drumm left the session under the impression that IBRC and the Trustee believed the transfers should all

have been disclosed in SOFA 10.  At the end of this session, the Meeting of Creditors was continued

generally, awaiting Drumm's promised amendment of his schedules and SOFA.  Eventually a last session

was scheduled for August 9, 2011.

142.    Drumm testified that the first time he became aware that there might be a problem

with the omission of cash transfers from SOFA 10 was in the latter part of the April 1 session.  Drumm

testified that after the meeting he felt "absolutely devastated" and "in a state of panic."  He testified

that he had a conversation with Zelevinsky about it immediately after the meeting "and she kind of

blanked me.  She didn't have the answer."  And then, Drumm testified, he "went after Stewart, who

gave me a pat answer that 'calm down, you know, it's going to be fine.'  And then he [Grossman] went

and spoke to Jalbert."  The other evidence does not corroborate Drumm's testimony of surprise, of

having just learned that he had made a big mistake in SOFA 10.

143.    The transcript of the April 1 session of the Meeting of Creditors gives no evidence of

surprise on Drumm's part.  At that meeting, when he was asked to acknowledge that the transfers had

not been disclosed in SOFA 10, Drumm did not ask whether the transfers should have been listed in

SOFA 10, protest that they needn't have been, or otherwise indicate surprise.  And if he left that session

believing that maybe SOFA 10 required more than he had seen fit to disclose, it was not because there

had been any discussion or questioning at the meeting about the meaning and requirements of SOFA

10.  There had not been—only the single question about whether certain transfers had been listed

there.  He has offered no explanation as to precisely how (as he maintains) he suddenly came to believe

that perhaps his treatment of SOFA 10 had been wrong.

144.     Zelevinsky did not corroborate Drumm's testimony that he had discussed this issue with

her immediately after the April 1 session.  She mentioned no discussion immediately after that session.

The only evidence of communication between Drumm and Zelevinsky on the subject is an email Drumm

sent her the next morning, Saturday April 2, at 9:52 a.m., which she received at the airport, waiting to

leave for vacation:  "Heather not sure if you have taken off for Italy yet but hopefully you are getting

this.  Should we have included the cash transfers from the joint account to Lorraine in 2008 at section 10

of the SOFA?  It looks like the bank is going to claim I lied on the Schedules.  Tell me I'm wrong.  Regards.

David."  The substance and tone of this communication are not consistent with a revisiting of an issue

first raised the day before.  Drumm was asking the question here for the first time.  And this is the first

communication on the subject that Drumm had with any of his advisers.

145.     At 11:20 a.m., Zelevinsky emailed a response to Drumm, with a copy to Grossman:

"We're waiting in the airport.   Yes, I have in my notes we should add all the transfers to Lorraine in Q10.

To err on the side of caution, all transfers (from you and from joint accounts), should be included,

though the latter arguably are not transfer to Lorraine.  Anglo may say that you made a false statement

under oath by filing Q10 one way and then changing it, but that seems like a smaller problem than not

changing it.  It is tough to get the SoFA 100% correct the first time, and there is no evidence you were

trying to conceal the transfers in any way."  I note that she did not say, "no, cash transfers don't go in

Q10," which is what Drumm now contends she had believed when she assisted him in drafting the SOFA.

At least as to transfers from his sole accounts, she expresses no doubt at all that they should be there.

As to transfers from joint accounts, she maintains that "arguably" they need not have been there, but

that she would err on the side of caution—which again is inconsistent with the stance Drumm now

alleges she took in drafting the SOFA.  And her reason for saying they arguably need not have been

listed is that the transferred assets were jointly held, not that they were cash.

146.    At 11:32 a.m., Drumm forwarded his question and Zelevinsky's response to Jalbert,

saying:  "Craig see email exchange below  - do you recall / have a view as to why we didn't put these in

the SOFA?"  Jalbert immediately forwarded this inquiry to Swanson, asking only "Thoughts?"  At 3:01

p.m., Swanson responded:  "I recall at the time we went back and forth on this.  Do they want to

amend?"  Jalbert answered only "Talk Monday."  There is no evidence of whether they did talk further

and what was said.  Nor was Swanson called to expand upon his response that "at the time we went

back and forth on this."

147.    Between 11:30 a.m. and 1:30 p.m., Drumm called Grossman.  Grossman testified that

Drumm was "very upset that it seemed like it was a mess up."  Grossman further testified that this all

caught him (Grossman) by surprise, that he couldn't understand what Drumm was talking about, and

that his goal was "to just calm him down while I could figure this out."

148.    At 1:33 p.m., Grossman emailed Zelevinsky:  "don't think about this on your vacation.

We will amend when you return with the footnote that we actually disclosed everything to the Trustee

and Anglo.  No intent and no harm.  I spoke with David and he has calmed down.  The reality is they are

after him and he has to drag it on rather than try to get it resolved now."

149.    Though Drumm later worked with Zelevinsky on drafting the Amended SOFA, he never

asked her why SOFA 10 needed amendment or why the new disclosures in item 10a of the Amended

SOFA did not appear in the original.  This was Zelevinsky's testimony at her deposition, which I credit.  At

trial she changed her testimony:  "Q.  And he also never asked you why any of the new disclosures in

SOFA 10 weren't on the original SOFA 10, correct?  A.  I think in not so many words he did."  Zelevinsky

offered no explanation for the change in testimony or of how Drumm had asked the question, if "not in

so many words."  I find the trial testimony not credible.  I also find it telling that Drumm did work with

Zelevinsky on the amendments and, notwithstanding wholesale omissions of major consequence for his discharge, did not regard her as incompetent.

150.     Grossman further testified that at some point he discussed the omissions from SOFA 10 with Zelevinsky.  If, in this conversation, she told him why she had not taken issue with Drumm's numerous omissions from his original draft of SOFA 10, Grossman could not recount the reason with any clarity or reliability.   His limited testimony on the subject was vague and fragmentary:  at one point he suggested it had something to do with ordinary course of business; at another, he said Zelevinsky "believed it was one year rather than two years."  None of this makes any sense; and all of it is inconsistent with the reasoning that Drumm now contends Zelevinsky employed.  Nor did Grossman recall ever having discussed with Drumm how it came to be that *he* omitted the cash and real estate transactions from his draft of SOFA 10.

151.     I conclude that Drumm was not surprised on April 1 to learn that his omissions from SOFA 10 had been in error.  The expressions of surprise that he memorialized in an email to Zelevinsky and a phone call to Grossman were not genuine but affected, for show, when Drumm realized that he would have to explain his omissions.  Only Grossman was surprised, but no one contends that he had known before April 1 of the omissions.  Zelevinsky was not surprised; and when faced with Drumm's email of April 2, she showed no indication of having ever believed that the omissions were justified.  Moreover, Swanson promptly recognized that "at the time we went back and forth on this."  But Drumm failed to call Swanson to explain this reaction.

152.     On May 17, almost seven weeks after the April 1 session, Drumm filed his Amended SOFA and Amended Schedules.

153.     On August 9, the sixth and final session of the Meeting of Creditors was held.

154.     On August 13, Drumm emailed to Lizotte a three-tab spreadsheet.  The first tab is labelled "SOFA 10," the second "SOFA 3c," and the third "Loan reconciliation." In the email, he says:

"Andy, see attached file which should be responsive to your question about Lorraine's loan balance at the 341. Heather was given this entire file and I understood it was being provided with the [amended] sofa and schedules, but it appears she only included the sofa 3 and sofa 10 schedules and not the loan reconciliation per the third tab of the spreadsheet." The loan reconciliation purports to show that in addition to the alleged $250,000 loan by Mrs. Drumm to him in February 2009, she later made further transfers to him of another $155,654.69.  And the loan reconciliation also purports to claim that in addition to the loan repayments itemized in Amended SOFA 3(c) of $73,000, he made additional payments totaling $115,564, they being the eight transfers listed on amended SOFA 10 that occurred after the date of the alleged $250,000 loan.  He concludes with an "unpaid loan balance at filing date" of $216,840.69.

155.      On August 16, Drumm emailed to Lizotte copies of what he says are "the financial statement provided to Anglo in November 2009 and October 2010 respectively."  The 2010 statement that he attached is the version that showed a negative net worth of ($3,216,986), which he had not given to AIB.  Drumm claims that this was a mistake.

**vi.     Non-Cash Omissions**

156.      Drumm omitted from item 10a of the Original SOFA not only transfers of cash but also four transfers of real estate and two of automobiles.

**a.     Epiphany Nominee Trust**

157.      On January 6, 2010, Drumm and his wife executed the SPA.  I have found that by the SPA, Drumm transferred, intended to transfer, and understood himself to be transferring, from himself to Mrs. Drumm a portion of his beneficial interest in the Epiphany Nominee Trust:  specifically, the first $415,553 that would otherwise have inured to his benefit on account of his fifty percent interest in the trust.  This transfer occurred within the two years before the Petition Date, yet Drumm omitted it from SOFA 10.

158.     Unlike every other alleged omission from the Original SOFA 10, Drumm denies that this was in fact an omission and instead maintains that the SPA did not effect a transfer.  I have already found otherwise.

159.     Drumm further defends by arguing that he relied on his advisers to tell him where and how to disclose the SPA and the Epiphany Nominee Trust, and that it was they who settled upon disclosing it as they did in Schedule B, the Schedule of Personal Property.  The evidence does not fully support this defense.  His advisers certainly did discuss the manner in which Drumm's interest in the Epiphany Nominee Trust would be disclosed and the import of the SPA in that disclosure.  However, they and Drumm settled that issue before they turned to the SOFA.  Drumm and all his advisers maintain that, with one notable exception, none of his advisers ever advised him at all on the requirements of SOFA 10.  The exception is that, after Schedule B had reached its final form, and Drumm and his advisers had settled on valuing Drumm's interest in the Trust at $0, Swanson asked, with regard to SOFA 10, "Do we need to list . . . [t]he transfer of debtor's Wellesley equity rights to Lorraine per the Property Agreement?"  Drumm answered:  "the Wellesley home was purchased by Epiphany—there were no transfers."  This question and response show that, in regard to the treatment of the SPA in SOFA 10, Drumm did not follow the advice of any adviser but went his own way.

160.     Drumm's answer to Swanson, that "there were no transfers," was disingenuous. Drumm knew that if the SPA had not effected a transfer, then the value of his 50 percent interest in the Trust would have been equal to half the equity in the Wellesley Property, a value that Drumm concedes was in the hundreds of thousands of dollars.  But Drumm was stating in Schedule B that the value of his interest was $0.  He cannot have it both ways.  He in fact believed that the SPA *had* effected a transfer, but he chose to pretend otherwise and falsified SOFA 10 by omitting from it "the transfer of debtor's Wellesley equity rights to Lorraine per the Property Agreement."  This omission was not Drumm's only attempt to conceal the nature of the SPA as a transfer back.  In his deposition, he falsely testified that

the SPA had been executed at the closing on the Wellesley Property, when in fact, as he well knew (and

conceded at trial), the SPA had been executed in a separate, later transaction on the same day.  See

Findings ¶ 33 above.  I find that the omission from SOFA 10 was knowing and intended to hinder, delay,

and defraud.

### b.    Skerries Rock Mortgage

161.    The Drumms jointly purchased Skerries Rock in 1999 and continued to hold it jointly

when, in December 2008, they borrowed €250,000 from KBC Homeloans, secured the loan by granting a

mortgage on the property to KBC Homeloans, and deposited the proceeds into an account in Mrs.

Drumm's sole name.  The grant of the mortgage and the deposit of the proceeds into Mrs. Drumm's

account were transfers.  Though Drumm never forgot that the mortgage proceeds went to Mrs. Drumm,

he omitted the granting of the mortgage and the transfer of the proceeds to Mrs. Drumm from SOFA 10.

(He did list the mortgage itself on his Schedule of Creditors Holding Secured Claims, but nowhere in the

Original Schedules or SOFA did he disclose the date on which the mortgage was granted.)  Drumm offers

no explanation or excuse for the omission of the mortgage.

162.    The only information that Drumm had provided to his advisers about the granting of this

mortgage was cryptic at best.  In a stack of documents he gave them in late September 2008, Drumm

had included a four-page folio marked Skerries Rock; the folio appears to be in the nature of a land

registry record.  At its fourth page, it includes this entry: "12-DEC-2008  Charge for present and future

advances repayable with interest.  KBC Mortgage Bank is owner of this charge."  This is Drumm's sole

disclosure of the Skerries Rock Mortgage to his advisers.  They may well have missed it.

163.    At the December 7 session of the meeting of creditors, Drumm was less than

transparent about the mortgage and disposition of its proceeds.  When the Trustee asked him when the

mortgage had been taken out, he answered "sometime during 2008," obscuring that the mortgage had

been taken out in December of 2008, within two years of the bankruptcy filing and after the collapse of

the AIB and Drumm's slide into insolvency.  When the Trustee then asked him what the mortgage

proceeds had been used for, there ensued the following colloquy:

> A. It just went into the household, into our bank accounts.
> Q. What bank account?
> A. I think they went into a personal account in either our joint names or Lorraine's name. I'll have to check. It just went into the household accounts. I can't remember.
> Q. What bank account?
> A. Our main bank accounts in Ireland were with AIB Bank, not to be confused with Anglo. It's a retail bank in Ireland.
> Q. Is it your testimony the proceeds went into an account at AIB Bank that was either in your name or a joint name?
> A. Yeah.
>   MR. GROSSMAN: Probably. He'll have to find out.
> A. I'll have to find out.
> Q. It might have gone in in some other name?
> A. No.

In fact, Drumm did remember and know where the proceeds had gone.  They had not gone to an

account in his own name or into a joint account, much less a "household" account.  He was here

hindering and delaying the Trustee and all in attendance, being deliberately evasive.

164.     Drumm testified that the next time he disclosed anything having to do with Skerries

Rock in the bankruptcy case was in the December 22 production to the Trustee, but he did not indicate

where in that production any such disclosure could be found.  The documents produced on December

22 consisted of records of Drumm's own bank accounts.  These records did not disclose anything about

the transfer of the Skerries Rock Mortgage proceeds because these proceeds did not originate in one of

Drumm's accounts.  In this testimony Drumm lied to the Court.

165.     The deposit of the proceeds into an account belonging solely to Mrs. Drumm was finally

disclosed on February 1, 2010, but not by Drumm himself, much less under oath.  Rather, it appeared in

the collection of Mrs. Drumm's bank statements that Panos, as counsel to Mrs. Drumm, delivered to

Lizotte with typed-up summaries that Drumm had prepared.  This document did not disclose *when* the

mortgage was granted.  The deposit also appeared in the so-called Road Map that Panos delivered to

Lizotte on February 3—again without information as to when the mortgage was given.

166.     In all of this Drumm acted with intent to hinder and delay the Trustee and, even more,

IBRC and the interested public.  For reasons of strategy, he wanted to and did control the timing and

manner in which the information that should have been in SOFA 10 reached the Trustee.  Later, he tried

to make off-the-record disclosure to the Trustee, which I conclude was intended to keep IBRC and the

public in the dark.  Thus, I conclude that his omissions of the granting of the Skerries Rock Mortgage and

of the transfer of the proceeds of that mortgage to Mrs. Drumm were knowing and fraudulent.

### c.     173 Cross Street

167.     In 2006, Drumm had entered into a joint venture to develop 173 Cross Street with a

Michael Barnett.  Drumm had supplied all the equity for the venture, but the real estate itself was held

in the name of Barnett.  The project ran significantly over time and over budget and missed the market.

As part of a settlement with Barnett, Barnett transferred the real estate to Drumm on September 30,

2008, subject to an existing mortgage securing an obligation in the approximate amount of $1,600,000.

Drumm contends that he had asked that the property be transferred to himself and Mrs. Drumm jointly;

be that as it may, the September 2008 transfer was to Drumm alone.  On October 20, 2008, Drumm

transferred a one-half interest in 173 Cross Street to Mrs. Drumm by transferring the property to himself

and her jointly.  He himself signed the deed to effect this transfer.

168.     In 2009, a contractor sued Drumm in connection with the 173 Cross Street project and,

in the complaint in that action, included a count against Mrs. Drumm for avoidance of the October 20

transfer as a fraudulent transfer.  As evidenced by an annotation he made in the margin of his copy of

the complaint, Drumm clearly read and took note of this count.  Later, he settled the action.

169.     On September 17, 2009, the Drumms sold 173 Cross Street to a third party for

$2,365,000, generating net proceeds of $412,000; and they deposited half of the proceeds into a bank

account in Mrs. Drumm's sole name.

170.     In the Original SOFA, Drumm omitted from SOFA 10 (i) the transfer of his 100 percent

interest in 173 Cross Street to himself and Mrs. Drumm jointly on October 20, 2008, (ii) the sale of 173

Cross Street on September 17, 2009, and (iii) the transfer of 50 percent of the $412,000 in net proceeds

from the September 17, 2009 sale to Mrs. Drumm's sole bank account.

171.     As to the two transfers of real property, Drumm concedes that he understood when he

filed the Original SOFA that SOFA 10 required that they be listed.  They were omitted, he would have the

Court find, because he failed to notice their omission when he reviewed Zelevinsky's draft.  This excuse

is implausible.  It does not explain why Drumm himself omitted the transfers from his own first draft.

Nor does it explain why Zelevinsky would not herself have addressed Drumm's omission of these

transfers.  Drumm's story, remember, is that Zelevinsky labored under the misunderstanding that SOFA

10 did not call for transfers of *cash*.  This is no excuse for not disclosing real estate.

172.     I note moreover that the excuse Drumm now proffers is inconsistent with that which he

offered in testimony at trial (and, before that, in an answer to an interrogatory and at his deposition):

specifically, that when he filed the Original SOFA, he had been unaware, or failed to remember, that he

had ever held the property in his name alone.  This testimony is not credible—Drumm himself had

signed the deed that effected the first transfer, and he well knew that it had given rise to fraudulent

transfer litigation—and fails to explain why he also omitted the September 2009 sale of the property.  It

is perhaps the implausibility of this earlier excuse that prompts Drumm's recourse to the current

proposed finding.

173.     Drumm further contends that these omissions were clearly inadvertent because he

himself had already disclosed the transfers in question to IBRC.  Drumm maintains that on October 23,

2009, his Irish attorney had sent a letter on Drumm's behalf to the Group Chief Executive of AIB that, in

relevant part, stated:  "The net sales proceeds of the property in Chatham were $412,000

approximately.  The house was owned jointly by our client and his wife. The net proceeds were split

50/50 with $206,000 lodged into their separate bank accounts."  It suffices to point out what the letter

did not disclose:  that the property was first owned by Drumm solely and only later transferred to

himself and Mrs. Drumm jointly.  It is this information that shows the final transfer of cash to Mrs.

Drumm to be the completion of a set of transfers that a trustee might avoid in bankruptcy as a

fraudulent transfer.  The letter does not help Drumm's cause.

174.    I conclude that Drumm's omission of the two transfers of 173 Cross Street and his

omission of the transfer of half the proceeds to Mrs. Drumm were knowing, deliberate, and of a piece

with his numerous other omissions from SOFA 10.

### d.    Automobiles

175.    In May 2009 Drumm sold a Range Rover that was titled in his sole name to a third party

for €36,000 and deposited all the proceeds into an account in Mrs. Drumm's sole name; and in

September 2009, Drumm sold a BMW that was titled in his sole name to his sister for €20,000 and

deposited the proceeds into an account he held jointly with Mrs. Drumm.

176.    Drumm had not informed his advisers of the automobile transfers, and his advisers had

no independent knowledge of those transfers.  Drumm testified that the "bank statement and stuff that

they got would have contained that information," but in fact the bank statements that he had given his

advisers were his own, not Mrs. Drumms, and did not show these transfers because they did not

originate in his own accounts. Though he had not forgotten about the automobile transfers, Drumm

asked his advisers no questions about whether and how they should be disclosed in the Original SOFA.

Drumm alone was responsible for the omissions of the vehicle sales from item 10a of the Original SOFA.

177.    Drumm seeks a finding that his omissions of the sales and of the dispositions of their

proceeds from the Original SOFA were unintentional—that with the passage of time, he had forgotten

about them.  He testified that these transfers didn't show up on his radar initially because he and his

advisers had been working on a balance sheet (the 2010 PFS), and he no longer owned these assets.  I

find this difficult to believe.  Drumm had no trouble remembering many other transfers he had effected

even further back in time; yet he omitted virtually every direct transfer to Mrs. Drumm and several that

were liquidations whose proceeds he transferred to Mrs. Drumm.  And his own testimony is that even

before the completion of the 2010 PFS, he and his advisers were preparing for the bankruptcy filing and

collecting the information they would need for the schedules and SOFA, including information about

assets transferred within the two years before the bankruptcy filing.

178.      At the December 7 session of the Meeting of Creditors, Drumm was asked whether he

had vehicles in Ireland.  He said he had two and that "we" sold both.  He referred to the BMW, of which

he had been sole owner, as his wife's car.  He disclosed that he had received €20,000 for it but not to

whom it had been transferred or when.  He disclosed that he'd sold the Range Rover for €35,000 in or

around June 2009 but didn't identify the transferee or mention that she was his sister.

179.      Even in his Amended SOFA, when he disclosed the disposition of the proceeds of these

two sales, Drumm did not disclose the dates of the sales or identify the transferees.

180.      Given Drumm's general lack of credibility, his failure to disclose numerous other

transfers to his wife, and the fact that one of the purchasers was an insider, the preponderance of the

evidence does not support Drumm's position.  I find that he acted knowingly and fraudulently in

omitting the automobile sales and the dispositions of their proceeds.

**vii.      Other Considerations Bearing on Intent**

181.      Drumm argues that notwithstanding all of the above, the Court should find that his

omissions were neither knowing nor fraudulent for two reasons:  (a) he fully cooperated with the

Trustee, gave her all the records she requested, gave her guides to Mrs. Drumm's accounts, and over

time fully disclosed to her everything that was missing from SOFA 10; and (b) he could not have hoped

to pull the wool over the eyes of the Trustee and IBRC, and therefore it would have been "incredibly"

stupid of him—literally, more stupid than I should believe him capable of—to try such a stunt, given that

the attempt would jeopardize his chance to discharge some $11 million of debt to IBRC.

182.     It is true that Drumm cooperated with the Trustee to an extent.  Most importantly, he

supplied her with his bank statements and, somewhat later and through Mrs. Drumm's attorney, with

her bank statements.  At various sessions of the Meeting of Creditors, he answered questions

truthfully—not all questions, but many.  He supplied the Trustee with other documents she requested.

The cumulative result of these efforts was to enable the Trustee and IBRC to piece together, by April 1,

2011, a mostly complete picture of the omitted transfers that are the subjects of Counts 1 through 18.

183.     Drumm's cooperation, however, was limited, delayed, and shaped to his purposes.  His

bank statements were delivered on December 22 and Mrs. Drumm's on February 1, 54 and 94 days

respectively after the Original SOFA was filed and due.  Though Drumm and his advisers had created

summaries of the cash transfers even before the Original SOFA was filed, these were not ever delivered;

Drumm deliberately removed two such summaries from his December 22 production of documents.

When he finally did begin itemizing his transfers for the Trustee, he did so with the Trustee alone, orally,

in an off-the-record meeting on January 24, and then in a settlement communication of February 3

through Mrs. Drumm and her counsel; none of this was under oath or shared with IBRC, much less made

available to the Court or the interested public.  His testimony at the Meeting of Creditors relating to the

omitted transfers was in many instances untruthful, partial, or misleading.  For these reasons I find that

Drumm's record of cooperation, such as it is, only reinforces the conclusion that his omissions from

SOFA 10 were knowing, deliberate, and intended to hinder, delay, and defraud the Trustee and IBRC.

184.     As for his suggestion that he has fully disclosed everything, I can make no such finding.

Only the transfers at issue in Counts 1-18 have now been accounted for.  On what basis can the Court

believe that the full extent of Drumm's assets and transfers has now been disclosed?  Certainly not on

his word for it, which is all I have, and therefore I can make no such finding.  In short, Drumm has not

earned the benefit of the doubt.

185.    This leaves only what IBRC refers to as Drumm's "so stupid" defense.  Drumm essentially

argues, as a matter of fact, that no one would be so stupid as to attempt what he is being accused of,

knowing it would likely result in forfeiture of a discharge of some $11 million of debt.  I agree with

Drumm that a debtor's strategic making of false oaths is generally imprudent, all the more so when the

debt at issue is large and the misrepresentations numerous and likely to be found out.  Still, people do

stupid things; § 727(a) exists not just for its *in terrorem* value but because debtors sometimes do things

warranting denial of discharge.  I need not attribute Drumm's conduct to stupidity; indeed it may well be

the product of cleverness.  Perhaps Drumm was emboldened by a sense that he could invoke the "so

stupid" defense against the consequences of his actions, the plausibility of the defense being directly

proportional to the scope and brazenness of the offense.  Perhaps he believed that his odds of getting a

discharge were slim anyway, in view of 11 U.S.C. § 727(a)(2)(A) and the fraudulent transfer effected by

the SPA, and that he had nothing to lose by making false oaths.  The Trustee points out that fraudulent

conveyances, too , are frequently stupid in this same way, see 11 U.S.C. § 727(a)(2)(A), yet Drumm

himself systematically conveyed his assets to Mrs. Drumm to hinder, delay, and defraud his creditors.

Drumm is a quick thinker, adept in testimony intended to deflect, misdirect, avoid, fabricate.  His

accounting and knowledge of his financial affairs is detailed, precise, almost obsessive.  He is confident

in his strategizing; and by the time he filed his bankruptcy petition, he had been planning and

strategizing for this eventuality for over two years.  No bumbler, and clearly a controlling type, he knew

what he was doing.  He was highly motivated to protect the Wellesley property.  He withheld

information and controlled its release for some perceived strategic advantage.  That he misunderstood

SOFA 10 as to some transfers and simply forgot several others—the very matters about which he was

most concerned in this case—this is exceedingly implausible.  I have no trouble finding him capable of

the kind of stupidity of which he stands accused.

     **viii.**    **Conclusion as to Knowledge and Specific Intent regarding Omissions**

    186.    On the basis of the above findings, I find by a wide preponderance of the evidence that

Drumm omitted the transfers at issue in Counts 1 through 18 from item 10a of the Original SOFA both

knowingly and fraudulently.  My reasons for doing so are numerous.  Drumm is intelligent, very

sophisticated in the kinds of accounting and financial issues he was addressing in SOFA 10, meticulous,

involved in the details of his bankruptcy filing, controlling, not one who would simply turn these matters

over to counsel to handle for him.  Over a period of two years, while insolvent and facing legal action on

$11 million of debt by IBRC, he had carefully transferred considerable value in cash and real estate to

Mrs. Drumm, to keep it from IBRC.  In the SPA, he again transferred value to her and structured the

purchase of the Wellesley Property to conceal that transfer.  He knew these transfers were fraudulent

and that they made Mrs. Drumm's interest in the Wellesley Property vulnerable in bankruptcy.  He

omitted from SOFA 10 not one or two odd transfers but eighteen, all but the only one already known to

IBRC, for aggregate value of many hundreds of thousands of euros and dollars.  Before he received the

alleged erroneous advice on which he blames the omissions, Drumm himself prepared a first draft of the

SOFA and *himself* omitted from item 10a all these transfers.  He offered no plausible excuse for this

original omission.  He is not credible or truthful and has made misrepresentations at every stage of

these proceedings.  He asked for no advice from his advisers on SOFA 10.  He claims that his advisers

were mistaken about the requirements of SOFA 10, but Swanson appears to have believed that cash

transfers were responsive to SOFA 10 and was not called as a witness.  Zelevinsky appears *not* to have

labored under the misunderstanding that Drumm attributes to her—that SOFA 10 calls for only non-cash

transfers—and in any event it would not explain the omission of six related non-cash transfers.

Grossman testified that Jalbert and Harbeson worked with Drumm on the schedules and SOFA, but

Drumm did not call them to testify.  Drumm says he was surprised to have learned at the April 1

Meeting of Creditors that SOFA 10 had been so grossly in error, but the evidence of surprise was

manufactured by Drumm for pretense; the only genuine surprise was Grossman's, who had not

participated in the drafting process and truly was surprised.  Zelevinsky expressed no surprise at all.  At

multiple junctures even after the Original SOFA, Drumm elected not to make the disclosures SOFA 10

required, showing that his withholdings of information were not accidental.  When he did make them,

he made them to the Trustee, through Mrs. Drumm and her counsel, for settlement purposes, and not

under oath; he deliberately excluded IBRC and the public.  He doled out the truth only when he sensed

he could gain an advantage in doing so.  The false oaths in Counts 1 through 18 were made knowingly

and fraudulently.

**P.       Knowledge and Intent regarding Undervaluation of Furniture and Fittings**

187.     Item 4 of Schedule B of Drumm's original schedules required that he disclose and value

"household goods and furnishings."  He listed "furniture and fittings at Chatham and Wellesley" and

valued the same at $10,000.   I have found [at Findings, ¶ 55] that this was a substantial understatement

by any measure, not only of the value of the household goods and furnishings, objectively considered,

but also of what the evidence establishes that Drumm believed the value of the furnishings and

household goods to be.  Drumm denies that this understatement was either knowing or fraudulent and

alleges that he made the valuation in reliance on the advice of Grossman, his attorney.

188.     The evidence shows that Drumm himself, in his First Draft, made the following entry for

this item: "Furniture and Equipment at Chatham and Wellesley," with a value of $49,751, which was a

valuation of his one-half interest in the furniture and equipment.  He has at all times maintained that he

owned these assets jointly with Mrs. Drumm, so he was here attributing a total value to the furniture

and equipment of just under $100,000.  From Drumm's hand-written First Draft of the schedules,

Zelevinsky generated and circulated on October 25, 2010 a computer-printed draft of the schedules.  In

it, at Schedule B, item 4, Zelevinsky identified the assets as "Furniture and Artwork at Chatham and

Wellesley," indicated that they are owned jointly, and valued them at $100,000.  This treatment is

essentially consistent with Drumm's original.  It is also consistent with Drumm's 2010 PFS, submitted

October 1, 2010, in which he valued his 50 percent interest in the "Furniture and Artwork" at $50,000.

189.      On October 27, Swanson sent extensive comments to Zelevinsky and Jalbert about the

draft.  Regarding valuation of furniture and other personalty he wrote:  "Furniture, Books, Clothing,

Jewelry, & Sports Equipment—don't we need to add a caveat explaining how each of these values was

derived?"  Zelevinsky testified that she couldn't recall any ensuing discussion about this particular

question.  Nonetheless, that same evening, Zelevinsky emailed further drafts of schedules A through J to

Drumm, with copies to Harbeson and Grossman, saying "Here are the revised schedules. Per our

conversation, I also attached a declaration for you to sign and return."  In this draft at item 4 of Schedule

B, the asset is identified as "Furniture and fittings at Chatham and Wellesley"—"Artwork" is removed

and replaced by "fittings"—and the value is reduced to $10,000.  This is how it reads in the Original

Schedules.

190.      By this time, Grossman had seen the earlier valuation and talked with Drumm about it.  I

have no evidence as to who instigated this conversation and why.  Grossman testified credibly that he

advised Drumm to reduce the value to $10,000, saying he had on only two occasions in his many years

and cases as a bankruptcy trustee ever realized significant value for furniture.  He told Drumm that

furniture in a vacation house was always essentially valueless—it just went along with the house—and

wall coverings and the like cannot be sold apart from the house.  Drumm says he deferred to

Grossman's experience.  No one indicates how and why "artwork" was changed to "fittings."

191.      Drumm had not informed Grossman of (i) the extent of the furnishings at either house,

(ii) the cost of furnishing Chatham, (iii) the amounts for which he had been insuring the contents of each

house, and (iv) the fact that the contents of Chatham were relatively new and very little used.  Drumm

knew Grossman was offering advice as to assets with which he was wholly unfamiliar.  I note further

that Grossman did not tell Drumm that furnishings were *never* of significant value in bankruptcy;

Grossman himself had twice liquidated furniture for significant value, and Drumm's own case is a further

example.  Moreover, Grossman told Drumm that, with a vacation house, the furnishings "just go along

with the house."  To the extent that they do go along with the house, it stands to reason they may

enhance the value of the house itself, and they have value to the extent they add value.  None of this

was lost on Drumm, who I find understood the limitations of the advice he received from Grossman.

192.     I cannot find, as Drumm would have me find, that Drumm was a mere passive and

obedient receiver of advice here.  I note that, in successive drafts of his schedules, he moved from

describing his automobiles as "2010 Mercedes Benz E350W4, 2011 Mercedes Benz G1450" to "2010 MB

sedan E350W4, 2011 MB SUV" and then, after telling Zelevinsky "I'm still not happy," just to "Sedan and

SUV."  He added:  "if the Trustee doesn't care she won't ask and the media can go fish."  Drumm showed

great concern about details, appearances, and minimizing the richness of his profile.

193.     Drumm never divulged to the Trustee that he was relying on Grossman in valuing the

furniture and in fact testified directly to the contrary.  At the December 7 session of the Meeting of

Creditors, when the Trustee asked Drumm how he had arrived at the $10,000 valuation, Drumm

answered that it was a "best guess on, you know, sale value of the furniture" and never mentioned any

advice from Grossman or that the valuation was anything other than his own best guess.  At trial,

Drumm changed his story; he said that he had testified falsely at the Meeting of Creditors and that

$10,000 was not his best guess but the advice of Grossman.  Drumm's contradictory stories place both

in doubt and evidence that Drumm did not approach his duties as a debtor honestly.

194.     For all these reasons, Drumm has not made the case that he relied on Grossman's

advice at all.  He received advice—the full extent of which I am not confident that I have—but knew its

limitations and that a $10,000 valuation would be misleading.  The Plaintiffs have carried their burden of

proving that Drumm made this valuation with knowledge that it was unreasonably low and with intent to mislead.

**Q.    False Oaths at Meeting of Creditors**

195.    I have found that at the first session of the Meeting of Creditors, held on November 16, 2010, Drumm testified under oath that the Original Schedules and Original SOFA were true and correct; that the Original Schedules and Original SOFA were false in the ways alleged in Counts 1 through 20, 22, and 23; and therefore that his November 16 testimony, the basis of Count 24, was also false.  Findings ¶ 57.  This session of the Meeting of Creditors occurred only 17 days after Drumm filed his Original Schedules and SOFA.  On the basis of my findings as to his knowledge of falsity and fraudulent intent in making the representations that are the subjects of Counts 1 through 20 and 22, I find that Drumm made the November 16 false oath, too, with knowledge that it was false and with fraudulent intent.

196.    I have also found that at the fifth session of the Meeting of Creditors, held on April 1, 2011, Drumm averred under oath that his Original Schedules and SOFA were correct (except in certain itemized particulars not relevant here)—knowing full well that in SOFA 10 and elsewhere, they were far from correct.  Findings ¶ 141.  On the basis of my findings as to his knowledge of falsity and fraudulent intent in making the representations that are the subjects of Counts 1 through 22, I find that Drumm made the April 1 false oath, too, with knowledge that it was false and with fraudulent intent.

**R.    Continuing Interest of Drumm in Transferred Cash and Epiphany Nominee Trust**

197.    Notwithstanding his numerous transfers of cash to Mrs. Drumm commencing in September 2008, her investment of much of it in the Wellesley Property (its purchase, renovation, and furnishing) and in the servicing of the mortgage on it, and then his transfer to her through the SPA of all the value of his beneficial interest in the Epiphany Nominee Trust, Drumm did retain a *de facto* ownership interest in the transferred cash and in its proceeds, the Epiphany Nominee Trust.  The transferred funds continued to be used by Drumm for the same purposes as they were used before he

effected the transfers.  Among other things, he used the transferred money to capitalize his business,

Harborlight, to pay the rent for the family's rental home, to pay his children's tuitions, and, not least, to

purchase the Wellesley Property for his family.  Likewise, after he transferred all the value of his interest

in the Epiphany Nominee Trust to Mrs. Drumm through the SPA, Drumm continued to occupy and

control the Wellesley Property, the trust's sole asset, as his residence; and he continued to be liable on

the mortgage loan with which it was purchased.  At all times through and after the Petition Date,

Drumm continued to control the family's financial decisions and the disposition of its assets as he had

before the transfers.  The transfers were intended to conceal Drumm's continuing interests in the

transferred cash and in the Epiphany Nominee Trust.

198.    These ownership interests continued through and after the Petition Date.  Likewise,

Drumm's concealment of these interests continued after the petition date.  Drumm concealed them

after the Petition Date by omitting from item 10a of the Original SOFA the transfers of cash, real estate,

automobiles, and his interest in the Epiphany Nominee Trust that are the subjects of Counts 1 through

18.  Proper disclosure of these transfers would have enabled the Trustee to trace the movements of

Drumm's assets into the name of Mrs. Drumm.  Drumm made these omissions with intent to hinder,

delay, and defraud the Trustee and IBRC.

**R.    Omission of SPA Transfer from Amended SOFA 10**

199.    In the Amended SOFA that Drumm filed under oath on May 17, 2011, Drumm again

omitted the January 6, 2010 transfer of a significant portion of his beneficial interest in the Epiphany

Nominee Trust to Mrs. Drumm.  I have found that his omission of this transfer from item 10a of the

Original SOFA was a false oath made knowingly and fraudulently.  [Findings ¶¶ 157-60.]  Drumm has

offered no reason why I should find otherwise as to the omission of this same transfer from the

Amended SOFA.  Drumm's false testimony at his deposition in this adversary proceeding concerning the

timing of the SPA shows that his attempts and intent to conceal the timing of the SPA, and the fact that

it did effect a transfer, continued well after even the filing of the Amended SOFA.  [Findings ¶¶ 33, 160.]

I find that the omission from SOFA 10 was knowing and fraudulent.

**P.      Omission of Skerries Rock Mortgage from Amended SOFA 10**

200.      In Count 27, the Plaintiffs allege that Drumm omitted from item 10a of his Amended

SOFA his grant of a mortgage to KBC Homeloans on Skerries Rock in December 2008 to secure a loan in

the amount of €250,000.   Drumm denies that he omitted the grant of the mortgage, contending that he

simply collapsed the grant of the mortgage and the distribution of its proceeds into a single entry.  He

also denies that the resulting omission—should the Court find that it was an omission—was either

knowing or fraudulent.  He points out that by this time, he had already fully disclosed the details of this

transaction to both the Trustee and IBRC and therefore had nothing to hide.

201.      Drumm made the following entry regarding Skerries Rock in item 10a of his Amended

SOFA: "12/12/2008, Proceeds of Mortgage Skerries Rock to Lorraine's Allied Irish Bank #9247,

€250,000." It is this entry that Drumm contends disclosed both the giving of the mortgage and the

distribution of the mortgage loan proceeds.  I find that the entry is not a disclosure of the grant of the

mortgage.  One may surmise from this entry that a mortgage was granted, but the entry does not

indicate the date on which the mortgage was granted, identify the grantee, or specify the relationship of

the grantee to the debtor, all three of which are required by item 10a.

202.      The evidence as to intent is mixed.  Drumm knew his entry failed to properly disclose

the grant of the mortgage, and the omission was therefore made knowingly.  Also, Drumm used this

same "collapsing" device with fraudulent intent as to at least one other transfer:  the sale of his BMW to

his sister.  Still, it is hard to see a fraudulent purpose in this particular instance.  As Drumm maintains,

well before he filed the Amended SOFA, he had already fully (albeit tardily) disclosed the details of this

transaction to both the Trustee and IBRC.  He knew that they knew these details because the grant of

this mortgage and distribution of its proceeds had been the subject of examination at the April 1 session

of the Meeting of Creditors.  Also, the mortgage loan debt had itself been disclosed on his schedule of

secured debt, and that entry had disclosed the identity of the mortgagee.[17]  And I am aware of no

allegation by the Trustee that the grant of the mortgage itself—as opposed to the transfer of its

proceeds to Mrs. Drumm, which *was* disclosed in the Amended SOFA—might be fraudulent.  The

evidence therefore preponderates against a finding of fraudulent intent as to this omission.

**Q.      Omission of 173 Cross Street Proceeds from Amended SOFA 10**

203.      Drumm omitted from item 10a of his Amended SOFA his transfer of 50% of the

$412,000 in jointly-owned proceeds from the sale of 173 Cross Street on September 17, 2009 to a bank

account in Mrs. Drumm's sole name.  Drumm contends that this omission was not false.  He reasons that

as a joint owner of 173 Cross Street, Mrs. Drumm had a 50 percent interest in the sale proceeds, and

therefore the transfer of half the proceeds to her was simply a giving to her of what was hers, not a

transfer in any sense from Drumm.  Drumm also denies that this omission—should the Court find that it

was one—was either knowing or fraudulent.

204.      I first find that the transfer in question is one that Drumm was obligated to list in SOFA

10.  At the time of its sale, Drumm and Mrs. Drumm owned 173 Cross Street jointly.  They therefore also

owned the proceeds of the sale jointly.  They placed half in a bank account in Drumm's sole name and

the other half in an account in Mrs. Drumm's sole name.  Each of these two transfers, half to him and

half to her, was a transfer of jointly-owned monies.  Drumm does not deny that his transfers from jointly

owned bank accounts to accounts in Mrs. Drumm's sole name, as in Counts 2 through 5, were transfers

requiring disclosure.  Before each such transfer, Drumm was a joint owner; after each transfer, he was

not.  No less so did this transfer require disclosure, notwithstanding that it was balanced by a transfer of

the other half of the proceeds to Drumm himself.

---

[17] The original mortgagee and current holder of a mortgage are often not the same entity, but here the mortgage
continued to be held by the original mortgagee, KBC Homeloans.

205.     It is not clear to me that in this instance, Drumm *understood* SOFA 10 to require the disclosure.  I find that the Plaintiffs have not satisfied their burden of proving that this omission was made with knowledge that disclosure was required.

206.     Regarding intent, the evidence is again mixed.  With fraudulent intent, Drumm had completely omitted three transfers related to 173 Cross Street from item 10a of his Original SOFA.  However, in the Amended SOFA, he did disclose two of the three—a transfer from Drumm to himself and Mrs. Drumm jointly, and then the sale to a third party—which would have given the Trustee and IBRC cause to inquire about the disposition of the proceeds.  Also, it is undisputed that well before he filed the Amended SOFA, the fact that these proceeds had been deposited into an account in Mrs. Drumm's sole name had been disclosed to the Trustee in the "road map" delivered on February 3, 2011.  He knew that IBRC and the Trustee knew these details because the disposition of the sale proceeds had been a subject of examination at the April 1 session of the Meeting of Creditors.  In view of the ambiguity regarding what Drumm understood SOFA 10 to require as to this transfer, and this further evidence of what the Trustee and IBRC knew and were known by Drumm to know, I find that the Plaintiffs have not satisfied their burden of proving that this omission was made with fraudulent intent.

**R.     Sales of Automobiles in Amended SOFA**

207.     I have found that Drumm omitted from item 10a of his Amended SOFA his sales in 2009 of two automobiles, a Range Rover and a BMW.  See Findings ¶¶ 60-61 above.  The Plaintiffs maintain that these omissions were made with knowledge of falsity and fraudulent intent.

208.     I find that Drum made both omissions with knowledge of falsity: that his entries did not indicate that the sales occurred within the two-year period—thus implying that they did not—or identify the transferees or their relation to the debtor, all of which is required by item 10a.

209.     Drumm contends that he could not have had fraudulent intent because the relevant facts had already come out in answers he had supplied at the Meeting of Creditors and in bank

statements that Mrs. Drumm had supplied.  The evidence shows that the relevant facts had already come out in these ways.  I find for these reasons that Drumm did not intend to mislead either the Trustee or IBRC.  Nonetheless, his answers continued to mislead other creditors, the Court, and the interested public, who were not privy to the earlier disclosures.  He offered no reason or excuse for his omissions.  The omission of the BMW served, and was intended, to keep a transfer to his sister from disclosure to other creditors, the Court, and the public.  I find that Drumm omitted the transfer of the BMW with intent to conceal and mislead.

210.      I am aware of no reason why he omitted the sale of the Range Rover, except perhaps for consistency with his treatment of the BMW.  The Plaintiffs do not suggest that the sale of the Range Rover was itself fraudulent or made to an insider.   The Plaintiffs have not carried their burden of proving fraudulent intent as to the Range Rover.

**S.      False Affirmance at August 9 Session of Meeting of Creditors**

211.      In Count 34, the Plaintiffs contend that Drumm knowingly and fraudulently made a further false oath at the August 9, 2011 session of the Meeting of Creditors when he testified under oath that the Amended Schedules and Amended SOFA were intended to be accurate or were accurate and complete when he filed them.  In fact, the Plaintiffs maintain, they were inaccurate in the manners alleged in Counts 26 through 33.  In Count 34, the Plaintiffs seek a determination that this answer was itself false.  Did Drumm speak falsely when he testified that he *intended* the Amended SOFA to be accurate?  I have found that the Amended SOFA was false in that it carried forward five omissions from the Original SOFA.  I now further find that the omissions that are the subjects of Counts 26, 27, 29, and 30 were deliberate and knowing, and that Drumm was aware of these omissions when he gave the testimony in question at the August session of the Meeting of Creditors, and therefore that his testimony at the August 2011 session regarding his intention was false.  However, I also find that the

omission that is the subject of Count 28 was not deliberate or knowing, and that Drumm's testimony was therefore not false in that particular respect.

**JURISDICTION**

The matters before the court are complaints under 11 U.S.C. § 727(a) to deny a debtor a discharge.  They arise under the Bankruptcy Code and in a bankruptcy case and therefore fall within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  They are core proceedings.  28 U.S.C. § 157(b)(2)(J) (core proceedings include objections to discharge).  This court accordingly has authority to enter final judgment on them.  28 U.S.C. § 157(b)(1).

**DISCUSSION**

**a.       False Oaths or Accounts, § 727(a)(4)(A):  Counts 1-35**

In each of their first 35 counts, the Plaintiffs object to Drumm's discharge under § 727(a)(4)(A).  That subsection states that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account."  11 U.S.C. § 727(a)(4)(A).  In the First Circuit, the leading case on the interpretation and application of § 727(a)(4)(A) is *Boroff v. Tully ( In re Tully)*, 818 F. 2d 106 (1st Cir. 1987).  *Tully* articulates a two-part inquiry:  "Under § 727(a)(4)(A), the debtor can be refused his discharge only if he (i) knowingly and fraudulently made a false oath, (ii) relating to a material fact."  *Id*. at 110.   The first of these parts includes four subparts.  Therefore, without adding to or subtracting from Tully's formulation, the inquiry can be restated as whether (i) the debtor made an oath (ii) that was false and (iii) related to a material fact in the case (iv) knowingly and (v) fraudulently.  See *Commonwealth of Massachusetts v. Bartel (In re Bartel)*, 2009 WL 2461727 at *5 (Bankr. D. Mass. 2009).

*Tully* makes clear that the burden of proof is on the party objecting to discharge. *Tully*, 818 F. 2d at 110 ("The burden of proof rests with the trustee."). The standard of proof is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287 (1991). Tully indicates, however, that "once it reasonably appears that the oath is false, the burden falls upon the [debtor] to come forward with evidence that he has not committed the offense charged." *Tully*, 818 F. 2d at 110. I do not understand this language to shift the burden of proof, which remains always on the plaintiff. Nor does it nullify the need to prove knowledge of falsity and fraudulent intent. *Robin Singh Educ. Servs. v. McCarthy (In re McCarthy)*, 488 B.R. 814, 826 (1st Cir. B.A.P. 2013) ("the existence of false or inaccurate statements is not, in and of itself, sufficient cause to deny a debtor's discharge unless it is shown that these were knowingly and fraudulently made"). Rather, it establishes that a false oath may itself be sufficient to establish knowledge of falsity and fraudulent intent. *In re Mascolo*, 505 F.2d 274, 276 (1st Cir. 1974) ("the trier may infer fraudulent intent from an unexplained false statement"). More generally, fraudulent intent may be established by circumstantial evidence or inferred from a course of conduct. *In re McCarthy*, 488 B.R. at 826.

Reckless disregard for the truth has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A). *Id*. and cases cited; *Tully,* 818 F. 2d at 112. The sheer volume of misstatements or omissions in a debtor's sworn bankruptcy filings may preclude a finding of excusable inadvertence and instead establish "the type of extreme carelessness or reckless indifference that equates to fraud and a bar to discharge." *Harrington v. Donahue (In re Donahue)*, 2011 WL 6737074 at *13 (B.A.P. 1st Cir. 2011) (citation and internal quotation mark omitted); see also *ABCD Holdings, LLC v. Hannon (In re Hannon)*, 512 B.R. 1, 18 (Bankr. D. Mass. 2014) ("the volume and repeated nature of the Debtor's omissions" made reckless indifference "the only plausible conclusion"); *Nickless v. Fontaine (In re Fontaine)*, 467 B.R. 267, 273 (Bankr. D. Mass. 2012) (debtor's cumulative omissions established his recklessness "beyond doubt"); cf. *Daniels v. Agin*, 736 F.3d 70, 85 (1st Cir. 2013) ("The amounts involved

here render reckless errors that arguably may have been only negligent if they had concerned less

significant items.").

Tully instructs that "the statutory right to a discharge should ordinarily be construed liberally in

favor of the debtor." Tully, 818 F. 2d at 110.  And it further insists that the reasons for denial of

discharge "be real and substantial, not merely technical and conjectural." Id.

Tully also articulates a countervailing consideration:

> On the other hand, the very purpose of certain sections of the law,
> like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the
> shelter of the bankruptcy code do not play fast and loose with their
> assets or with the reality of their affairs.  The statutes are designed to
> insure that complete, truthful, and reliable information is put forward at
> the outset of the proceedings, so that decisions can be made by the
> parties in interest based on fact rather than fiction.  As we have stated,
> the successful functioning of the bankruptcy act hinges both upon the
> bankrupt's veracity and his willingness to make a full disclosure.  Neither
> the trustee nor the creditors should be required to engage in a laborious
> tug-of-war to drag the simple truth into the glare of daylight.

Id. (internal quotations and citations omitted).  This passage indicates that a debtor's obligation to

provide, at the outset of the case, complete, truthful, and reliable information is for the benefit of "the

trustee" and "the creditors" and, more generally, "parties in interest."  For disclosure purposes, "parties

in interest" also include the court itself and the interested public.  The court frequently consults a

debtor's schedules and statements in connection with matters in a case.  And the non-creditor public,

too, has diverse and legitimate interests in a debtor's mandated disclosures.  See 11 U.S.C. § 107(a)

(papers filed in a case are public records and open to examination).  It is not enough for a debtor to deal

privately with the trustee but, by omissions and misrepresentations in his or her schedules and

statements, to leave these others out of the loop, and I do not understand Drumm to contend

otherwise.

A debtor cannot escape a denial of discharge under § 727(a)(4)(A) by amending his disclosures

after falsehoods or omissions have been detected.  Payne v. Wood, 775 F.2d 202, 205 (7th Cir. 1985);

*Donahue*, 2011 WL 6737074 at *14.  It is clear from the evidence that Drumm adopted a "strategy" with respect to truth-telling and full disclosure, a strategy that involved the initial deliberate withholding of required information and then the later controlled release of that information, when and as it suited his purposes.  Strategic disclosure of this sort is not consistent with the basic precepts of the Bankruptcy Code.  Amendments and disclosures of this kind plainly cannot cure deliberate omissions for purposes of § 727(a)(4)(A).

In order to deny Drumm a discharge, the Plaintiffs need prevail on only a single count.

### i.      Counts 1-9:  Cash Transfers

In Counts 1 through 9, the Plaintiffs allege that Drumm knowingly and fraudulently omitted from his Original SOFA, at item 10a, nine transfers of cash from himself to his wife.  Drumm admits that each omission was a false and material[18] statement under oath but denies in each instance that the omission was knowing or fraudulent.  He concedes that he had knowledge of each transfer but maintains that, in reliance on the advice of counsel, he did not understand item 10a to require disclosure of transfers other than of real estate.  I have found that Drumm did not, in any sense, answer item 10a in reliance on the advice of counsel, did not misunderstand the requirements of item 10a, omitted these transfers with knowledge that he was thereby falsifying his disclosures, and did so with fraudulent intent—an intent to keep information from the Trustee, IBRC, and the public for strategic advantage.  I so find by a generous preponderance of the evidence.[19]  These findings require denial of discharge on each of Counts 1 through 9.

### ii.     Count 10:  SPA Transfer

In Count 10, the Plaintiffs allege that Drumm knowingly and fraudulently omitted from his Original SOFA, at item 10a, his transfer through the SPA of his 50 percent equity interest in the Epiphany

---

[18] Materiality is not disputed as to any of the alleged false oaths.
[19] Were I not so persuaded, I would find that Drumm had omitted these transfers with at least reckless disregard for the truth, with the same result.

Nominee Trust to Mrs. Drumm on January 6, 2010.  Drumm admits the fact of the omission and its

materiality but denies falsity (that the SPA effected a transfer), knowledge of falsity, and fraudulent

intent.

I have found that the SPA did effect a transfer to Mrs. Drumm of virtually all of his then existing

beneficial interest in the Epiphany Nominee Trust:  of the first $415,553 that would otherwise have

inured to his benefit on account of his fifty percent interest in the trust.  He retained only the right to

share equally with Mrs. Drumm in any future appreciation that might yield net equity beyond that

figure.  As of the Petition Date, however, the Wellesley Property had, by Drumm's own valuation,

depreciated substantially from its acquisition price, such that, by virtue of the SPA, Drumm's interest

had no value on the Petition Date.

Drumm argues that the SPA cannot have effected a transfer for two reasons of law:  that it

employed no language of transfer, and that it did not satisfy a requirement of the Trust itself.  Both are

unavailing.  First, although it is true that the SPA employed no traditional language of transfer, both

parties to the SPA nonetheless understood it to effect a change:  to vest in Mrs. Drumm the first

$415,553 that would otherwise have inured to Drumm's benefit on account of his fifty percent interest

in the trust.  Viewed in context—as Drumm and Mrs. Drumm both understood it—and according to its

effect, the SPA was in fact an instrument of transfer, and the parties to the agreement mutually and

manifestly so understood it.  Second, Drumm states that, where there is no evidence that he and Mrs.

Drumm ever executed a revised Schedule of Beneficial Interests, there can have been no transfer

because the Epiphany Nominee Trust requires the execution of a revised Schedule of Beneficial Interests

as a condition of transfer.  This argument overstates the import of the relevant language in the trust.  It

states:  "The Trustee or Trustees shall not be affected by any assignment or transfer of any beneficial

interest until receipt by the Trustee or Trustees of notice that such assignment or transfer has in fact

been made and a revised Schedule of Beneficial Interests shall have been duly executed and filed with

the Trustee or Trustees."  This language merely protects the trustee from recognizing a transfer of which

she has not been afforded notice in the manner specified.  It does not prescribe the manner in which a

transfer may be effected and, in fact, contemplates that the act of assignment or transfer might be

different from that of executing and delivering to the trustee a revised Schedule of Beneficial Interests.

The trust therefore does not invalidate the transfer.

I have further found that Drumm understood the SPA to have effected this transfer and that he

omitted the transfer from SOFA 10 with fraudulent intent and without reliance on the advice of counsel.

These findings and the above rulings require denial of discharge on Count 10.

### iii.    Counts 11 and 12:  Skerries Rock Mortgage and Proceeds

In Count 11, the Plaintiffs contend that Drumm knowingly and fraudulently omitted from his

Original SOFA, at item 10a, the grant of the Skerries Rock Mortgage to KBC Homeloans in December

2008 to secure a loan in the amount of €250,000.  In Count 12, the Plaintiffs contend that Drumm also

knowingly and fraudulently omitted from his Original SOFA, at item 10a, the transfer of the proceeds of

the Skerries Rock Mortgage, some €250,000, to Mrs. Drumm in December 2008.  As to each omission,

Drumm admits that it was a false and material statement under oath but denies that it was knowing or

fraudulent.  I have found that both omissions were knowing and fraudulent.[20]  These findings require

denial of discharge on Counts 11 and 12.

### iv.    Counts 13 and 14:  173 Cross Street

In Count 13, the Plaintiffs contend that Drumm knowingly and fraudulently omitted from his

Original SOFA, at item 10a, the transfer of Drumm's 100 percent interest in 173 Cross Street to himself

and Mrs. Drumm jointly on October 20, 2008.  And in Count 14, the Plaintiffs contend that Drumm

knowingly and fraudulently omitted from his Original SOFA, at item 10a, the sale of 173 Cross Street to

---

[20] Were I not so persuaded, I would find that Drumm had omitted these transfers with at least reckless disregard
for the truth, with the same result.

the Porch Light Trust on September 17, 2009 for the sum of $2,365,000.[21] As to each omission, Drumm admits that it was a false and material statement under oath but denies that it was knowing or fraudulent. I have found that both were knowing and fraudulent.[22] These findings require denial of discharge on Counts 13 and 14.

### v.       Counts 15-18:  Sales of Automobiles and Disposition

In Counts 15 through 18, the Plaintiffs contend that Drumm knowingly and fraudulently omitted from his Original SOFA, at item 10a, the sales of two automobiles that Drumm himself had wholly owned (Counts 15 and 17) and the transfers of the proceeds of those sales to Mrs. Drumm alone (Count 16, proceeds of Range Rover) and to himself and Mrs. Drumm jointly (Count 18, proceeds of BMW).   As to each omission, Drumm admits that it was a false and material statement under oath but denies that it was knowing or fraudulent. I have found that each was knowing and fraudulent.[23] These findings require denial of discharge on each of Counts 15 through 18.

### vi.       Counts 19 and 20:  Loan from Mrs. Drumm

In Count 19, the Plaintiffs contend that Drumm knowingly and fraudulently made a material false oath or account when he indicated that payments totaling $50,093.00 within one year of the Petition Date to Mrs. Drumm were repayments for a loan; in fact there was no loan, and the transfers were just additional cash transfers to Mrs. Drumm.  In Count 20, the Plaintiffs contend that the Drumm knowingly and fraudulently made a material false oath in Schedule F of his Original Schedules by indicating that, as of the Petition Date, he owed Mrs. Drumm $210,347.00 on a loan; in fact there was no loan.  Drumm admits that he made the statements in question, that he did so under oath, and that

---

[21] This sale generated net proceeds of $412,000, of which 50 percent was transferred to a bank account in Mrs. Drumm's sole name, but the subject matter of Count 14 is solely the omission of the sale, not the omission of the disposition of the sale proceeds.
[22] Were I not so persuaded, I would find that Drumm had omitted these transfers with at least reckless disregard for the truth, with the same result.
[23] Were I not so persuaded, I would find that Drumm had omitted these transfers with at least reckless disregard for the truth, with the same result.

they were material, but he denies that they were false, insists that Mrs. Drumm had made a loan to him,

and denies knowledge of falsity or fraudulent intent.  I have found (at Findings ¶¶ 16-20, 49, and 53)

that there was no loan and that Drumm knew these statements were false and made them with

fraudulent intent.  These findings require denial of discharge on Counts 19 and 20.

### vii.    Count 21:  Valuation of Interest in Epiphany Nominee Trust

In Count 21, the Plaintiffs contend that Drumm knowingly and fraudulently made a material

false oath or account when, in Schedule B of his Original Schedules, at item 19, Drumm represented the

current value of his 50 percent interest in the Epiphany Nominee Trust as $0.00 and thereby concealed

value of approximately $415,000.  I have found (at Findings, ¶¶ 33-39, 54) that this representation of

value was not false:  by virtue of the transfer effected by the SPA, Drumm had transferred back to Mrs.

Drumm all then-existing value in his 50 percent beneficial interest.  Drumm believed the statement of

value to be true when he made it.[24]  For lack of a false statement and knowledge of falsity, Count 21

must be dismissed.

### viii.    Count 22:  False Valuation of Furniture

In Count 22, the Plaintiffs contend that Drumm knowingly and fraudulently made a material

false oath or account when, in Schedule B of his Original Schedules, at item 4, Drumm materially

understated the value of his household goods and furnishings when he listed his "Furniture and fittings

at Chatham and Wellesley" as having a current value of $10,000.  Drumm defends his valuation, denies

knowledge of falsity and fraudulent intent, and pleads reliance on the advice of counsel.  I have found

(at Findings ¶¶ 55, 95, 99-100, and 187-94) that the valuation was false, well below any reasonable

value Drumm might have placed on the furniture and household goods; that he knew and believed his

---

[24] Counts 10 and 21 are closely related.  Count 10 alleges that it was a false statement for Drumm to represent in
SOFA 10 that there was no transfer of any part of his beneficial interest in the Epiphany Nominee Trust; Count 21
alleges that it was a false statement for Drumm to value his beneficial interest in the trust at $0.00.  Both cannot
be true.  However, neither can Drumm have believed both that there was no transfer *and* that his beneficial
interest had no value on the Petition Date.  Had I believed Drumm in his contention (relative to Count 10) that he
did not understand the SPA to have effected a transfer, I would further find that, when he filed the Original
Schedules, he did not believe his beneficial interest in the nominee trust to be worth $0.00.

valuation to be false and unreasonably low; that he did not rely on the advice of counsel in a manner or to an extent that might relieve him of responsibility for the valuation; and that he made the valuation with intent to mislead.  These findings require denial of discharge on Count 22.

        **ix.**      **Count 23:  Omission of Furniture in Storage**

In Count 23, the Plaintiffs contend that Drumm knowingly and fraudulently made a material false oath or account when, in Schedule B of his Original Schedules, at item 4, he failed to disclose furniture held in storage.  Drumm concedes the omission but denies knowledge of falsity and fraudulent intent.  I have found (at Findings ¶ 56) that the omission of the few items of furniture in storage was an oversight and neither knowing nor fraudulent.  For these reasons, Count 23 must be dismissed.

        **x.**      **Counts 24 and 25:  False Affirmations**

In Counts 24 and 25, the Plaintiffs contend that Drumm knowingly and fraudulently made material false oaths when (i) at the November 16, 2010 session of the Meeting of Creditors, he falsely affirmed under oath that the Original Schedules and SOFA were "true and correct" (Count 24) and (ii) at the April 1, 2011 session of the Meeting of Creditors, he falsely affirmed under oath that, except for a few irrelevant amendments disclosed at the start of that meeting, his Original Schedules and SOFA were "complete and accurate" (Count 25).  Drumm invokes his defenses to Counts 1-23 and, where falsity is admitted, denies knowledge of falsity and fraudulent intent.  I have found (at Findings ¶¶57, 141, and 195-96) that the Original Schedules and Original SOFA were false in the ways alleged in Counts 1 through 20, 22, and 23; that Drumm's November 16 and April 1 affirmations under oath of their truth and accuracy were therefore also false; and that Drumm made these affirmations with knowledge that they were false and with fraudulent intent.  These findings require denial of discharge on Count 24 and 25.

Before leaving this count, I note that, in opposition to it, Drumm advances an unusual defense. He points out that, at the April 1 meeting, the Trustee already knew that his answer to item 10a in the

Original SOFA was false in numerous respects.  It therefore was her obligation, Drumm argues, to point

out the inaccuracies to him and afford him an opportunity to amend.  Drumm says that she did not so

advise him, that her failure to do so amounts to "sandbagging" that was designed to give her a tactical

advantage in the present litigation, a game of "gotcha," and that the court should not countenance such

"underhanded activity."

This defense fails for at least three reasons.  First, Dwyer did tell Drumm, at the end of their off-

the-record meeting of January 24, 2011, that he needed to file amendments to reflect disclosures he

was then making to her for the first time.  Drumm says there is no evidence to corroborate that she so

instructed him, only her own testimony, but I find her credible and him not.  She had on several

occasions before reminded him of his need to file amendments when new information had surfaced; I

have no reason to doubt that she did the same in this instance.

Second, this defense is based on the premise that Drumm went into the April 1 meeting not

knowing that his Original Schedules and SOFA were incorrect, at SOFA 10 and elsewhere.  But I have

found that he knew from the creation of his first draft that these were false. He did not need for the

Trustee or anyone else to point this out to him.  And if Drumm had gone into the April 1 meeting not

knowing of the falsity, that in itself would have been all the defense he required; the alleged failure of

the Trustee to point this out to him would be irrelevant.

Third, Drumm cites no law, and I know of none, that requires a trustee to warn a debtor before

she asks him a question.  Drumm knew he was under oath and obligated to tell the truth.  He was

entitled to no special warning.  As Dwyer testified, "That kind of instruction the trustee does not have to

provide."  "I can't do his job for him.  I don't make suggestions about things that I'd take a second look

at. . . .  The system doesn't work in a fashion where the trustee has to spot it and give you a warning and

then ask again and then, boy, you'd better by the third time and then you're in trouble at that point."

Just so.

### xi.      Counts 26-28:  Real Estate Transfers in Amended SOFA

In Counts 26, 27, and 28, the Plaintiffs contend that Drumm knowingly and fraudulently made three false oaths in the Amended SOFA at item 10a concerning real estate transfers.  He again omitted (i) the transfer of his 50 percent equity interest in the Epiphany Nominee Trust to Mrs. Drumm on January 6, 2010 (Count 26), (ii) his grant of a mortgage to KBC Homeloans on Skerries Rock in December 2008 to secure a loan in the amount of €250,000 (Count 27), and (iii) his transfer of half the $412,000 in jointly-owned proceeds from the sale of 173 Cross Street on September 17, 2009 to a bank account in Mrs. Drumm's sole name.

As to Count 26, I have found that the omission was a false oath and that Drumm made it both knowingly and fraudulently.  Findings ¶ 199.  These findings require denial of discharge on Count 26.

As to Count 27, I have found that the omission was false and knowing but also that the Plaintiffs have not carried their burden as to fraudulent intent.  Findings ¶¶ 200-202.  As to Count 28, I have found that the omission was false but also that the Plaintiffs have not carried their burden as to knowledge of falsity and fraudulent intent.  Findings ¶¶ 203-206.  These findings require dismissal of Counts 27 and 28.

### xii.      Counts 29 and 30:  Sales of Automobiles in Amended SOFA

In Counts 29 and 30, the Plaintiffs contend that Drumm knowingly and fraudulently made false oaths in the Amended SOFA at item 10a by failing to disclose the sales of automobiles:  he again omitted the sale of the Range Rover owned and titled in his sole name for €36,000 on or about May 5, 2009 (Count 29); and he again omitted the sale of the BMW owned and titled in his sole name to his sister for €20,000 on or about September 7, 2009 (Count 30).  Drumm denies that he omitted the sales; he contends that he simply collapsed the sale of each automobile and the transfer of its proceeds into a single entry doing double duty.

I have found that Drumm did in fact omit from item 10a of the Amended SOFA the transfers of

the automobiles, that he did so in both instances with knowledge of falsity, that the Plaintiffs have not

carried their burden of proving fraudulent intent as to the Range Rover, and that the Plaintiffs have

proven that Drumm acted with fraudulent intent as to the BMW.  Findings ¶¶ 60-61, 207-210.  These

findings require denial of discharge on Count 30 for nondisclosure of the BMW but dismissal of Count 29

regarding the Range Rover.

### xiii.        Counts 31-33:  Misrepresentations in Amended Schedules

In Counts 31 through 33, the Plaintiffs contend that Drumm knowingly and fraudulently made

three material false oaths in his Amended Schedules.  The Plaintiffs have not sustained their burden of

proving that when Drumm filed the Amended Schedules, he did so under oath.  I have no evidence that

he affirmed under oath or penalty of perjury that the contents of the Amended Schedules were true and

correct.  *See* Findings ¶ 62.  The oath being a necessary element of the Plaintiffs' case under §

727(a)(4)(A), judgment must enter for Drumm as to Counts 31 through 33.

### xiv.        Count 34:  False Affirmation as to Amended Schedules and SOFA

In Count 34, the Plaintiffs contend that Drumm knowingly and fraudulently made a further false

oath at the August 9, 2011 session of the Meeting of Creditors when he testified under oath that the

Amended Schedules and Amended SOFA were intended to be accurate; but in fact, they were inaccurate

in the manners alleged in Counts 26 through 33.  Drumm simply reiterates his defenses to Counts 26

through 33.

I have found that the Amended Schedules and SOFA were false in the manners specified in

Counts 26, 27, 28, 29, 30, and 33 but not 31 or 32.  I have further found that Drumm made the false

statements in Counts 26, 30, and 33, but not 27, 28 or 29, with both knowledge of falsity and fraudulent

intent.  See Findings ¶ 199 as to Count 26, ¶¶ 200-202 as to Count 27, ¶¶ 203-206 as to Count 28,  ¶¶

207-210 as to Counts 29 and 30, ¶¶ 62-63 as to Count 31, ¶ 64 as to Count 32, and ¶ 65 as to Count 33.

I have further found that, at the August 9, 2011 session of the Meeting of Creditors, Drumm did affirm under oath that when he filed the Amended SOFA, he intended it to be accurate and that, to the best of his knowledge, the Amended Schedules were complete and accurate when he filed them.  I further find that when he made these affirmations, he knew his Amended Schedules and SOFA to be false in the manners specified in Count 26, 30, and 33 and made the affirmances with fraudulent intent. These findings require denial of discharge on Count 34.

### xv.   Count 35:  False Statement of Intent

In Count 35, the Plaintiffs contend that, at the April 1, 2011 session of the Meeting of Creditors, Drumm knowingly and fraudulently made a further false oath when he falsely represented under oath that he would amend the Mrs. Drumm loan claim in Schedule F to $200,215.69; in fact, on May 17, 2011, he amended the loan amount to $216,840.69.  This count differs from all of the foregoing counts in that the alleged misrepresentation is of Drumm's then-present intention to do a thing in the future.  I find that when Drumm made the representation in question, he did in fact intend to amend Schedule F in the manner he specified.  Accordingly, the representation was not false, and accordingly the Plaintiffs are entitled to no relief on this count.

### b.    False Claims, § 727(a)(4)(B):  Counts 36-40

In each of Counts 36 through 40, the Plaintiffs object to Drumm's discharge under § 727(a)(4)(B).  This subsection states that "[t]he court shall grant the debtor a discharge, unless . . . the debtor knowingly and fraudulently, in or in connection with the case . . . presented or used a false claim."  The Plaintiffs allege that Drumm presented or used a false claim in five instances:

- when, in Schedule F of his Original Schedules, he indicated that, as of the Petition Date, he owed Mrs. Drumm $210,347.00 on a loan, but in fact there was no loan (Count 36);

- when, in his Original SOFA at item 3c, he swore that he had repaid Mrs. Drumm $50,093.00 within one year of the Petition Date, but in fact there was no loan (Count 37);

- when, in Schedule F of his Amended Schedules, he indicated that, as of the Petition Date, he

  owed Mrs. Drumm $216,840.69 on a loan, but in fact there was no loan (Count 38);

- when, in his Amended SOFA at Item 3c, he swore that he had repaid Mrs. Drumm $73,250.00

  within one year of the Petition Date, when in fact there was no loan (Count 39); and

- when, at the April 1 session of the Meeting of Creditors, Drumm falsely testified under oath that

  the Mrs. Drumm Loan claim in Schedule F, previously stated to be in the amount of $210,347,

  was  amended to $200,215.69 (Count 40).

"Claim" is a defined term.  In the Bankruptcy Code, it does not mean statement or assertion but

rather "right to payment" or a "right to an equitable remedy for breach of performance if such breach

gives rise to a right of payment."  11 U.S.C. § 101(5); *Scheidelman v. Henderson (In re Henderson)*, 423

B.R. 598, 619 (Bankr. N.D.N.Y. 2010).   There is very little case law on § 727(a)(4)(B) and, in particular, on

what it means to "present or use" a false claim.  The Plaintiffs have not explained how the various acts

of which they complain can constitute the presentation or use of a claim.  "Present" and "use" are not

defined in the Bankruptcy Code.

In a bankruptcy case, a claim is most commonly asserted by the creditor's filing of a proof of

claim, Fed R. Bankr. P. 3002(a), but the Plaintiffs do not allege that Mrs. Drumm filed a proof of claim—

she did not—much less that Drumm put her up to filing one.  A debtor may in certain circumstances file

a proof of claim for a creditor when the creditor herself has not timely done so, Fed. R. Bankr. P. 3004,

but it is undisputed that Drumm did not file a proof of claim on behalf of Mrs. Drumm.  In a chapter 11

case, when a debtor schedules a liability to a creditor in a schedule of liabilities and does not indicate in

the schedule that the liability is contingent, unliquidated, or disputed, the scheduling of the debt serves

as the functional equivalent of the filing of a claim on behalf of the creditor.  See Fed. R. Bankr. P.

3003(b)(1) and (c)(2).  Drumm did schedule the alleged liability to Mrs. Drumm as undisputed,

liquidated, and noncontingent, but his bankruptcy case is not and has never been a case under chapter

11, and the same rule does not apply to a case under chapter 7.   Fed  R. Bankr. P. 3003(a) ("This rule

applies in chapter 9 and 11 cases.").  The mere scheduling of the liability in this case did not operate as

the filing of a proof of claim.  Drumm therefore has not asserted a claim against the estate.

In what other sense, if any, might Drumm's scheduling of the false obligation have amounted to

presentation or use of a claim?  The Plaintiffs do not say, but it is clear that the gravamen of these

counts is simply the knowing and fraudulent making of a representation to the effect that a particular

claim exists when in fact the claim does not exist, virtually the same conduct as justifies denial of

discharge under subsection (a)(4)(A).  I need not decide whether this conduct amounts to presentation

or use of a claim within the meaning of subsection (a)(4)(B).  In Counts 19 and 20, I have found that this

precise conduct is cause to deny Drumm a discharge under subsection (a)(4)(A).  It suffices to note that

Counts 36 through 40 state no more and no less cause for denial of discharge, except perhaps in that

they are separate iterations of the same misrepresentation.  I will therefore treat Counts 36 through 40

as redundant of Counts 19 and 20 and therefore moot.

c.      **Transfer, Removal, or Concealment of Property Within One Year Before the
        Petition Date, § 727(a)(2)(A):  Counts 41-45**

In Counts 41 through 45, the Plaintiffs object to Drumm's discharge under 11 U.S.C. §

727(a)(2)(A).  In each count they allege that Drumm, with intent to hinder, delay, or defraud a creditor,

transferred, removed, or concealed property he owned within one year before the Petition Date.

Section 727(a)(2)(A) bars a debtor's discharge if, "with intent to hinder, delay, or

defraud a creditor or an officer of the estate charged with custody of property under [the Code],"

the debtor "has transferred, removed, . . . or concealed, or has permitted to be transferred, removed, . .

. or concealed . . . property of the debtor, within one year before the date of the filing of the petition."

11 U.S.C. § 727(a)(2)(A).  A § 727(a)(2)(A) claim has four elements: (1) a transfer or concealment of

property (2) that belonged to the debtor (3) less than a year before the petition date (4) with actual

intent to hinder, delay, or defraud a creditor or the trustee.  *Marrama v. Citizens Bank of Mass. (In re Marrama) (Marrama II)*, 445 F.3d 518, 522 (1st Cir. 2006); *Groman v. Watman (In re Watman)*, 301 F.3d 3, 7 (1st Cir. 2002).  "Transfer" means "each mode . . . of disposing of or parting with . . . property or an interest in property."  11 U.S.C. § 101(54)(D).  Under this definition, "any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is no transfer of title." *Watman*, 301 F.3d at 10 (citation omitted).  "Concealment" can take various forms.  These include (i) the debtor's withholding of information about an asset in which he or she has an interest and that he or she is duty-bound to reveal and (ii) the debtor's ostensible transfer of title to an asset coupled with his or her secret retention of the benefits of ownership.  *R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes)*, 229 B.R. 253, 259 (B.A.P. 1st Cir. 1999) and cases cited.  Further, under the doctrine of "continuing concealment," § 727(a)(2)(A) can bar a debtor's discharge even if the original transfer or concealment occurred more than a year before the petition date "if it is established that the debtor continued to conceal that interest from creditors during the year prior to the petition filing."  *Investors Grp., Inc. v. Annunziata (In re Annunziata)*, 2008 WL 410643, at *5–6 (Bankr. D. Mass. Feb. 12, 2008) (citation omitted); see also *Hayes*, 229 B.R. at 259 (continuing concealment applies "when a debtor, prior to the year before bankruptcy, has transferred property but has secretly held something back, and has concealed that secret interest in the months immediately preceding bankruptcy").  "[A] relevant concealment can occur only if *property of the debtor* is concealed. . . .  the debtor must possess some property interest to be barred from discharge on the grounds of 'continuing concealment.'"  "This doctrine does not negate the 'act' requirement of § 727 but merely recognizes that a failure to reveal property previously concealed can, in some circumstances, properly be considered culpable conduct during the year before the bankruptcy warranting a denial of discharge."  *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3rd Cir. 1993).  The Bankruptcy Appellate Panel has cautioned:  "Section 727(a)(2)(A)

plaintiffs must prove that the requisite conduct, accompanied by the requisite intent, actually took place

within the year preceding the bankruptcy." *Hayes*, 229 B.R. at 260.

Because it is phrased disjunctively, the intent prong of § 727(a)(2) is satisfied by an intent to

hinder, or an intent to delay, or an intent to defraud. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1200

(9th Cir 2010); *Warchol v. Barry (In re Barry)*, 431 B.R. 533, 539-40 (Bankr. D. Mass. 2010), *aff'd in part,*

*rev'd in part on other grounds,* 451 B.R. 654 (B.A.P. 1st Cir. 2011).  Direct evidence of intent is not

required.  *Marrama II*, 445 F.3d at 522.  Instead, intent can be established by one or more badges of

fraud, including: (1) insider relationships; (2) the debtor's continued possession, benefit, or use of

transferred property; (3) a lack of consideration; (4) the debtor's financial condition; (5) a pattern or

series of transactions or course of conduct after the onset of debt, financial difficulties, or litigation

(actual or threatened); (6) the general chronology of events; and (7) an attempt to keep transactions a

secret.  *Id*.; see also *EFA Acceptance Corp. v. Cadarette (In re Cadarette)*, 601 F.2d 648, 651 (2d Cir. 1979)

("The retention of the use of transferred property very strongly indicates a fraudulent motive underlying

the transfer.").  The accumulation of several badges "indicates strongly that a debtor possessed the

requisite improper intent." *Annino, Draper & Moore, P.C. v. Lang (In re Lang)*, 246 B.R. 463, 469 (Bankr.

D. Mass. 2000), *aff'd*, 256 B.R. 539 (B.A.P. 1st Cir. 2000); accord *Watman*, 301 F.3d at 8.  Further, a

debtor's reckless disregard of his financial obligations, *Cox v. Villani (In re Villani)*, 478 B.R. 51, 61 (1st

Cir. BAP 2012), and failure to properly disclose a transfer, *id*. at 60, are both probative of fraudulent

intent.  In addition, where, as here, the debtor is financially sophisticated, it is less likely that a transfer

or concealment is innocent in nature. See *JP Morgan Chase Bank v. Koss (In re Koss)*, 403 B.R. 191, 213

(Bankr. D. Mass. 2009).  And in assessing intent, a court should consider the debtor's "'whole pattern of

conduct.'" *Lassonde v. Stanton (In re Stanton)*, 2010 WL 757804, at *14 (Bankr. D.N.H. Feb. 8, 2010)

(citation omitted); *Villani*, 478 B.R. at 60 (weighing all of the debtor's transfers and concealments

together to find intent).

### i.      Count 41:  Purchase of Wellesley Property through Nominee Trust

In Count 41, the Plaintiffs allege that Drumm, with intent to hinder, delay, or defraud a creditor, IBRC, and within one year before the Petition Date, "transferred, removed, or concealed property when he executed and permitted the Wellesley purchase through the Epiphany Nominee Trust."  This allegation is three in one:  "transferred, removed, or concealed."  As a preliminary matter, I note that the Plaintiffs have not briefed or otherwise addressed the issue of how Drumm's alleged conduct can have constituted a "removal" of property, and therefore I deem the allegation of removal to be waived.  I also find that Drumm did not participate in the purchase of the Wellesley Property as a transferor of the Wellesley Property; rather, he was a beneficiary of the nominee trust that, in the purchase, *received* the Wellesley Property.[25]  Therefore, the gravamen of this count is reduced to an allegation of concealment.

What property do the Plaintiffs contend was concealed?  And by precisely what features of the purchase transaction do the Plaintiffs contend that Drumm concealed this property?  The Plaintiffs' joint Itemized Statement does not itself answer these questions.  The Itemized Statement refers to the paragraphs in the Plaintiffs' respective complaints on which this count is founded, but neither do those paragraphs directly answer these questions.  At best, one can discern in the underlying complaints two sets of allegations on which this count may be founded.

The first is that Mrs. Drumm funded the purchase of the Wellesley Property with monies that "mostly had originated from Drumm's earnings and accounts or accounts and property interests held jointly by the Drumms," (IBRC Complaint, ¶43), and that were "derived from the fraudulent transfer of Drumm's earnings and property interests to Lorraine Drumm beginning in 2008" (IBRC Complaint, ¶58).

---

[25] Through the SPA, Drumm transferred most of his rights as trust beneficiary to Mrs. Drumm, but, as the Plaintiffs themselves maintain, this occurred only after the closing on the Wellesley Property, in a separate and later transaction. Also, as a beneficiary of the nominee trust, Drumm, as part of the purchase transaction, likely authorized and directed the Trustee of the Epiphany Nominee Trust to grant Boston Private a mortgage on the Wellesley Property; in that sense he might be deemed a transferor, but the Plaintiffs do not base this count on the grant of the mortgage.

However, nowhere in the cited paragraphs of its complaint does IBRC allege that Drumm secretly retained an interest in the funds that Mrs. Drumm used as purchase money for Wellesley.  Nor does the IBRC's demand for relief under § 727(a)(2)(A) for this conduct charge concealment or continuing concealment.  IBRC Complaint, ¶58.  I therefore do not construe this count as based on continuing concealment.  Drumm cannot have had fair notice that continuing concealment was the basis of this count.

The second set of allegations on which this count may be founded is as follows:  that in the purchase of the Wellesley Property, Drumm acquired an equity interest in the property, an interest having a value at the time of purchase of approximately $415,000, but Drumm hid this interest from creditors by acquiring the property through the device of a nominee trust.  In that way, the trust would and did appear as the owner of public record, and Drumm's interest in the trust, which was established by a schedule of beneficiaries that itself was not required to be filed in public land records, remained private.  This is the most natural reading of the Plaintiffs' allegations in this count, and Drumm clearly understood the Plaintiffs to be prosecuting a count of this nature.  I therefore so construe it.

Turning to the merits of the count as so construed, I conclude that Drumm did not use the device of the nominee trust to conceal his interest in the Wellesley Property from IBRC.  Within hours of his having received an interest in the Epiphany Nominee Trust, Drumm transferred virtually all its then-existing value away to Mrs. Drumm through the SPA.  The use of the nominee trust device to purchase and hold the property actually did conceal an interest of value for only a few hours.  Thereafter, it served only to conceal his *transfer* of his beneficial interest in the trust to Mrs. Drumm.  This was fraudulent, but not concealment *of property*.  This particular subsection requires concealment of "property of the debtor."  11 U.S.C. § 727(a)(2)(A).  Judgment shall enter for Drumm on this count.

### ii.      Count 42:  Transfer through Separate Property Agreement

In Count 42, the Plaintiffs allege that Drumm, with intent to hinder, delay, or defraud a creditor, especially IBRC, executed the SPA on January 6, 2010, and thereby transferred his fifty percent interest in the Epiphany Nominee Trust to Mrs. Drumm within one year before the Bankruptcy Petition.  I have found that on January 6, 2010 a date within one year before he filed his bankruptcy petition, Drumm executed the SPA and thereby transferred to Mrs. Drumm virtually all of his then existing beneficial interest in the Epiphany Nominee Trust:  the first $415,553 that would otherwise have inured to his benefit on account of his fifty percent interest in the trust.  Findings ¶¶ 33-39.  This was a transfer of all the then-existing value of his beneficial interest.  He retained only the right to share equally with Mrs. Drumm in any future appreciation.  I have further found that Drumm made this transfer with intent to place his interest in the Epiphany Nominee Trust beyond the reach of IBRC.  Findings ¶¶ 37, 39. Therefore, this transfer was made with intent to hinder, delay, and defraud a creditor.  On the basis of these findings, the Plaintiffs have in Count 42 established cause to deny Drumm a discharge under § 727(a)(2)(A).

### iii.      Count 43:  Transfer by Disclaimer through SPA of Interest in Purchase Money

In Count 43, the Plaintiffs allege that Drumm, with intent to hinder, delay, or defraud a creditor, especially IBRC, executed the SPA on January 6, 2010, thereby disclaimed his past or present interest in the funds used to make the down payment to buy the Wellesley Property, and, by this disclaimer, effected a transfer of his interest in those funds within one year before he filed his bankruptcy petition. In essence, the Plaintiffs are here alleging that, by virtue of a disclaimer of his earlier interest in funds he had transferred to Mrs. Drumm and that she had then used to purchase the Wellesley Property, Drumm effected a second transfer of the same funds to her.  This count fails because the disclaimer cannot have effected a transfer to Mrs. Drumm of monies that, by virtue of an earlier transfer from Drumm, he had already transferred to her.  To be sure, in the purchase of the Wellesley Property, she had given some of

that money back to Drumm in the form of his 50 percent beneficial interest in the Epiphany Nominee

Trust; however, aside from this beneficial interest—Drumm's transfer of which was addressed in Count

42—Drumm had received none of the purchase monies back in any form.  He had nothing to transfer

back except that which was the subject of Count 42.  This count therefore fails to state a claim on which

relief can be granted.

### iv.       Count 44:  Concealment through SPA and Nominee Trust of Interest in Wellesley

In Count 44, the Plaintiffs allege that with intent to hinder, delay, or defraud a creditor,

especially IBRC, and through the purchase of the Wellesley Property using the Epiphany Nominee Trust

and the Separate Property Agreement within one year of the Petition Date, Drumm intended to and did

continuously conceal significant transfers of cash, property, and property-related proceeds to Mrs.

Drumm.  This count, too, fails to state a claim on which relief can be granted.  Subsection 727(a)(2)(A)

permits denial of discharge for a debtor's concealment of "property of the debtor," but not for

concealment of transfers of property of the debtor.  Transfers by a debtor may conceal a continuing *de

facto* interest in the transferred property, but the concealment of a continuing interest in property is not

the stated basis of this count.  Relief must be denied on Count 44.

### v.       Count 45:  Concealment of Interest in Cash Transfers by Use of Fictitious Loan

In Count 45, the Plaintiffs allege that with intent to hinder, delay, or defraud a creditor,

especially IBRC, and within one year of the Petition Date, Drumm concealed his interest in non-ordinary

course of business cash transfers from himself to Mrs. Drumm by characterizing the transfers as loan

repayments on account of a fictitious loan from Mrs. Drumm.  For the same reasons as stated in Count

44, this count, too, fails to state a claim on which relief can be granted.  The concealment of a transfer is

not a basis for denial of discharge under § 727(a)(2)(A).

**d.**     **Transfer, Removal, or Concealment of Estate Property After the Petition Date, § 727(a)(2)(B):  Counts 46-52**

In each of Counts 46 through 52, the Plaintiffs object to Drumm's discharge under 11 U.S.C. §

727(a)(2)(B), alleging in each instance that, with intent to hinder, delay, or defraud a creditor or the

chapter 7 trustee, Drumm concealed property of the estate after the Petition Date.  Subsection

727(a)(2)(B) bars a debtor's discharge if the debtor, "with intent to hinder, delay, or defraud a creditor

or an officer of the estate charged with custody of property under [the Code], has transferred, removed,

destroyed, mutilated, or concealed . . . property of the estate, after the date of the filing of the

petition." 11 U.S.C. § 727(a)(2)(B).  The Plaintiffs' counts under this subsection all allege only

concealment, not transfer, removal, destruction, or mutilation.  To prevail on their § 727(a)(2)(B) claims,

the Plaintiffs must establish that Drumm, with intent to hinder, delay, or defraud a creditor or the

Trustee, concealed estate property after the Petition Date.  *Agin v. Sarafoglou (In re Sarafoglou)*, 2011

WL 2893109, at *7 (Bankr. D. Mass. 2011).  In determining whether the debtor acted with the specific

intent required by § 727(a)(2)(B), courts may look to circumstantial evidence, and they generally employ

certain well-established indicia of fraudulent intent.  See *Nickless v. Saykosy (In re Saykosy)*, 382 B.R.

173, 176 (Bankr. D. Mass. 2008).

**i.**     **Count 46:  Interest in Epiphany Nominee Trust**

In Count 46, the Plaintiffs allege that Drumm concealed property of the estate after the Petition

Date when he listed the current value of his 50% equity interest in the Epiphany Nominee Trust as $0.00

in Schedule B, item 19, and testified during the case that he held no property interest in the Epiphany

Nominee Trust as a result of the Separate Property Agreement.  I have found no concealment.  In fact,

on the petition date, and by virtue of the SPA, the value of Drumm's interest in the Epiphany Nominee

Trust *was* $0.00, as Drumm represented in his Original Schedules and believed at the time.  His valuation

of his interest did not hide any value.  Nor am I aware that Drumm testified in the case that he had *no*

interest in the Epiphany Nominee Trust.  In his Original Schedules, he indicated that his assets included

118

his 50 percent beneficial interest in that trust.   Accordingly, I find no concealment of the kind alleged in

Count 46 and will enter judgment for Drumm on this count.

### ii.      Counts 47-49:  Omitted Asset Transfers

In Counts 47, 48, and 49, the Plaintiffs allege that Drumm concealed property of the estate after

the Petition Date by omitting from his answers to item 10a in his Original SOFA and his Amended SOFA

the transfers of cash, real estate, automobiles, and interest in the Epiphany Nominee Trust that are the

subjects of Counts 1-18 and 28-30.   The Plaintiffs' theory in each of Counts 47 through 49 is that the

cash that Drumm had ostensibly transferred to Mrs. Drumm—as alleged in Counts 1-9 (bank account

transfers), 12 (proceeds of Skerries Rock Mortgage), 14 and 28 (proceeds of sale of 173 Cross Street),

and 16 and 18 (proceeds of sales of automobiles)—nonetheless remained his to use and dispose of as he

saw fit at the time of the bankruptcy filing and thereafter.  That is, he secretly retained control over and

a beneficial interest in the funds, and in the real property in which they mostly had been invested, but

he concealed that interest by omitting the cash holdings from his schedules of personal property and,

more to the point, omitting the cash and related non-cash transfers from item 10a in his Original and

Amended SOFA.   I have found that, notwithstanding his numerous transfers of cash to Mrs. Drumm, her

investment of much of it in the Wellesley Property (its purchase, renovation, and furnishing), and in the

servicing of the mortgage on it, and then his transfer to her of all the value of his beneficial interest in

the Epiphany Nominee Trust, Drumm did retain de facto ownership interests in the cash and in its

proceeds, the Wellesley Property, through the Epiphany Nominee Trust.  Findings ¶ 197.  I have further

found that Drumm concealed these continuing interests after the Petition Date by omitting from item

10a of the Original SOFA the transfers of cash, real estate, automobiles, and his interest in the Epiphany

Nominee Trust that are the subjects of Counts 1 through 18, and that Drumm omitted these transfers

with intent to hinder, delay, and defraud the Trustee and IBRC.   These omissions were acts of

concealment as to continuing interests in cash fraudulently transferred, the real estate purchased with

some of it, and Drumm's interest in the nominee trust that owns the real estate.  Accordingly, the

Plaintiffs have established cause for denial of discharge under § 727(a)(2)(B) for the concealments

alleged in each of Counts 47 (cash from bank accounts), 48 (real estate proceeds), and 49 (automobile

proceeds).

### iii.     Count 50:  Valuation of Furniture

In Count 50, the Plaintiffs allege that Drumm concealed property of the estate after the Petition

Date when he misrepresented the value of his household goods and furnishings by swearing to a total

value of $10,000 in his Original Schedule B, item 4, and by later revising that valuation to "unknown" in

his Amended Schedule B.  I have found that Drumm did value his household goods and furnishings at

$10,000 with knowledge that this was unreasonably low and with intent to mislead.  Findings ¶¶187-94.

On the basis of these findings, I determined in Count 22 that Drumm should be denied a discharge under

§ 727(a)(4)(A) for this false oath. Having so determined, it is unnecessary to determine whether the

same act is also one of concealment under § 727(a)(2)(B).  The question is only one of law:  whether an

unreasonably low valuation, intended to mislead and deflect a trustee's and creditors' attention from a

collection of unitemized assets, that obscures not the assets themselves but their extent and value, is an

act of concealment of the assets.  The answer is unclear, and it is unnecessary in this case to determine

it.

### iv.     Counts 51 and 52

In Counts 51 and 52, the Plaintiffs allege that Drumm concealed property of the estate after the

Petition Date when he "presented and used the fictitious Mrs. Drumm Loan claim and loan

repayments in his Original and Amended Schedule F and SOFA question 3c" (Count 51) and when he

"intentionally carved out of the Estate the Mrs. Drumm Loan monies and his Harborlight/Delta bank

accounts and related transactions by insisting on the validity of the Mrs. Drumm Loan claim and the

legitimacy of the alleged loan repayments within one year of the Petition Date" (Count 52).  It is not self-

evident how Drumm's alleged conduct—the scheduling of the fictitious Mrs. Drumm loan debt, the purported payments on it, the Harborlight bank account that it funded—served to conceal property of the estate.  This was not evident in the Trustee's or IBRC's complaint, in the Itemized Statement, or in the Joint Pretrial Memorandum; nor is it evident even now in the Plaintiffs' proposed findings and conclusions.

Perhaps the Plaintiffs are relying on a continuing concealment theory:  that despite Drumm's transfer of funds to Mrs. Drumm, her alleged loan back to Drumm of $250,000, and his investment of the funds in Harborlight, they always in fact remained his.  But this theory does not work because it is undisputed that the money used to capitalize Harborlight was entirely dissipated before the Petition Date.  To be sure, most of it had been expended for Drumm's personal and family obligations, but it undisputedly was all expended; no part of it continued to belong in any sense to Drumm, Mrs. Drumm, or Harborlight.  Therefore, even if those funds had never become Mrs. Drumm's or been transferred to Harborlight, Drumm can have had no continuing interest in them on the Petition Date, and they therefore cannot have become property of the bankruptcy estate.  The Plaintiffs bear the burden of proving that the assets concealed were "property of the estate."  11 U.S.C. § 727(a)(2)(B).  Where the assets in question had been transferred before the Petition Date, they did not remain Drumm's on the Petition Date and therefore did not become property of the estate through 11 U.S.C. § 541(a)(1) (the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case").  If they became assets of the estate by another means, the Plaintiffs have not explained how.  For this reason, and in any event for the sheer unintelligibility of these counts, judgment will enter for Drumm on Counts 51 and 52.

**CONCLUSION**

In each of Counts 1-20, 22, 24-26, 30, 34, 42, and 47-49, the Plaintiffs have established cause to

deny Drumm a discharge.  Though the remaining counts will be dismissed, the Plaintiffs need prevail on

only a single count, and therefore the Court will enter a judgment of denial of discharge.


Date:  January 6, 2015

_____
Frank J. Bailey
United States Bankruptcy Judge